No. 24-1095

In the United States Court of Appeals
for the Fourth Circuit

RODNEY D. PIERCE and MOSES MATTHEWS,
*Plaintiffs-Appellants*,
v.
NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of North Carolina

**BRIEF OF AMICI CURIAE
GOVERNOR ROY A. COOPER, III AND
ATTORNEY GENERAL JOSHUA H. STEIN
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

JOSHUA H. STEIN
Attorney General

Ryan Y. Park
Solicitor General

James W. Doggett
Lindsay Vance Smith
Deputy Solicitors General

South A. Moore
Deputy General Counsel

Mary Elizabeth D. Reed
Solicitor General Fellow

*Counsel for Amici Curiae*

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION ..............................................................................1

STATEMENT OF INTEREST ............................................................3

ARGUMENT .....................................................................................4

I.  The Voting Rights Act Is One of the Most Important and
    Effective Laws in American History. ................................................4

II.  The Voting Rights Act's Protections Are Needed in North
     Carolina, Especially in Its Northeastern Region. ...........................7

III.  Plaintiffs Have Demonstrated a Strong Likelihood of
      Success on Their Claim Under the Voting Rights Act. ...................9

IV.  The District Court Erred in Denying Plaintiffs' Motion. ..............15

     A.  Plaintiffs established legally significant racially
         polarized voting. ....................................................................16

     B.  The totality of the circumstances demonstrates that
         the political process is not equally open to Black voters in
         northeastern North Carolina. ...............................................19

     C.  *Purcell* is no barrier to relief here........................................22

CONCLUSION ...............................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
 599 U.S. 1 (2023)........................................................ *passim*

*Bartlett v. Strickland,*
 556 U.S. 1 (2009)................................................... 16, 17

*Cooper v. Harris,*
 581 U.S. 285 (2017) .................................................. 9

*Covington v. North Carolina,*
 316 F.R.D. 117 (M.D.N.C. 2016) ............................... 18

*Covington v. State,*
 No. 1:15-cv-399 (M.D.N.C. Sept. 19, 2017) ................ 26

*Democratic Nat'l Comm. v. Wisconsin State Legislature,*
 141 S. Ct. 28 (2020) ................................................. 22

*Harper v. Hall,*
 886 S.E.2d 393 (N.C. 2023) ...................................... 25

*Harris v. McCrory,*
 159 F. Supp. 3d 600 (M.D.N.C. 2016) ................... 18, 19

*Hines v. Mayor & Town Council of Ahoskie,*
 998 F.2d 1266 (4th Cir. 1993) ..................................... 8

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
 4 F.3d 1103 (3d Cir. 1993) ........................................ 17

*Johnson v. Halifax County,*
 594 F. Supp. 161 (E.D.N.C. 1984) .............................. 8

*Lassiter v. Northampton Cnty. Bd. of Elections*,
    360 U.S. 45 (1959) ................................................................8

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ...................................................22, 24

*N.C. State Conf. of the NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ......................................*passim*

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018) ...............................................................9

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...................................................................22

*Singleton v. Allen*,
    No. 2:21-cv-1291, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) ............17

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ....................................................*passim*

*Tice v. Dep't of Transp.*,
    312 S.E.2d 241 (N.C. Ct. App. 1984) ....................................3

**Constitutional Provision**

N.C. Const. art. III, § 1 ............................................................3

**Statutes**

52 U.S.C. § 10301 ....................................................................5

N.C. Gen. Stat. § 114-1.1 .........................................................3

N.C. Gen. Stat. § 163-110 ......................................................28

**Session Law**

Act of Oct. 25, 2023, S.L. No. 2023-146 ........................................... 10, 26

**Rule**

Fed. R. App. P. 29 ....................................................................... 1

**Other Authorities**

Colin Campbell (@RaleighReporter),
    X (formerly Twitter) (Oct. 23, 2023, 3:11 PM),
    https://tinyurl.com/2s3pa7mv .............................................. 17

N.C. General Assembly, 2022 Interim Congressional Map,
    (last accessed Feb. 5, 2024), http://tinyurl.com/2n3bmdcf ................. 23

*President Bush Signs Voting Rights Act Reauthorization and
    Amendments Act of 2006*,
    The White House (July 27, 2006),
    https://tinyurl.com/p5upu3au ..................................... 4, 5, 8

S. Rep. No. 97-417 (1982) ................................................. 5, 6

Thomas M. Boyd & Stephen J. Markman,
    *The 1982 Amendments to the Voting Rights Act: A Legislative History*,
    40 Wash. & Lee L. Rev. 1347 (1983) ..................................... 6

North Carolina Governor Roy A. Cooper, III and North Carolina Attorney General Joshua H. Stein respectfully submit this amicus brief in support of Plaintiffs-Appellants.[1]

## INTRODUCTION

Eight contiguous northeastern North Carolina counties are the State's only counties with majority-Black populations. Washington, Hertford, and Bertie counties lie just south of the Virginia border on the Albemarle Sound. They neighbor Northampton, Halifax, Edgecombe, Warren, and Vance counties, also near the Virginia border in the eastern Piedmont. Alongside these eight counties lies Martin County, where more than forty percent of the population is Black.

In its most recent districting plan, the General Assembly cracked these counties into three separate state senate districts, diluting Black voting power in the only majority-Black region of the State.

---

[1] Attorney General Stein has recused himself from representing the North Carolina State Board of Elections, its members, or any of the other defendants in this case. No counsel for any party authored this brief in whole or in part, and no entity or person made any monetary contribution toward its preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

This dilution of Black voting power represents a textbook violation of the Voting Rights Act—one of the most successful and important laws in our nation's history. Since its enactment in 1965, the Act has been essential to helping Black Americans secure a meaningful role in our nation's civic life, especially in the South after decades of discrimination under Jim Crow. But the Act's work is far from done. In North Carolina, and northeastern North Carolina in particular, its protections remain urgently needed. Black North Carolinians continue to be repeatedly targeted by discriminatory laws making it harder for them to vote and exercise their political rights. Fortunately, as the Supreme Court has recently reaffirmed, the Voting Rights Act provides robust protections against such abuses, including by protecting the right of Black voters to join together to elect candidates of their choice.

When the North Carolina General Assembly drew new state senate districts late last year, however, it failed to follow the law. It drew Plaintiffs Rodney D. Pierce and Moses Matthews into a serpentine district that winds from deep inland at the Virginia border to the distant Outer Banks on the Atlantic coast. By separating Plaintiffs from other Black voters who live nearby, the new senate districts will

prevent Black voters in northeastern North Carolina from electing candidates of their choice. This separation clearly violates Section 2 of the Voting Rights Act.

Given the clarity of the Voting Rights Act violation here and the profound harm that this violation will impose on Black voters, the Governor and the Attorney General respectfully request that this Court reverse the order below and remand this case for entry of a preliminary injunction.

## STATEMENT OF INTEREST

Amici are the Governor and Attorney General of North Carolina. The Governor is North Carolina's chief executive officer. N.C. Const. art. III, § 1. The Attorney General is, in turn, North Carolina's chief legal officer. *See Tice v. Dep't of Transp.*, 312 S.E.2d 241, 244 (N.C. Ct. App. 1984); N.C. Gen. Stat. § 114-1.1. Given these roles, the Governor and Attorney General have a strong interest in being heard to ensure that North Carolina complies with the federal laws that secure the voting rights of its citizens.

**ARGUMENT**

## I. The Voting Rights Act Is One of the Most Important and Effective Laws in American History.

The Voting Rights Act has been—and remains—one of the most significant and successful statutes that Congress has ever enacted. As President George W. Bush observed when he signed the law reauthorizing the Act in 2006, the Act's passage allowed Black Americans to appear "on the voting rolls" in the South for the first time "since Reconstruction." *President Bush Signs Voting Rights Act Reauthorization and Amendments Act of 2006*, The White House (July 27, 2006), https://tinyurl.com/p5upu3au. By doing so, the Act finally "broke the segregationist lock on the ballot box" that had prevented Black Americans from playing their deserved role in "the civic life of our nation." *Id.* Congress has declared the Act to be "the most successful civil rights statute" in the nation's history. S. Rep. No. 97-417, at 111 (1982).

Section 2 of the Act has been central to its success. It prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This test is satisfied

when "the totality of the circumstances" show that a state's "political processes . . . are not equally open to participation" by minority voters. *Id.* § 10301(b). Political processes are not "equally open" when minority voters "have less opportunity" than others "to elect representatives of their choice." *Id.*

The current text of Section 2 traces back to 1982. That year, President Ronald Reagan signed amendments to Section 2 into law after large bipartisan majorities in Congress enacted considerable revisions to its text. *See* Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History*, 40 Wash. & Lee L. Rev. 1347, 1424-25 (1983). Congress amended Section 2 to clarify that voting practices violate the statute when they have a discriminatory effect—even when they are not motivated by discriminatory intent. S. Rep. No. 97-417, at 2.

These amendments made clear that Section 2 prohibits districting plans that have the effect of diluting minority voting power. In 1986, the Supreme Court held in *Thornburg v. Gingles* that North Carolina's use of a districting plan that included multi-member districts violated Section 2 because it "caused black voters . . . to have less opportunity

than white voters to elect representatives of their choice."  478 U.S. 30, 80 (1986).  In so holding, the Court explained that unlawful vote dilution can be caused both by "the dispersal of blacks into districts in which they constitute an ineffective minority of voters" or by their concentration "into districts where they constitute an excessive majority."  *Id.* at 46 n.11.

These principles continue to apply today.  Just last year, in *Allen v. Milligan*, the Supreme Court reaffirmed that Section 2 prohibits districting plans that "operate[ ] to minimize" the ability of minority voters "to elect their preferred candidates."  599 U.S. 1, 17-18 (2023).  The Court held that Alabama violated Section 2 by enacting a congressional map with only one majority-Black district, where it was possible to create "two majority-black districts that comported with traditional districting criteria."  *Id.* at 20.

Thus, while the Voting Rights Act has played a vital role in helping our country move past the worst abuses of the Jim Crow era, the Act's work is far from done.  As President Bush observed when the Act was reauthorized in 2006, although our country has "made progress toward equality" since 1965, "the work for a more perfect union is never

ending." White House, *supra*. And as the Supreme Court recently confirmed, the political process still provides voters of some races in our country "less opportunity . . . to participate in the political process." *Milligan*, 599 U.S. at 22-23 (quoting 52 U.S.C. § 10301(b)).

## II. The Voting Rights Act's Protections Are Needed in North Carolina, Especially in Its Northeastern Region.

Section 2 remains urgently needed to secure equal voting rights in North Carolina. That is especially true in the State's northeastern region, which Plaintiffs call home.

It is no accident that *Gingles*, the leading case construing Section 2, arose in North Carolina and involved some of the same northeastern counties at issue here. North Carolina sadly has a long and shameful history of discrimination against its Black citizens.

After emancipation, Black North Carolinians continued to suffer from "historic discrimination in education, housing, employment, and health services." *Gingles*, 478 U.S. at 39. This social discrimination was paired with political discrimination. During Jim Crow, North Carolina "officially discriminated against its black citizens with respect to their exercise of the voting franchise," employing tools like "a poll tax" and "a literacy test" to prevent them from voting. *Id.* at 38; *see also*

*Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 45 (1959) (discussing application of literacy test to bar a Black resident of northeastern North Carolina from voting).

Although the Voting Rights Act ended some of North Carolina's most egregiously discriminatory voting practices, discrimination has continued. For example, between 1982 and 2006, private plaintiffs "brought fifty-five successful cases" challenging the State's voting practices under Section 2. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 224 (4th Cir. 2016). Many of those cases arose from northeastern North Carolina. *See, e.g.*, *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1269 (4th Cir. 1993) (finding that "a history of racially polarized voting" in Hertford County supported a remedial plan under Section 2); *Johnson v. Halifax County*, 594 F. Supp. 161, 162 (E.D.N.C. 1984) (granting preliminary injunction in Section 2 challenge to Halifax county's system for electing county commissioners).

Less than a decade ago, this Court struck down an "omnibus" election law enacted by the North Carolina General Assembly that restricted voting "in five different ways, all of which disproportionately affected African Americans." *McCrory*, 831 F.3d at 214. The law

violated the Equal Protection Clause because its provisions intentionally "target[ed] African Americans with almost surgical precision," seeking to make it harder for them to vote. *Id.*

Since this ruling, the list of discriminatory actions taken by the General Assembly against Black voters has only continued to grow. For example, in recent years, the Supreme Court has affirmed two judgments holding that the General Assembly racially gerrymandered North Carolina's congressional and legislative districts, diluting the voting power of Black voters by overconcentrating them in certain districts. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018) (per curiam); *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

In sum, North Carolina history is replete with examples of discrimination against Black North Carolinians, stretching back to the State's founding and continuing to the present. Against this backdrop, Section 2 of the Voting Rights Act remains critically necessary to secure equal rights for Black voters, especially in northeastern North Carolina.

## III. Plaintiffs Have Demonstrated a Strong Likelihood of Success on Their Claim Under the Voting Rights Act.

This case provides a clear example of why the Voting Rights Act's protections remain so important in North Carolina.

This past October, the North Carolina General Assembly enacted new congressional and legislative districts, including for the state senate. *See, e.g.*, Act of Oct. 25, 2023, S.L. No. 2023-146. As Plaintiffs have shown, the General Assembly diluted Black voting power in northeastern North Carolina by dividing Black voters across multiple state senate districts, such that these voters "constitute an ineffective minority" in those districts. *Gingles*, 478 U.S. at 46 n.11. This vote dilution plainly violates the Voting Rights Act.

In *Milligan*, the Supreme Court reaffirmed the longstanding *Gingles* test for determining where legislatures must create districts in which minority voters will be able "to elect their preferred candidates." 599 U.S. at 17-18. Under *Gingles*, legislatures must first assess (1) whether a minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district, (2) whether the minority group is politically cohesive, and (3) whether bloc voting by the majority group will work to defeat the minority group's preferred candidate. *Id.* at 18. If these criteria are satisfied, then a district where minority voters can elect their preferred candidate must

be drawn if the totality of the circumstances show that the political process is not equally open to those voters.  *Id.*

Here, as in *Milligan*, all the *Gingles* criteria are easily satisfied. As Plaintiffs have shown, the distribution of Black voters in northeastern North Carolina is sufficiently compact that a reasonably configured district can be easily drawn where they constitute a majority:



Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 10, ECF No. 17; Reply in Supp. of Pls.' Mot. for Prelim. Inj. at 2-5, ECF No. 42.

The remaining *Gingles* criteria are satisfied as well.  Black voters within this area are politically cohesive, in that they regularly support

the same candidates by margins of nine-to-one or greater.  ECF No. 17 at 11-12; ECF No. 42 at 5.  Likewise, white voters vote together in sufficient numbers in this area to defeat the preferred candidates of Black voters.  ECF No. 17 at 12-14; ECF No. 42 at 5-7.  In 2022, for instance, Black voters in northeastern North Carolina were similarly divided among multiple districts, and their preferred candidates lost.  ECF No. 17 at 4-5.  Finally, the shameful and continuous history of discrimination against Black voters in North Carolina results in the political process not being equally open to them.  ECF No. 17 at 14-20; ECF No. 42 at 7-9; *see also supra* at 7-9.  Less than a decade ago, after all, this Court held that the North Carolina General Assembly targeted Black North Carolinians "with almost surgical precision" by passing an omnibus elections bill that was intentionally designed to make it harder for them to vote.  *McCrory*, 831 F.3d at 214.

For these reasons, the Voting Rights Act requires that a district be drawn where Black voters can elect their preferred candidate.  As in *Milligan*, the question of whether such a district must be created here is not an especially "close one."  599 U.S. at 16.

But rather than following the law, the legislature went out of its way to dilute Black voting power in northeastern North Carolina. Consider senate district 2, where Plaintiffs reside. First Am. Compl. ¶¶ 11-12, ECF No. 13. This snake-shaped district begins deep inland along the Virginia border, then twists south and north and south again across the coastal plane, and finally arrives at distant Ocracoke Island on the Outer Banks, dozens of miles off-shore:



ECF No. 17 at 6. The district is so irregularly shaped that, as one North Carolina reporter has observed, travelling across its entire length appears to require a six-hour drive that, to be possible at all, must utilize two separate ferries whose ports are located beyond the district's boundaries:



**Colin Campbell**
@RaleighReporter                          ...

I tried to find a route in which the senator for proposed #ncga District 2 could drive from one end of the district to the other without leaving the district...and it appears to be impossible without a boat. This route is 6+ hr and requires two ferries outside district #ncpol

3:11 PM · Oct 23, 2023 · **49.6K** Views

*See* Colin Campbell (@RaleighReporter), X (formerly Twitter) (Oct. 23, 2023, 3:11 PM), https://tinyurl.com/2s3pa7mv.

Compliance with the Voting Rights Act would make such a misshapen district impossible. That Plaintiffs' proposed district is so much more compact than the one the General Assembly enacted only underscores that Plaintiffs are likely to succeed on the merits here.

## IV. The District Court Erred in Denying Plaintiffs' Motion.

Below, the district court did not dispute that Plaintiffs had made a sufficient showing on the first and second *Gingles* factors. On the first factor, the court assumed that Plaintiffs had established that Black voters in northeastern North Carolina constitute a "sufficiently large and geographically compact" population "to constitute a majority in a reasonably configured district." Order at 16, ECF No. 61 (quoting *Milligan*, 599 U.S. at 18). On the second factor, the court concluded that Plaintiffs likely established that northeastern North Carolina's Black voters are politically cohesive. *Id.* at 35-36.

Nevertheless, the court denied Plaintiffs' motion for a preliminary injunction for three reasons. First, it held that Plaintiffs had not satisfied the third *Gingles* factor because they had not established legally significant racially polarized voting in northeastern North Carolina. Second, it held that Plaintiffs failed to prove that, under the totality of the circumstances, the political process is not equally open to Black voters. Third, it held that the *Purcell* doctrine prevented the court from granting relief at this time. Each of these conclusions was erroneous.

## A. Plaintiffs established legally significant racially polarized voting.

The third *Gingles* factor requires a showing that a majority group will usually vote in a bloc to defeat candidates supported by a minority group. 478 U.S. at 69. As Plaintiffs have shown, this factor is satisfied here because there remains an extremely high degree of racially polarized voting in northeastern North Carolina. ECF No. 17 at 12-14. In holding to the contrary, the district court made several legal errors.

For example, the court misread *Bartlett v. Strickland* to bar Plaintiffs' claim because there is some limited white crossover voting for Black-supported candidates in northeastern North Carolina. *See* ECF No. 61 at 40-43 (citing 556 U.S. 1, 9, 23 (2009) (plurality op.)). But *Strickland* plainly did not hold that minimal crossover voting defeats a claim under Section 2. To the contrary, *Strickland* merely held that a plaintiff cannot satisfy *the first step* of *Gingles* by showing that a possible crossover district exists. 556 U.S. at 12, 23. That holding is not implicated here. As the district court itself assumed, Plaintiffs have established that it is possible to draw a compact district where Black voters make up a *majority* of the population. *See supra* at 15.

The Supreme Court recognized this distinction between the first and third *Gingles* factors in *Strickland* itself. Contrary to the district court's holding, *Strickland* explicitly made clear that so long as crossover voting is not "substantial," the third factor *can* be satisfied. 556 U.S. at 24. That is how other federal courts understand the third factor as well. The Third Circuit, for example, has explained that "*Gingles* does not require a showing that white voters vote as an unbending monolithic block against whoever happens to be the minority's preferred candidate." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993). Rather, "the *Gingles* standard presupposes the existence of crossover voting." *Id*. The same is true in *Milligan* itself, where the remedial district does not comprise a majority of Black voters, and thus *relies on* crossover voting to ensure that Black voters can elect their preferred candidate. *See Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 6567895, at *16 (N.D. Ala. Oct. 5, 2023) (adopting a remedial district with a Black voting-age population of 48.7%).

As another example of the district court's flawed analysis, the court read *Covington* and *Harris*—two recent cases where the Supreme

Court affirmed that the General Assembly engaged in racial gerrymandering to weaken Black voting power—to support its holding that Plaintiffs' Section 2 claim fails. ECF No. 61 at 10-11, 45. Specifically, the court misread those cases to stand for the proposition that there is an "absence of legally significant racially polarized voting in North Carolina." *Id.* at 10.

That is not at all what those cases say. Rather, the courts in those cases held that the State could not argue that compliance with the Voting Rights Act justified its gerrymandered districts, because the General Assembly had "never conducted an inquiry" into whether the Act actually required their creation. *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016); *see also Harris v. McCrory*, 159 F. Supp. 3d 600, 624 (M.D.N.C. 2016). They hardly stand for the proposition that there is no racially polarized voting anywhere in North Carolina sufficient to support the creation of a district under the Act.

As a final example of the district court's errors, the court treated the success of some Black-supported candidates in North Carolina as somehow dispositive here. The court's reliance on the victory of a Black-supported candidate in the 2022 election for congressional district

1 was particularly misleading. ECF No. 61 at 43-44. Unlike the rural districts at issue here, congressional district 1 includes several urban areas—such as Greenville and Wilson—where there is significant crossover voting. *See* N.C. General Assembly, 2022 Interim Congressional Map, (last accessed Feb. 5, 2024), http://tinyurl.com/2n3bmdcf; *cf*. Mem. in Supp. of Pls.' Mot. for Prelim. Inj., Ex. 2, ECF No. 17-2 (showing reduced racially polarized voting in northeastern North Carolina when the region is defined to include Pitt County). The same is not true in the rural counties at issue here. ECF No. 17 at 11-14.

### B. The totality of the circumstances demonstrates that the political process is not equally open to Black voters in northeastern North Carolina.

Plaintiffs have also shown "under the totality of the circumstances, that the political process is not equally open to minority voters." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45-46). Only in rare cases will a plaintiff meet each of the *Gingles* preconditions but fail at the totality of the circumstances stage. *See, e.g.*, *Harris*, 159 F. Supp. 3d at 623.

As the Supreme Court has recently emphasized, a totality of the circumstances analysis requires "'an intensely local appraisal' of the electoral mechanism at issue." *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79). But here, the district court failed to focus on northeastern North Carolina, considering only statewide evidence instead. For instance, when assessing the number of Black elected officials, the court noted that the minority leaders of the state house and senate—neither of whom hail from northeastern North Carolina—are Black. ECF No. 61 at 50. That point has little bearing on the "intensely local appraisal" required under Section 2.

Courts are also required to perform a "searching practical evaluation of the past." *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79). Here, however, the district court dismissed evidence of past racial discrimination as irrelevant. For example, it held that the extent of historical discrimination against Black voters in North Carolina should be afforded only "little weight." It reasoned that "just one case from the last 30 years" has "found the General Assembly acted with discriminatory intent when it enacted a voting law." ECF No. 61 at 47 (citing *McCrory*, 831 F.3d at 238). This indifference to past

discrimination was an error that this Court identified in *McCrory* itself. 831 F.3d at 223 (holding that the district court there clearly erred when its analysis of past racial discrimination stated only that there had been "little evidence of official discrimination [in North Carolina] since the 1980s").

The district court likewise ignored *Gingles*'s command that it consider the "present reality." 478 U.S. at 79. Specifically, the court refused to consider evidence that the General Assembly's actions have produced discriminatory results against Black voters. *See* ECF No. 61 at 47. This decision flouted *McCrory*, which held that "a historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." 831 F.3d at 223-24. Here, as in *McCrory*, "the record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans." *Id.* at 223; *see* ECF No. 17 at 15-17.

## C. *Purcell* is no barrier to relief here.

Finally, the district court also concluded that even if Plaintiffs were otherwise entitled to a preliminary injunction, such relief would be barred by the *Purcell* doctrine.  ECF No. 61 at 61-68.  This conclusion was again incorrect.

The Supreme Court has cautioned against enjoining "state election laws in the period close to an election."  *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).  As the Court has explained, "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others."  *Id.* at 881.  For example, in *Purcell*, the Supreme Court vacated an injunction entered just weeks before a November general election.  549 U.S. at 3; *see also Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 28 (2020) (Roberts, C.J., concurring) (noting that *Purcell* is appropriately invoked to stay injunctions entered "in the thick" of election season).

*Purcell* does not apply here.  To start, the requested revisions can be easily implemented in time for the upcoming primary election.

Plaintiffs have sought changes only to the boundary between two of the state's fifty senate districts. ECF No. 13; ECF No. 17 at 10, 22-23. This narrow remedy is both feasible and would cause minimal disruption to the state's elections calendar. Although the primary elections are scheduled for March 5, 2024, the State has reserved a second primary date on May 14, 2024, for runoff elections. ECF No. 42 at 9. If necessary, this reserved date may be used for the re-adjusted voting districts. In fact, the Board of Elections has explicitly "recommend[ed]" this approach, noting that the primary date has been moved "with some frequency" in North Carolina and would thus be "administratively feasible" here. Resp. in Opp'n Regarding Mot. for Prelim. Inj. by State Board of Elections at 4-6, ECF No. 40.

It is also far from clear whether primaries will be required in the first place. In the current districts, only one candidate has filed for any party, and thus there will be no primaries. Pls.' Notice of Withdrawal of Emergency Mot. for Limited Inj. Pending Appeal at 1-2, No. 23-2317, ECF No. 30-1 (4th Cir. 2023); *see* N.C. Gen. Stat. § 163-110. And if there are no primaries, it cannot possibly be a *Purcell* violation to adjust voting districts when the general election is over nine months away.

Moreover, even if the timing of a possible primary election would pose administrative difficulties, the *Purcell* doctrine would still not bar relief here. *Purcell* does not function as an "absolute" bar providing "that a district court may never enjoin a State's election laws in the period close to an election." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (emphasis omitted). Instead, it merely serves as "as a sensible refinement of ordinary stay principles for the election context." *Id.* Thus, it is appropriate to issue an injunction shortly before an election when: (1) the merits are "entirely clearcut in favor of the plaintiff"; (2) "the plaintiff would suffer irreparable harm absent the injunction"; (3) the requested changes are "feasible" prior to the election "without significant cost, confusion, or hardship"; and (4) the plaintiff has not "unduly delayed" in bringing his claims. *Id.*

These circumstances are present here. First, as discussed above, the merits of this case are "clearcut" in Plaintiffs' favor. *Supra* at 10-14. Second, Plaintiffs have demonstrated that they will suffer irreparable harm—a dilution of their right to vote—if the injunction is not issued. *See id.* Third, Plaintiffs' requested changes are limited, narrow, and "administratively feasible." *Supra* at 22-23. Fourth, Plaintiffs did not

unduly delay in bringing this lawsuit.  To the contrary, Plaintiffs sued

just a few weeks after the General Assembly enacted the re-drawn

maps on October 25, 2023.  Compl., ECF No. 1.  They also sought

expedited review of their preliminary injunction motion, which the

district court denied.  Pls.' Emergency Mot. To Expedite, ECF No. 5;

Order, ECF No. 23.  Instead, the district court did not rule until

January 26, 2024—more than two months after Plaintiffs moved for a

preliminary injunction.  Order, ECF No. 61.

The speed and diligence with which the Plaintiffs have acted only

underscores a broader point:  The compressed timelines here are

entirely the result of the General Assembly's decision to delay

redrawing districts until the last minute.  At the outset, it bears

emphasizing that the General Assembly chose to redraw its state

legislative districts voluntarily—the decennial census was complete

nearly three years ago, and the General Assembly was under no legal

obligation to draw new districts for the 2024 election cycle.  Indeed, it

had no legal *right* to do so until it sought and received permission from

the North Carolina Supreme Court to circumvent the state

constitution's bar on mid-decade redistricting.  *See Harper v. Hall*, 886

S.E.2d 393, 448 (N.C. 2023).  And even that order was issued in April 2023, nearly six months before the General Assembly acted on its newfound authority.  *See* Act of Oct. 25, 2023, S.L. No. 2023-146.

To apply *Purcell* in these circumstances, where the General Assembly waited for half a year to undertake voluntary—and unnecessary—redistricting, would allow state legislatures to insulate their redistricting decisions from timely judicial review.  Indeed, this is precisely what occurred last decade.  Through a similar "delay," the General Assembly ensured that a *majority* of North Carolina's state legislative elections last decade were held under invalid and unconstitutional districting maps.  *See, e.g.*, Mem. Op. at 1-2, *Covington v. State*, No. 1:15-cv-399 (M.D.N.C. Sept. 19, 2017).

Expeditious review and reversal of the order below is urgently needed to prevent North Carolina voters from again being forced to vote in illegal districts.  No elections should be held using a serpentine district that illegally deprives Black voters in northeastern North Carolina of the representation that they are guaranteed under the Voting Rights Act.  Black voters in northeastern North Carolina have

the right "to elect their preferred candidates" in this coming election. *Milligan,* 599 U.S. at 18.

## CONCLUSION

Governor Cooper and Attorney General Stein respectfully request that this Court reverse the decision below and remand this case for entry of a preliminary injunction.

Respectfully submitted,

JOSHUA H. STEIN
Attorney General

/s/ Ryan Y. Park
Ryan Y. Park
Solicitor General

James W. Doggett
Lindsay Vance Smith
Deputy Solicitors General

South A. Moore
Deputy General Counsel

Mary Elizabeth D. Reed
Solicitor General Fellow

*Counsel for Amici Curiae*

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

February 5, 2024

**CERTIFICATE OF SERVICE**

I certify that on this 5th day of February, 2024, I filed the

foregoing brief with the Clerk of Court using the CM/ECF system,

which will automatically serve electronic copies on all counsel of record.

/s/ Ryan Y. Park
Ryan Y. Park

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4797 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a 14-point, proportionally spaced typeface.

/s/ Ryan Y. Park
Ryan Y. Park