No. 24-1095

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RODNEY D. PIERCE and MOSES MATTHEWS,

*Plaintiffs-Appellants,*

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, JEFF CARMON III, in his official capacity as Secretary of the North Carolina State Board of Elections, STACY "FOUR" EGGERS IV, in his official capacity as a member of the North Carolina State Board of Elections, KEVIN N. LEWIS, in his official capacity as a member of the North Carolina State Board of Elections, SIOBHAN O'DUFFY MILLEN, in her official capacity as a member of the North Carolina State Board of Elections, PHILIP E. BERGER, in his official capacity as President Pro Tem of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

*Defendants-Appellees.*

On Appeal from the United States District Court for
the Eastern District of North Carolina
The Honorable James C. Dever III (No. 4:23-cv-193-D-RN)

## OPENING BRIEF FOR LEGISLATIVE DEFENDANTS-APPELLEES

Phillip J. Strach
Thomas A. Farr
Alyssa M. Riggins
Cassie A. Holt
Alexandra M. Bradley
NELSON MULLINS RILEY &
    SCARBOROUGH LLP
301 Hillsborough Street
Raleigh, North Carolina 27603
(919) 329-3800
phil.strach@nelsonmullins.com

Richard B. Raile
Katherine L. McKnight
Trevor M. Stanley
Benjamin D. Janacek
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

(additional counsel listed on inside cover)

Patrick T. Lewis
BAKER & HOSTETLER LLP
Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 861-7096
plewis@bakerlaw.com

Rachel Palmer Hooper
Tyler G. Doyle
BAKER & HOSTETLER LLP
811 Main Street
Houston, TX 77002
(713) 646-1329
rhooper@bakerlaw.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1095_          Caption: _Rodney D. Pierce, et al. v. N.C. State Board of Elections, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate_
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Richard B. Raile                          Date: _____February 5, 2024_____

Counsel for: Philip E. Berger

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1095__     Caption: _Rodney D. Pierce, et al. v. N.C. State Board of Elections, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives_
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Richard B. Raile _____     Date: _____February 5, 2024_____

Counsel for: Timothy K. Moore _____

Print to PDF for Filing

# TABLE OF CONTENTS

Preliminary Statement ................................................................... 1

Statement of Jurisdiction ............................................................. 2

Statement of the Issue ................................................................. 2

Statement of the Case ................................................................. 2

    A.    Legal Background .............................................................. 2

    B.    Factual Background ........................................................... 5

    C.    Procedural Background ..................................................... 10

Summary of the Argument ......................................................... 14

Standards of Review .................................................................. 16

Argument ................................................................................... 18

    I.    The District Court Correctly Held That Plaintiffs
        Are Unlikely to Succeed on the Merits ..................................... 18

        A.    Plaintiffs Are Unlikely to Establish a
             Cause of Action .............................................................. 18

        B.    Plaintiffs Are Unlikely to Establish § 2 Liability ............. 21

             1.    The Third Precondition ......................................... 21

                  a.    The Court Properly Discredited
                      Dr. Barreto's Report .................................. 22

                  b.    Plaintiffs' Evidence Lacks
                      Legal Significance ..................................... 27

             2.    The First Precondition ........................................... 31

                  a.    Demonstration District B-1 ........................ 32

                  b.    Demonstration District A ........................... 35

              3.    The Totality of the Circumstances ........................ 38

II.    The District Court Correctly Held That Equitable Factors Foreclose an Exceptional Mandatory Injunction ................................................................... 45

    A.    The *Purcell* Principle Bars an Injunction ........................ 45

    B.    Other Equitable Considerations Foreclose Relief ............ 49

Conclusion .................................................................................. 51

Addendum: Relevant Statutory Provisions:

    Voting Rights Act § 2, 52 U.S.C. § 10301 ................................... Add-1

    Voting Rights Act § 3, 52 U.S.C. § 10302 ................................... Add-2

    Voting Rights Act § 5, 52 U.S.C. § 10304 ................................... Add-5

    Voting Rights Act § 12, 52 U.S.C. § 1308 ................................... Add-8

    Voting Rights Act § 14, 52 U.S.C. § 10310 ................................ Add-11

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ........................................................ 2, 3, 21, 38

*Abrams v. Johnson,*
    521 U.S. 74 (1997) ...............................................................32, 36

*Alexander v. Sandoval,*
    532 U.S. 275 (2001).............................................................18, 19

*Allen v. Milligan,*
    599 U.S. 1 (2023) .............................................................. 31, 32, 36-40

*Andino v. Middleton,*
    141 S. Ct. 9 (2020).............................................................46, 48

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment,*
    86 F.4th 1204 (8th Cir. 2023)...........................................18-20

*Banerian v. Benson,*
    597 F. Supp. 3d 1163 (W.D. Mich. 2022) (three-judge court),
    *appeal dismissed*, 143 S. Ct. 400 (2022) .................................. 36

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) .....................................................6, 27-32, 34, 35, 48

*Bethune-Hill v. Virginia State Bd. of Elections,*
    326 F. Supp. 3d 128 (E.D. Va. 2018) .................................. 36

*Bone Shirt v. Hazeltine,*
    461 F.3d 1011 (8th Cir. 2006) ............................................ 23

*Cannon v. Univ. of Chicago,*
    441 U.S. 677 (1979)........................................................... 19

*Centro Tepeyac v. Montgomery Cnty.,*
    722 F.3d 184 (4th Cir. 2013) (en banc)............................... 16

*Chisom v. Roemer,*
    501 U.S. 380 (1991)........................................................... 19

*Clarno v. People Not Politicians Oregon*,
    141 S. Ct. 206 (2020) ................................................................46, 48

*Clay v. Bd. of Educ. of City of St. Louis*,
    90 F.3d 1357 (8th Cir. 1996) ............................................................ 26

*Common Cause v. Lewis*,
    18-cvs-014001, 2019 WL 4569584 (N.C. Super. Sep. 03, 2019).............. 7

*Cooper v. Harris*,
    581 U.S. 285 (2017).................................... 3-5, 23, 26, 28, 30, 31, 36, 50

*Covington v. North Carolina*,
    316 F.R.D. 117 (M.D.N.C. 2016) (three-judge court),
    *aff'd*, 581 U.S. 1015 (2017) .........................................................6, 27-30

*Covington v. North Carolina*,
    283 F. Supp. 3d 410 (M.D.N.C. 2018) (three-judge court),
    *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018).................................... 7

*Dickson v. Rucho*,
    766 S.E.2d 238 (N.C. 2014),
    *vacated on other grounds*, 575 U.S. 959 (2015)........................................... 4

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003)........................................................................ 2

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)...................................................................19, 20

*Growe v. Emison*,
    507 U.S. 25 (1993) ........................................................................ 26

*Harper v. Hall*,
    868 S.E.2d 499 (N.C. 2022) (*Harper I*).............................................. 8

*Harper v. Hall*,
    881 S.E.2d 156 (N.C. 2022) (*Harper II*)........................................... 8, 9

*Harper v. Hall*,
    886 S.E.2d 393 (N.C. 2023) (*Harper III*) .......................................... 9

*Hazardous Waste Treatment Council v. South Carolina*,
    945 F.2d 781 (4th Cir. 1991) ................................................................ 17

*Hendricks v. Cent. Rsrv. Life Ins. Co.*,
    39 F.3d 507 (4th Cir. 1994) ................................................................ 25

*Hill v. Coggins*,
    867 F.3d 499 (4th Cir. 2017) ................................................................ 38

*In re TMI Litigation*,
    193 F.3d 613 (3d Cir. 1999) ................................................................ 25

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ................................................................ 37, 40, 42

*Johnson v. Hamrick*,
    196 F.3d 1216 (11th Cir. 1999) ......................................................... 23

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ................................................................ 50

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ................................................................ 36

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
    986 F.2d 728 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993) ..... 21

*Levy v. Lexington Cty., S.C.*,
    589 F.3d 708 (4th Cir. 2009) ................................................... 18, 26, 38

*Little v. Reclaim Idaho*,
    140 S. Ct. 2616 (2020) ................................................................ 46

*Luna v. County of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018) ............................................. 41

*Madden v. United States Dep't of Veterans Affs.*,
    873 F.3d 971 (7th Cir. 2017) ................................................................ 25

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ............................................... 18, 21, 45, 47, 49

*Merrill v. People First of Alabama*,
    141 S. Ct. 190 (2020) ........................................................................ 46

*MicroStrategy Inc. v. Motorola, Inc.*,
    245 F.3d 335 (4th Cir. 2001) ........................................................... 17

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ............................................................................ 21

*Miller v. Johnson*,
    512 U.S. 1283 (1994) ....................................................................... 46

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016),
    *aff'd*, 894 F.3d 924 (8th Cir. 2018) .................................................. 25

*Murphy v. United States*,
    383 F. App'x 326 (4th Cir. 2010) ............................................... 22, 25

*N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*,
    65 F.3d 1002 (2d Cir. 1995). ........................................................... 43

*Negron v. City of Miami Beach, Fla.*,
    113 F.3d 1563 (11th Cir. 1997) ...................................................... 33

*North Carolina v. Covington*,
    581 U.S. 1015 (2017) ..................................................................... 6, 7

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ........................................................................... 7

*Perry v. Judd*,
    471 F. App'x 219 (4th Cir. 2012) .................................................... 49

*Pope v. Cnty. of Albany*,
    No. 1:11-cv-0736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) ....... 32, 33

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) (per curiam) ........................................... 18, 45, 48

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ............................................................. 16

*R.R. ex rel. R. v. Fairfax Cnty. Sch. Bd.*,
    338 F.3d 325 (4th Cir. 2003) ............................................................. 18, 38

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) ....................................................................... 46

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ......................................................................... 45, 46

*Rodriguez v. Bexar Cnty., Tex.*,
    385 F.3d 853 (5th Cir. 2004) .............................................................. 22

*Rollins v. Fort Bend Indep. Sch. Dist.*,
    89 F.3d 1205 (5th Cir. 1996) .............................................................. 26

*Rose v. Raffensperger*,
    No. 1:20-cv-2921, 2022 WL 670080 (N.D. Ga. Mar. 7, 2022) ........ 41, 42

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019) ....................................................................... 50

*Shaw v. Reno*,
    509 U.S. 630 (1993) (*Shaw I*) ............................................................... 5

*Shaw v. Hunt*,
    517 U.S. 899 (1996) (*Shaw II*) ......................................................... 5, 37

*Shelby Cty., Ala. v. Holder*,
    570 U.S. 529 (2013) ........................................................................... 39

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022) ................................................ 49

*Solomon v. Liberty Cnty. Comm'rs*,
    221 F.3d 1218 (11th Cir. 2000) ...................................................... 17, 41

*Stephenson v. Bartlett*,
    562 S.E.2d 377 (N.C. 2002) (*Stephenson I*) ................................ 4, 37, 38

*Stephenson v. Bartlett*,
    582 S.E.2d 247 (N.C. 2003) (*Stephenson II*) ........................................ 4

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994)................................................................ 17

*Teague v. Attala Cnty., Miss.*,
    17 F.3d 796 (5th Cir. 1994)................................................................ 22

*Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs*,
    60 F.3d 867 (1st Cir. 1995) ................................................................ 25

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) .................................................. 17, 21, 27, 29, 38-42

*United States v. Charleston Cty., S.C.*,
    365 F.3d 341 (4th Cir. 2004)..........................................................17, 43

*United States v. City of Euclid*,
    580 F. Supp. 2d 584 (N.D. Ohio 2008) ................................................ 41

*United States v. Hasson*,
    26 F.4th 610, 626 (4th Cir.), *cert. denied*, 143 S. Ct. 310 (2022) ............. 25

*United States v. Wooden*,
    693 F.3d 440 (4th Cir. 2012)............................................................... 25

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ................................................................ 43

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016)............................................................... 39

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)........................................................................... 27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................. 16, 45, 49

*Wise v. Circosta*,
    978 F.3d 93 (4th Cir. 2020) (en banc)................................................. 46

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) .......................................................23, 40

**Constitution and statutes**

28 U.S.C. § 1331 ................................................................. 2

28 U.S.C. § 1342(a) ........................................................... 2

28 U.S.C. § 1292(a)(1) ...................................................... 2

42 U.S.C. § 1983 ............................................................. 20

N.C. Const.:

    Art. II, § 3 .................................................................. 2, 4

    Art. II, § 5 .................................................................. 2, 4

Voting Rights Act of 1965, Pub. L. No. 89-110,
    79 Stat. 437 (52 U.S.C. 10301 et seq.):

    § 2, 52 U.S.C. § 10301 ...............................................3, 19

    § 3, 52 U.S.C. § 10302 ...............................................20, 21

    § 5, 52 U.S.C. § 10304 ................................................. 20

    § 12, 52 U.S.C. § 10308 ............................................... 20

    § 14, 52 U.S.C. § 10310 ............................................... 20

**Other authorities**

Brief for the United States as Amicus Curiae, *Evenwel v. Abbott*,
    No. 14-940, 2015 WL 5675829 (filed Sep. 2015) .................................. 33

N.C. State Board of Elections, Candidate Detail List 5 (Jan. 29, 2024),
    https://s3.amazonaws.com/dl.ncsbe.gov/Elections/2024/Candidate%2
    0Filing/2024_General_Election_Candidate_PDFs/2024_general_candid
    ate_detail_list_federal_and_state.pdf.................................................. 48

## PRELIMINARY STATEMENT

This appeal is taken from a district-court order declining to require North Carolina to violate the Constitution. In the past 30 years, every state and federal court to have adjudicated a redistricting case in this State has held that majority-minority districts are unnecessary and often impermissible. These districts can upend the county groupings required by the North Carolina Constitution and trigger strict scrutiny under the U.S. Constitution. Not one North Carolina district in decades has satisfied that standard. Dozens have failed. A legislative remedial plan ratified by a three-judge district court in 2018 contained no majority-Black senate districts. Many Black senate candidates prevailed under it. In considering the improbable assertion that Voting Rights Act (VRA) § 2 now demands a new majority-minority district in northeast North Carolina, the district court found practically every contested fact question against Plaintiffs (the two voters who brought this suit) and determined that multiple independent failings render their claim highly unlikely to succeed. Under the governing clear-error standard, that decision is unimpeachable.

And the Court need not reach the merits to affirm because the *Purcell* principle bars Plaintiffs' demand for a new senate plan for 2024. The March 5, 2024, primary election is underway: candidate filing closed on December 15, 2023, ballots have been issued, voters are right now casting ballots in absentee voting, and in-person voting begins February 15. The relief Plaintiffs demand would require the North Carolina State Board of Elections (the State Board) to implement new district lines across the State, cancel ballots already cast, create

and disseminate new ballots, educate voters about their new districts and candidates, and conduct a new set of primaries across North Carolina. The Supreme Court has routinely stayed (or summarily reversed) far more modest injunctions than what Plaintiffs demand here. Their appeal fails for that reason alone.

## STATEMENT OF JURISICTION

Jurisdiction in the district court was proper under 28 U.S.C. §§ 1331 and 1342(a). The district court denied Plaintiffs' preliminary-injunction motion on January 26, 2024, and Plaintiffs appealed the same day. JA964; JA965. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in denying an exceptional mandatory preliminary injunction when none of the many requisite factors were satisfied.

## STATEMENT OF THE CASE

### A.    Legal Background

After each decennial census, "States must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). In North Carolina, the State Constitution commits that task solely to the General Assembly. N.C. Const. art. II, §§ 3, 5. "Redistricting is never easy." *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018). The General Assembly is subject to "complex and delicately balanced requirements regarding the consideration of race" under federal law, as well as "special state-law districting rules." *Id.*

1.    "The Equal Protection Clause of the Fourteenth Amendment...prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation omitted). A state's predominant use of race triggers strict scrutiny, which is satisfied only with proof that the use of race was narrowly tailored to a compelling interest. *Id.* at 292.

At the same time, the VRA "pulls in the opposite direction: It often insists that districts be created precisely because of race." *Abbott*, 138 S. Ct. at 2314. VRA § 2 requires majority-minority districts upon proof that "members of a [protected] class…have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Plaintiffs alleging vote dilution under § 2 must prove "three threshold conditions": that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; that the group is "politically cohesive"; and that a white majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301-02 (citation omitted). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 138 S. Ct. at 2331.

A state that creates a majority-minority district for predominantly racial reasons invites strict constitutional scrutiny, which can only be satisfied with contemporaneous evidence proving the three *Gingles* preconditions. *Id.* at 2309-

10. If a state lacks evidence that each is met, the majority-minority district will be an unconstitutional racial gerrymander. *See Cooper*, 581 U.S. at 301-02.

2.    The North Carolina Constitution's whole-county provisions (the WCP) dictate that "[no] county shall be divided in the formation of a Senate district." N.C. Const. art. II, § 3; *see id.* art. II, § 5 (same for house districts). Although federal law partially preempts the WCP, the North Carolina Supreme Court harmonized these competing dictates by reading the WCP to forbid county lines from being transgressed only "for reasons unrelated to compliance with federal law." *Stephenson v. Bartlett*, 562 S.E.2d 377, 389 (N.C. 2002) (*Stephenson I*); *see* JA913-19.

Under this synthesis, the court directed that "legislative districts required by the VRA" be "formed prior to creation of non-VRA districts," that total-population deviations "be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements," and that county groupings be identified consistent within those confines to ensure county lines are followed to the maximum extent, except as federal law otherwise requires. *See Stephenson I*, 562 S.E.2d at 396-97. The formula of groupings and traversal rules is objectively ascertainable. *Id.*; *see also Stephenson v. Bartlett*, 582 S.E.2d 247, 248 (N.C. 2003) (*Stephenson II*); *Dickson v. Rucho*, 766 S.E.2d 238, 258 (N.C. 2014), *vacated on other grounds*, 575 U.S. 959 (N.C. 2015); JA916-18.

As relevant here, "[a]fter the 2020 U.S. Census, mathematicians," including Plaintiffs' expert, Blake Esselstyn, "produced" a formula compliant

4

with the WCP, including "two optimal county groupings for Senate districts in northeast North Carolina." JA923. That formula is not disputed in this case.

### B.   Factual Background

The General Assembly has for decades struggled to navigate these competing obligations.

1.    In the 1990 redistricting cycle, the Supreme Court first recognized the racial-gerrymandering claim in a challenge to North Carolina's congressional district (CD) 1 and CD12. *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*). It ultimately invalidated CD12 because the district did not satisfy the *Gingles* compactness requirement. *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (*Shaw II*).

Two decades later, the story was the same. In *Cooper*, the Supreme Court again encountered CD1 and CD12 and invalidated both. As relevant here, it concluded that race predominated in CD1 because the General Assembly "purposefully" made it a majority-minority district and moved a significant number of voters to that end. 581 U.S. at 300. CD1 failed strict scrutiny because the third *Gingles* precondition was not met: evidence before the General Assembly demonstrated that Black candidates of choice could prevail in a district below a 50% Black voting-age population (BVAP) majority, called a "crossover" district, which indicated there was no "effective white voting bloc." *Id.* at 304. CD1 occupied various counties at issue in this case, including Northampton, Hertford, Halifax, Warren, Bertie, Gates, Chowan, and Washington. *See id.* at 325; JA20-21; JA40; JA905.

2.    Legislative redistricting has proven equally difficult in North Carolina.

In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the General Assembly departed from WCP formula to create a legislative crossover district with "an African-American voting-age population of 39.36 percent." *Id.* at 7 (plurality opinion). Both the United States and North Carolina Supreme Courts found this departure unjustified by § 2, which does not require "crossover" districts, i.e., those "in which minority voters make up less than a majority of the voting-age population." *Id.* at 13; *see also id.* at 11, 14. Accordingly, state law, not § 2, governed, and the crossover district was illegal because it violated the WCP.

In response to that holding, the General Assembly adopted a policy of creating majority-minority districts. That also failed. Based on an expert's finding of divergent racial voting patterns, the General Assembly included 28 majority-minority districts in the 2011 legislative plans. *Covington v. North Carolina*, 316 F.R.D. 117, 132-33, 169 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017). The *Covington* court found racial predominance from the General Assembly's goal of drawing majority-minority districts "first, before any other 'non-VRA' districts," which overrode the WCP formula. *Id.* at 130-31, 138-39. The districts did not satisfy strict scrutiny because the expert analysis the General Assembly consulted "made [no] determination whether majority bloc voting existed at such a level that the candidate of choice of African-American voters would usually be defeated without a VRA remedy" (i.e., a

majority-minority district). *Id.* at 168. The Supreme Court summarily affirmed. *North Carolina v. Covington*, 581 U.S. 1015 (2017).

3.    "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). That is what the General Assembly did.

In the 2017 remedial redistricting after *Covington*, the General Assembly implemented a criterion of race-neutrality. *See Covington v. North Carolina*, 283 F. Supp. 3d 410, 418 (M.D.N.C. 2018). The *Covington* court found no fault in that choice. To be sure, the *Covington* court itself considered racial data, *see id.* at 421, and ultimately made some alterations to cure the prior racial intent, *id.* at 449; *see North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018) (affirming some changes, reversing others). The district court in *Covington*, however, did not find that § 2 required any majority-minority districts, and it affirmed most of the 2017 districts. 283 F. Supp. 3d at 458. "The remedial Senate districting plan after *Covington* included no majority-black Senate districts," but that did not prevent the election of Black senators.[1] JA906.

In 2018, different plaintiffs—represented by the legal team that brings this appeal—filed a state-court suit challenging the 2017 legislative plans under a novel doctrine purportedly prohibiting "partisan" gerrymandering. *Common Cause v. Lewis*, 18-cvs-014001 2019 WL 4569584, at *1-2, 38

---

[1] Moreover, "the 2003 Senate redistricting plan did not have any majority-black Senate districts, yet black Senators were regularly elected in North Carolina (including in northeast North Carolina)." JA905.

(N.C. Super. Sep. 03, 2019). In September 2019, a three-judge panel accepted the doctrine and invalidated the plans. *Id.* at \*135. During the remedial redistricting, the General Assembly again adopted a criterion of race neutrality, an approach the *Common Cause* plaintiffs advocated. *See id.* at \*131.

Before final judgment, the *Common Cause* plaintiffs presented a brief and expert study contending that legally significant white bloc voting did not exist anywhere a majority-Black district could be drawn, because "the average minimum BVAP necessary for African Americans to elect candidates of their choice" was below 50%. JA490; *see also* JA491-516. The state court endorsed this analysis. JA596-635. The expert's supporting data and tables addressed the counties at issue in this case and showed victories for Black candidates of choice in districts below 50% BVAP. JA637.

4.     In 2020, North Carolina's districts were again configured without racial data. This, again, posed no VRA problems.

Several groups of plaintiffs, including some represented by Plaintiffs' counsel, again pressed partisan-gerrymandering theories against the 2021 legislative and congressional plans. In February 2022, the North Carolina Supreme Court accepted the theory and enjoined the plans. *See Harper v. Hall*, 868 S.E.2d 499 (N.C. 2022) (*Harper I*).

Another remedial redistricting followed. In evaluating remedial plans, both the state trial court and North Carolina Supreme Court concluded that a polarized voting analysis of Dr. Jeffrey Lewis, who advised the General Assembly, demonstrated no § 2 vulnerability. *Harper v. Hall*, 881 S.E.2d 156, 180

(N.C. 2022) (*Harper II*). Specifically, Dr. Lewis concluded that "[i]n no district…does it appear that a majority Black VAP is needed for that district to regularly generate majority support for minority-preferred candidates." JA762. Although Dr. Lewis's analysis arguably demonstrated that crossover districts would improve minority opportunity, the North Carolina Supreme Court found that irrelevant because § 2 "do[es] not require the General Assembly to create functioning crossover districts." *Harper II*, 881 S.E.2d at 180.

The remedial senate plan again included no majority-Black districts. In the November 2022 elections, "North Carolina citizens elected nine black Senators out of 50 Senators, including a black Senator from Edgecombe and Pitt Counties" in northeastern North Carolina. JA906.

5.    The North Carolina Supreme Court subsequently overruled its prior partisan-gerrymandering decision and permitted the General Assembly to redistrict without encumbrance of that novel (and erroneous) doctrine. *Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023) (*Harper III*). That redistricting produced the senate plan challenged here (the Senate Plan).

The Senate Redistricting and Elections Committee "elected not to use race in drawing" the Senate Plan "to protect the state from lawsuits alleging illegal racial gerrymandering." JA904 (citation omitted). Accordingly, "the General Assembly did not have race in the computer when it created the" Senate Plan. JA902; *see also* JA645.

The Senate Plan was made public on October 18, 2023. JA839. Then, the Committee for the first time directed the General Assembly's central staff to load

racial data into the redistricting software. JA904. The Committee announced it would "consider any evidence that a member of this committee or a third party advocating altering plans for racial reasons brings forth that provides a strong basis in evidence that the *Gingles* preconditions are present in a particular area of the state." JA904 (citation omitted). The Committee received no such evidence. One organization asked that an alternative county grouping be selected for SD1 and SD2 (as two permissible groupings were available in northeast North Carolina), but that organization "did not request any majority-minority district." JA904 (citation omitted).

The General Assembly enacted the Senate Plan on October 25, 2023. JA12; JA44.

### C.    Procedural Background

1.    On November 20, 2023, 33 days after the Senate Plan was published and 26 days after it became law, Plaintiffs, who are two Black voters who reside in senate district (SD) 1 and SD2, filed this § 2 suit against the State Board, its members, and Legislative Defendants, contending that SD1 and SD2 violate § 2. JA7. On November 22, Plaintiffs filed an amended complaint, JA11-34, moved for a preliminary injunction, JA7, and demanded that the district court make oppositions due in one business day, the Monday after Thanksgiving, JA447. Calling that proposal "a game of ambush," the district court denied it as "meritless." JA448-449.

The parties collectively submitted more than 700 pages of evidence with their preliminary-injunction briefing. JA899. In briefing and correspondence,

Plaintiffs asked the court to rule on the papers by December 28, 2023, so that an injunction might practically apply to the March 5, 2024, senate primaries. *See* JA843; *see also* D.Ct.Doc.42 at 9. On December 29, the district court issued an order announcing it "will employ a judicious deliberative process, including holding a hearing on the plaintiffs' motion for a preliminary injunction." JA845. The court observed that Plaintiffs' right to relief "is not as clear as [they] suggest" and that "a hearing will permit the court to hear from the advocates and to have the advocates answer the court's questions" with "sufficient time to review the 835 pages of filings" submitted. JA843-846. The Court expedited the hearing, scheduling it for January 10, 2024. JA846.

Plaintiffs responded with an *appeal*, JA847, which this Court promptly dismissed, *see* JA850-851.

2.     Before the mandate issued, when the district court still lacked jurisdiction, it conducted the scheduled preliminary-injunction hearing. JA900. The court questioned counsel about a finding in the report of Plaintiffs' statistical expert, Dr. Barreto, which demonstrated that SD2 would have handily elected a Black-preferred candidate in the 2022 North Carolina senate elections. JA932-933. Plaintiffs' counsel "responded that this figure must have been a typo and asked to supplement Dr. Barreto's report." JA933.

The ensuing supplement admitted the finding was not a typo. JA933. Dr. Barreto attempted to discredit his own finding, and proposed new ways of conducting the analysis. JA853-854. None of this had been disclosed with his initial report. Dr. Barreto also had not "produc[ed] his complete data files to the

legislative defendants" and, given the highly expedited proceeding, was not deposed. JA934; *see also* JA675 ("despite a request for his data files and details of his analysis, Dr. Barreto declined to provide the actual data files he utilized").

3.    On January 26, the district court issued a 69-page opinion and order, with findings of fact and conclusions of law, denying Plaintiffs' motion. JA896-964. The court found multiple independent bars to relief.

The court discredited Dr. Barreto's report, finding that his "belated explanation undercuts all of [his] conclusions." JA934. Independently, the court found that racial bloc voting does not exist at levels that are legally significant under the third *Gingles* precondition. JA935. The court found substantial evidence that Black candidates of choice can prevail without majority-minority districts and that Dr. Barreto improperly examined "*statistically* significant," not "*legally* significant," polarization. JA935; *see* JA934-940.

The district court also was not persuaded by Plaintiffs' attempts to establish the first *Gingles* precondition. It found that one of Plaintiffs' proposals (Demonstration District B-1) is a crossover district, not a majority-minority district. JA926-930. It doubted the other proposal (Demonstration District A) satisfies the first precondition, given that it dismantles the whole-county formula "and necessitate[s] a new statewide Senate districting plan." JA923; *see* JA913-925. Because Plaintiffs presented no evidence that such a plan could be reasonably configured, the court found that Legislative Defendants' objections to Demonstration A "have force," but left the question unresolved. JA925.

In addition, the district court weighed the totality of circumstances in an "intensely local appraisal of the electoral mechanism at issue." JA941 (citation omitted). Of the nine so-called "Senate factors" that guide the inquiry, the court found that at least four (2, 3, 7, 9) affirmatively favor Legislative Defendants and that Plaintiffs failed to show the other factors (1, 4, 5, 6, 8) favored their case. JA942-953. None favored Plaintiffs. Separately, the court credited the analysis of Legislative Defendants' expert, Dr. Alford, showing that, "under the totality of circumstances, voting is politically polarized, not racially polarized." JA946; *see* JA947-949.

The district court also found that all equitable considerations forbid an injunction. JA953-964. It found that election-administration considerations foreclosed an injunction when the impacted election is "ongoing." JA898. The court also found that Plaintiffs forfeited their right to expedited provisional relief by "wait[ing] 26 days after the General Assembly enacted SB 758 to file suit and 28 days to seek a preliminary injunction concerning the 2024 elections." JA954. The court stressed the severe risks of an order imposing racial classifications on a tentative basis, especially given that the General Assembly did not have "a strong basis in evidence for concluding in October 2023 that Section 2 required a majority-black Senate district in northeast North Carolina." JA954. Under these and other considerations, the district court determined that "the balance of equities and public interest weigh against a federal court issuing the requested mandatory preliminary injunction." JA963.

## SUMMARY OF THE ARGUMENT

The district court's order rests on multiple firm grounds that merit the highest levels of deference on appeal. This Court should affirm.

I.     Plaintiffs are unlikely to succeed on the merits. There is no private right of action to enforce § 2, for reasons the Eighth Circuit recently recognized. That aside, Plaintiffs are unlikely to establish vote dilution where the district court found multiple failings in their claim. Its findings are reviewable only for clear error.

The third *Gingles* precondition requires proof of legally significant white bloc voting. The district court discredited the expert report Plaintiffs submitted to show this. That alone refutes this precondition, and the holding is above reproach. Besides, Plaintiffs' expert report did not evaluate whether racial voting patterns are so polarized as to necessitate the majority-minority district Plaintiffs demand. The report, at best, showed statistically, not legally, significant polarization.

Independently, the first precondition requires proof that the relevant minority can be a majority of a reasonably configured single-member district. The district court correctly found as fact that one of Plaintiffs' illustrative districts (Demonstration District B-1) is not a majority-minority district. It is a crossover district that breaches the WCP. Under *Bartlett*, it not only fails the first precondition; it is illegal. Plaintiffs' other proposal (Demonstration District A) was not shown to be reasonably configured because Plaintiffs did not demonstrate whether it can connect with other districts in a reasonably

14

configured plan or how it would impact minority opportunity in neighboring districts.

The ultimate question of vote dilution is one of fact and turns on a variety of circumstances and factors. The district court weighed them all and found Plaintiffs unlikely to succeed. This ultimate determination, together with the court's finding that politics, not race, explains the muted polarization, is not erroneous, let alone clearly erroneous.

II.    All equitable considerations independently foreclose an injunction, and the district court did not abuse its discretion in withholding one. It had no other choice.

The *Purcell* principle bars an injunction. Primary election day is March 5. Candidate filing has come and gone, ballots have been mailed, voters are right now casting absentee ballots, and in-person voting begins February 15. The Supreme Court has stayed injunctions issued *weeks* before elections; an injunction entered *during* an election is untenable. Plaintiffs' effort to cabin the harms to just two districts (SD1 and SD2) were weighed, tried, and found wanting below on the facts. Demonstration District A would require an entirely new senate plan and, hence, entirely new senate elections. *Purcell* forbids that. Demonstration District B-1 is not a majority-minority district and can neither be enforced nor countenanced.

There is more. The district court did not abuse its discretion in finding that Plaintiffs' unjustifiable delay in bringing this action disqualifies their demand for an injunction. The district court also properly concluded that the risks of an

injunction outweigh its benefits. Imposing a majority-minority quota on SD2 would inflict suspect racial classifications that contravene the public interest. The district court correctly recognized the equitable significance of Plaintiffs' failure to justify racial predominance to the General Assembly in October and wait until November to make their case for the first time in court. Ultimately, Plaintiffs fell well short of the heightened standard to justify a mandatory injunction. Their appeal is without merit.

## STANDARDS OF REVIEW

This Court "review[s] for abuse of discretion the district court's preliminary injunction decision." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Accordingly, the "decision will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently." *Id.* (quoting *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir.1989)). In this assessment, the Court "review[s] the district court's factual findings for clear error and review[s] its legal conclusions de novo." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly

and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted). Because "[t]he rationale behind a grant of a preliminary injunction has been explained as preserving the status quo," *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991) (citation omitted), "[m]andatory preliminary injunctive relief"—i.e., relief that "goes well beyond simply maintaining the status quo *pendente lite*"—"in any circumstance is disfavored." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citation omitted). A mandatory injunction can be justified only by "the most extraordinary circumstances." *Id.*

The likelihood-of-success inquiry in this case turns on the district court's application of VRA § 2. "[T]he clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986). "The clearly erroneous standard extends to an appellate court's review of a district court's finding that different pieces of evidence carry different probative values in the overall section 2 investigation." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000). Because "[c]laims of vote dilution require trial courts to immerse themselves in the facts of each case, and to engage in 'an intensely local appraisal of the design and impact of the contested electoral mechanisms,'" the appellate court's "function is not to reweigh the evidence presented to the district court." *United States v. Charleston Cty., S.C.*, 365 F.3d 341, 349 (4th Cir. 2004) (quoting *Gingles*, 478 U.S. at 79). To "preserve[] the benefit of the trial court's particular familiarity with the indigenous political reality," the Court determines

17

only whether "the district court's finding rested on substantial, credible evidence." *Id.* Moreover, the Court's "role in reviewing the district court's reliance on" or rejection of "expert testimony is limited." *Levy v. Lexington Cty., S.C.*, 589 F.3d 708, 719 (4th Cir. 2009).

The district court's weighing of equitable factors entailed "considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The *Purcell* principle establishes "(i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when…lower federal courts contravene that principle." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). In applying this principle, this Court must "give deference to the discretion of the District Court." *Purcell*, 549 U.S. at 5.

## ARGUMENT

## I. The District Court Correctly Held That Plaintiffs Are Unlikely to Succeed on the Merits

### A. Plaintiffs Are Unlikely to Establish a Cause of Action

As the Eighth Circuit recently held, § 2 is not privately enforceable. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). Although the district court did not reach this point, Legislative Defendants preserved it, JA463, and it supports affirmance, *see R.R. ex rel. R. v. Fairfax Cnty. Sch. Bd.*, 338 F.3d 325, 332 (4th Cir. 2003).

1. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is

to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* VRA § 2 provides neither.

First, it creates no private right. Its text focuses "on the person regulated rather than the individuals protected." *Id.* at 289. It provides that, under certain conditions, "[n]o voting qualification or prerequisite to voting or standard practice, or procedure shall be imposed *by any State or political subdivision*…." 52 U.S.C. § 10301(a) (emphasis added). No privately enforceable rights arise from text phrased "as a ban on discriminatory conduct" rather than "with an unmistakable focus on the benefited class." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690-91 (1979); *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). Plaintiffs assert "the violation of federal *law*," not "the violation of a federal *right*." *Gonzaga*, 536 U.S. at 282 (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). That the statute goes on to address "the right of any citizen of the United States to vote," 52 U.S.C. § 10301(a), does not alter the analysis because (1) the focus of the syntax remains the regulated parties (with voting rights mentioned in a prepositional phrase of a relative clause), and (2) § 2 does not establish the right to vote but rather guarantees equality with respect to voting rights created by other means, *see, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 400-01 (1991).

Second, there is no "private remedy." *Alexander*, 532 U.S. at 286. The text of § 2 does not address "*who* can enforce it," *Arkansas State Conf. NAACP*, 86 F.4th at 1210, and the VRA's enforcement provision, § 12, creates an express right of action for the U.S. Attorney General, not for private individuals,

19

52 U.S.C. § 10308(d). "The omission was no accident, given the remedial framework that § 12 provides," including criminal penalties. *Arkansas State Conf. NAACP*, 86 F.4th at 1210. There is no basis for a right of action in § 3, 52 U.S.C. § 10302, which addresses procedures under "statutes that already allow for private lawsuits" and creates no independent right of action, *id.* at 1211; *see Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008). Nor does § 14 create a right of action. *See* 52 U.S.C. § 10310. It provides for attorney fees as to VRA sections (like §5, 52 U.S.C. § 10304) where a right of action is otherwise recognized. *Arkansas State Conf. NAACP*, 86 F.4th at 1213 n.4. Understood as a whole, the statute creates no private right under § 2.

2.      Plaintiffs have no recourse to enforcement under 42 U.S.C. § 1983. *See Gonzaga*, 536 U.S. at 280. Under § 1983, "the initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case." *Id.* at 285. The absence of a private right under § 2 ends the inquiry.

Besides, any "presumption" of a § 1983 remedy is overcome by the "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 285 n.4 (citation omitted). As noted, VRA § 12 establishes a reticulated remedial system, including criminal sanctions of fines and imprisonment, conspiracy liability, civil-enforcement powers, and other processes. 52 U.S.C. § 10308. And VRA § 3 provides yet more mechanisms, which are available where a right of action otherwise exists, including for poll observers, suspension of tests and devices, and a remedial

preclearance system. 52 U.S.C. § 10302. The VRA's structure confirms that these mechanisms are exclusive. VRA § 2's expansive verbiage necessarily engenders "considerable disagreement and uncertainty," *Milligan*, 142 S. Ct. at 882 (Roberts, C.J, dissenting from grant of applications for stays), which reflects congressional intent to vest the Attorney General (not private parties) with discretion to influence § 2's contours and enforce them, *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

### B.    Plaintiffs Are Unlikely to Establish § 2 Liability

Assuming a right of enforcement, Plaintiffs are unlikely to establish § 2 liability. As explained (Background §A.1, *supra*), a § 2 plaintiff must prove threshold preconditions and vote dilution under the totality of circumstances. *Abbott*, 138 S. Ct. at 2331. The district court found multiple failings, and its "ultimate finding" was one "of fact" that is reviewed only for clear error. *Gingles*, 478 U.S. at 78. None is present here.

### 1.    The Third Precondition

The third precondition requires proof of an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). Plaintiffs typically attempt to show this with "statistical evidence of racially polarized voting." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 744 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). Plaintiffs relied solely on statistical evidence here. *See* JA932. The district court correctly found it flawed twice over.

### a. The Court Properly Discredited Dr. Barreto's Report

"The district court is not obliged to accept statistical evidence as conclusive on the question whether racially polarized voting exists." *Teague v. Attala Cnty., Miss.*, 17 F.3d 796, 798 (5th Cir. 1994). The district court did not accept it here. It found that Dr. Barreto's shifting opinions "undercut[] all of [his] conclusions." JA934. That decision "is deserving of the highest degree of appellate deference." *Murphy v. United States*, 383 F. App'x 326, 330 (4th Cir. 2010) (citation omitted).

Dr. Barreto presented what he claimed were "recompile[d] election results from 2022 and 2020 for the two different Plaintiffs' illustrative maps as compared to the 2023 enacted map." JA283. A recompiled election analysis is (or should be) "a relatively simple method that extracts actual election results from a variety of statewide and local races that subsume the area being analyzed and determines, precinct-by-precinct within the new district, the racial composition of the vote and the 'winner' within the new district." *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 861 (5th Cir. 2004). Dr. Barreto opined that, under "the newly enacted 2023 map, Black candidates of choice cannot win office in either Senate District 1 or 2." JA283. Dr. Barreto reported results of that analysis in Appendix B (Tables B1 and B2), JA291-293, but refused to

"produce his input data," JA947 & n.12. That made it impossible to examine the information Dr. Barreto implemented into his method.[2] JA675.

However, Dr. Barreto's own table showed that SD2 would have handily elected the *Black-preferred candidate* under the 2022 state senate data Dr. Barreto considered (but did not disclose). JA291. That result carried significance because most of Dr. Barreto's election data was from "exogenous" elections, i.e., those involving different offices than the office at issue, such as federal and judicial contests. JA281. The 2022 senate data was from "endogenous" elections (i.e., those involving the office at issue), which are "more probative than exogenous elections." *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020). The 2022 senate data was probative for the additional reason that Legislative Defendants' expert, Dr. Alford, criticized Dr. Barreto's limited data set, JA677, and the 2022 data suggested that a broader data set, including more endogenous elections, might change the analysis, *see* JA947 (crediting this criticism).

The district court's "deliberative," rather than hurried, approach proved sound. JA845. As it forecasted, the court had "questions" for "the advocates."

---

[2] In a different section, reported at Appendix A, Dr. Barreto evaluated "whether voters of different racial/ethnic backgrounds tend to prefer different or similar candidates in a wide range of electoral settings." JA278; *see* JA285-290. That analysis showed "(to no one's great surprise) that in North Carolina, as in most States, there are discernible, non-random relationships between race and voting." *Cooper*, 581 U.S. at 304 n.5. It proved nothing. *See id.*

23

JA845-846. Asked about the 2022 senate data, Plaintiffs' counsel "responded that this figure must have been a typo and asked to supplement Dr. Barreto's report." JA933. But the ensuing supplement conceded "this figure was not a typo." JA933. It was correct. However, rather than accept the output of his own analysis, Dr. Barreto for the first time challenged his own finding, disclosing after the hearing that it included "only the 2022 vote shares in Halifax, Warren, and Martin counties," not "any of the other counties within current Senate District 2." JA853. Dr. Barreto then noted that "uncontested elections are excluded" from his analysis and proposed that, "if we tally the total votes cast" in uncontested elections, "current Senate District 2 will not perform." JA853-54.

The district court had good cause to conclude that "Dr. Barreto's belated explanation undercuts all of Dr. Barreto's conclusions by demonstrating that fuller data sets could change his estimated outcomes." JA934. For one thing, it validated Dr. Alford's criticism of the limited data set "by demonstrating that fuller data sets could change his estimated outcomes." JA934; *see also* JA677; JA947. For another thing, this new information raised more questions than answers. Dr. Barreto did not explain (1) why he did not perform his newly proposed analysis originally, (2) why he did not disclose these deficiencies until questioned, and (3) how his explanation could—quite fortuitously for Plaintiffs—explain away only data unhelpful to Plaintiffs' case. It was particularly confusing that Dr. Barreto abruptly proposed including uncontested races, which "have little to no probative value." *Missouri State Conf. of the NAACP*

24

*v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 & n.18 (E.D. Mo. 2016) (collecting cases), *aff'd*, 894 F.3d 924 (8th Cir. 2018). And, because Dr. Barreto refused to disclose his data, it was a mystery what he was saying and impossible to vet it, which was yet another strike against his credibility. The court correctly faulted Dr. Barreto for "not explain[ing] the profound discrepancies between the methods of analysis he performed in his initial report and in his supplemental declaration" or "why the court should credit any of his estimate outcomes." JA934. After Legislative Defendants raised these concerns, JA889-895, Plaintiffs offered no further explanation.

The district court did not err. "Evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer." *Hendricks v. Cent. Rsrv. Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994). District courts have every prerogative (even a duty) to discredit expert opinion where it is "internally inconsistent," *United States v. Wooden*, 693 F.3d 440, 454 (4th Cir. 2012), where they "detect[] a sense of bias," *Madden v. United States Dep't of Veterans Affs.*, 873 F.3d 971, 973 (7th Cir. 2017); *see also Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs*, 60 F.3d 867, 878 n.5 (1st Cir. 1995), after questioning "reveal[s] 'serious questions' about [an expert's] methodology," *United States v. Hasson*, 26 F.4th 610, 626 (4th Cir.), *cert. denied*, 143 S. Ct. 310 (2022), when an expert's "methodology did change" in response to criticism, *In re TMI Litigation*, 193 F.3d 613, 687 (3d Cir. 1999), and where courts find one expert "to be more credible and reliable" than another, *Murphy*, 383 Fed. App'x at 330. For example, in *Clay v. Bd. of Educ. of*

*City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996)—a decision this Court has cited favorably, *see Levy*, 589 F.3d at 719—the Eighth Circuit affirmed a § 2 ruling discrediting a polarized-voting analysis that "failed to define" a key "term" and that "relie[d] on exogenous elections, which should be used only to supplement the analysis of the specific election at issue." 90 F.3d at 1362; *cf. Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1221 (5th Cir. 1996) ("we cannot say that the district court erred in limiting the probative value of the exogenous elections"). Dr. Barreto did more than leave key terms undefined and weigh exogenous elections too heavily: he challenged and changed his own analysis in self-serving and selective ways. The district court could have excluded the supplement and was within its discretion to discredit it. *See, e.g., Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 629, 631 (E.D.N.C. 2008) (finding supplement improper where expert "changed his conclusion"); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009) (rejecting supplement that "employs a host of new detailed analyses" not "developed in the original report").

With that, this appeal should end. Plaintiffs rested their third-precondition case solely on Appendix B and accompanying text in Dr. Barreto's report, and their claim fails if any precondition is not shown. *See Cooper*, 581 U.S. at 287-88; *Growe v. Emison*, 507 U.S. 25, 41-42 (1993). Their claim fails with Dr. Barreto's credibility.

### b.    Plaintiffs' Evidence Lacks Legal Significance

The district court correctly found Plaintiffs' showing deficient in all events because it "fail[s] to demonstrate *legally* significant racially polarized voting in northeast North Carolina in the counties at issue in this case." JA940. Plaintiffs demand a majority-minority district in northeast North Carolina that is neither necessary nor justified.

The Supreme Court recognized in *Gingles* that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters," 478 U.S. at 49 n.15, a point it has since reiterated, *see Voinovich v. Quilter*, 507 U.S. 146, 158 (1993). It has also since recognized the other side of that coin: "[i]n areas with substantial crossover voting"—*i.e.*, white voting for minority-preferred candidates—"it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition." *Bartlett*, 556 U.S. at 24 (plurality opinion). Accordingly, while "the general term 'racially polarized voting' is defined much more broadly and simply refers to when different racial groups 'vote in blocs for different candidates,'" the "third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting.'" *Covington*, 316 F.R.D. at 170 (citations omitted). "The key inquiry…is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 168 (emphasis added) (quotation and edit marks omitted). Because a remedial district is a majority-minority district, *Bartlett*, 556 U.S. at 19, polarization lacks

legal significance where a majority-minority district is unnecessary, *id*. at 18; *Covington*, 316 F.R.D at 168-69.

*Bartlett* made this clear. In holding that § 2 does not require "crossover" districts, the Court reasoned that the third precondition will not "be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." 556 U.S. at 16 (plurality opinion). Those voting patterns reflect the "substantial crossover voting," which is the opposite of an effective white voting bloc. *Id.* at 24. The Court considered the North Carolina house district before it (District 18) with a BVAP of 39.36%, *see id.* at 8, and noted that the very assertion that District 18 could perform disproved the third precondition, *id.* at 16. For that reason, the Supreme Court faulted the respondents before it for having "for some reason…conceded the third *Gingles* requirement in state court." *Id.* (Legislative Defendants did not make that mistake here. *See* JA469-472).

The Supreme Court subsequently turned that subtle prick into a hammer, affirming the invalidation of at least 29 majority-minority districts on this basis. One was CD1, a majority-Black North Carolina congressional district— occupying counties at issue here—that was drawn to achieve a 50% BVAP target and thus had to "survive the strict scrutiny applied to racial gerrymanders." *Cooper*, 581 U.S. at 301. It failed, given evidence that "a meaningful number of white voters joined a politically cohesive black community to elect that group's favored candidate." *Id.* at 303. Quoting *Bartlett*, the Court explained that evidence that equal Black opportunity would exist in "a 'crossover' district, in

which members of the majority help a large enough minority to elect its candidates of choice," defeated the third precondition, given that "[w]hen voters act in that way, 'it is difficult to see how the majority-bloc-voting requirement could be met.'" *Id.* at 303 (quoting 556 U.S. at 16). Evidence that a crossover district would perform disproved the third precondition.

The Supreme Court reiterated this point again with its summary affirmance in *Covington*. The *Covington* court took issue with the General Assembly's creation of majority-Black legislative districts based on the advice of experts who found "statistically significant racially polarized voting in 50 of the 51 counties studied." *Covington*, 316 F.R.D. at 169 (quotation marks omitted). The expert studies merely found "'racially polarized voting'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Id.* at 170. But they missed, the court wrote, the "crucial difference between *legally significant* and *statistically significant* racially polarized voting." *Id.* Whereas polarized voting can occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," *id.* at 170, "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,'" *id.* (quoting *Gingles*, 478 U.S. at 51, 55-56). Non-actionable polarized voting becomes legally significant only when "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Id.* at 168 (quotation and alteration marks omitted). Yet

again, evidence that crossover districts could perform defeated an assertion of an effective white voting bloc.

This case presents the same fact pattern as *Bartlett*, *Covington*, and *Cooper*, but the roles are reversed. Here, recognizing high white crossover voting, the General Assembly did not create a majority-minority district in northeast North Carolina that would certainly have been unconstitutional. Plaintiffs ask this Court to impose one all the same.

The district court correctly concluded that the same failing identified in *Bartlett*, *Covington*, and *Cooper* plagues Plaintiffs' claim. Dr. Barreto did not determine whether a majority-minority district is necessary in northeast North Carolina, JA937, which is the omission condemned in *Cooper* and *Covington*. *Cooper*, 581 U.S. at 302; *Covington*, 316 F.R.D. at 167-69. Dr. Barreto's report expressly finds "statistically significant racially polarized voting," but not legally significant polarization. JA273. That is exactly what does *not* work. *See Covington*, 316 F.R.D. at 170. Likewise, Dr. Barreto's assertions that a crossover district in the region would perform affirmatively disproved the third precondition, JA938, as the Supreme Court declared in *Bartlett*, *see* 556 U.S. at 16. And the district court found substantial evidence that Black-preferred candidates can prevail in northeast North Carolina in districts below 50% BVAP. JA939. That mirrors with the Supreme Court's finding that CD1 in the same territory with "a BVAP of around 48%" consistently elected Black candidates of choice "by some handy margins." *Cooper*, 581 U.S. at 294.

Accordingly, the district court correctly concluded that—even if Plaintiffs'
recompiled election analysis were credible—it falls short of the legal mark.

That is the only holding that could make sense, as 2019 state-court filings
by Plaintiffs' counsel recognized. JA490-516. As noted, the Supreme Court in
*Bartlett* held that it "must not interpret § 2 to require crossover districts." 556
U.S. at 23. Under Plaintiffs' view, legislatures *would* be required to create
crossover districts because *Cooper* holds that majority-minority districts are not
narrowly tailored where crossover districts will perform, 581 U.S. at 302, but
Plaintiffs propose that districts in such areas that do *not* perform must be
converted into performing districts. With majority-minority districts unavailable
(per *Cooper*) a legislature's only choice would be crossover districts. That, indeed,
is what Plaintiffs have proposed. *See* §I.B.2.a, *infra*. And it contradicts everything
the Supreme Court has said about the third precondition since (at least) 2009.
The district court, in sum, was right. This, too, should end the appeal.

## 2.    The First Precondition

The district court's order is independently supported under the first *Gingles*
precondition, which requires proof that the minority group is "sufficiently large
and geographically compact to constitute a majority in a reasonably configured
district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration marks omitted).
Under this precondition's numerosity component, the plaintiff most show that
the relevant group constitutes a "working majority of the voting-age
population." *Bartlett*, 556 U.S. at 13 (plurality opinion). Under the compactness
component, the plaintiff must present a "reasonably configured" alternative,

31

*Milligan*, 599 U.S. at 20, according to "traditional districting criteria," including maintaining "county lines," *id.* at 20; *Abrams v. Johnson*, 521 U.S. 74, 92 (1997). Plaintiffs made two attempts at these showings: Demonstration District B-1 and Demonstration District A. Both fell short.

### a.    Demonstration District B-1

The district court correctly found that Demonstration District B-1 fails the numerosity rule. Its BVAP is 48.4%. JA930. The element is unmet where "the minority group makes up less than 50 percent of the voting-age population in the potential election district." *Bartlett*, 556 U.S. at 12 (plurality opinion). It is not met here.

Plaintiffs defended Demonstration District B-1 under a different metric known as citizen voting-age population (CVAP). JA928. Plaintiffs' expert, Blake Esselstyn, proposed that Demonstration District B-1 has a Black CVAP of 50.19%, JA48, but the relevant metric is "voting-age population," not CVAP, *Bartlett*, 556 U.S. at 12 (plurality opinion). CVAP is less reliable than BVAP because CVAP derives from the Census Bureau's American Community Survey (ACS), which is based on samples, whereas voting-age population (VAP) is derived from the decennial census, which is an actual enumeration of the population. JA926-927.

Accordingly, courts have looked to CVAP only where it provides probative information not available from the decennial census. To be precise, "CVAP has been applied only where there is a significant noncitizen population." *Pope v. Cnty. of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *12

(N.D.N.Y. Jan. 28, 2014). The purpose of utilizing CVAP is for "refinement" of VAP figures to account for "a significant difference in the citizenship rates of the majority and minority populations," as often occurs in cases involving Hispanic populations. *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1568 (11th Cir. 1997). Because the ACS "is less reliable than Census data and not intended to be used in redistricting," *Pope*, 2014 WL 316703, at *13 n.22, and because it provides no relevant information unavailable through the census, it is the wrong metric here, *see* Brief for the United States as Amicus Curiae, *Evenwel v. Abbott*, No. 14-940, 2015 WL 5675829, at *22 (filed Sep. 2015).

Nevertheless, "employ[ing] a judicious deliberative process," JA845, the district court did not categorically disregard Plaintiffs' CVAP evidence. Instead, it considered itself to have "discretion to use either black CVAP or BVAP." JA928. Accordingly, the court examined the method Mr. Esselstyn used (relying on a website called the Redistricting Data Hub) to "disaggregate[] CVAP data to calculate black CVAP totals at the precinct level for the black CVAP statistics in his report." JA928. The court then found that the median margin of error at the relevant geographic level (the "block group level") is 57.6%, that the average margin of error is 85.5%, and that the maximum margin of error is 4,475%. JA928-929. Looking to the Redistricting Data Hub website, Mr. Esselstyn's report, and Plaintiffs' briefing, the court found no discussion of "these margins of error" or explanation of "how" Mr. Esselstyn "took the margins of error into account" in disaggregating the block group level data to precincts. JA929.

On that basis, the Court had compelling reasons to "decline[] to use black CVAP instead of BVAP." JA929. With a reported Black CVAP of just 50.19%, the true Black CVAP of Demonstration District B-1 could as easily fall below the majority-minority line under margins of error between 57% and 4,475%. Accounting "for a statistical margin of error" falls comfortably within the district court's "broad discretion in determining what information to credit in making its calculations." *United States v. Stewart*, 256 F.3d 231, 253 n.18 (4th Cir. 2001). The court was certainly justified in faulting a presentation that disregarded statistical uncertainty.

Because Demonstration District B-1 was not found to be a majority-minority district, but a crossover district, it is neither an acceptable remedy nor a *permissible* one. As explained, in *Bartlett*, the Supreme Court held that, because § 2 does not require crossover districts, the WCP cannot be breached to create one. 556 U.S. at 7-8, 24-25. Demonstration District B-1 violates the WCP in northeast North Carolina with an "arm…that extends into (and splits) Pasquotank County to take in Elizabeth City." JA661. In failing to minimize county-line traversals, Demonstration District B-1 breaches the WCP for the same reason District 18 did in *Bartlett*. See 556 U.S. at 8 ("[T]he General Assembly drew it by splitting portions of Pender and New Hanover counties."). State law forbids that, § 2 does not require it, and Demonstration District B-1 is illegal. The State could not use it if it wanted to.

b.    **Demonstration District A**

The district court also expressed skepticism of Plaintiffs' Demonstration District A. JA925. Although it crosses the numerosity mark, Plaintiffs did not prove that it is reasonably configured, and the district court found Legislative Defendants' objections "have force." JA925.

The district court validated the key factual premise of Legislative Defendants' concern. It found that implementing Demonstration District A would require reconfiguring the senate plan's county groupings "and necessitate a new statewide Senate districting plan." JA923. As described (Background §A.2, *supra*) The North Carolina Constitution requires adherence to county lines, and its rules are distilled into the county-grouping and traversal rules of the WCP. JA913-919; *see also Bartlett*, 556 U.S. at 7. After the 2020 census, mathematicians—including Plaintiffs' expert, Mr. Esselstyn—produced two valid county groupings for senate districts in northeast North Carolina, both "groupings keep Warren, Halifax, and Martin Counties together," and "[n]either optimal grouping includes Vance County." JA923. Demonstration District A, however, "groups Vance County with Warren, Halifax, and Martin Counties" and leaves Franklin and Nash Counties without sufficient population to support a single senate district. JA923. That dramatic change "would reset the county grouping algorithm," "leading to 'a cascade of changes that are difficult to sort out.'" JA923 (quoting JA658). That finding of fact is secure beyond meaningful contest.

Multiple conclusions flow from this.

First, Demonstration District A cannot be deemed "reasonably configured," *Milligan*, 599 U.S. at 20, without evidence of its impact on surrounding districts. "[A] districting plan is like a Rubik's Cube: every adjustment requires still more adjustments." *Banerian v. Benson*, 597 F. Supp. 3d 1163, 1169 (W.D. Mich. 2022) (three-judge court), *appeal dismissed*, 143 S. Ct. 400 (2022). The WCP amplifies that "ripple effect," *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 172 (E.D. Va. 2018), so that a proposed § 2 remedy "of necessity must affect almost every district," *Abrams*, 521 U.S. at 86. Without evidence that Demonstration District A can coherently be connected with other districts into a reasonably configured plan, it is a mystery what its imposition would mean, which is why successful § 2 challengers have presented entire plans, not isolated districts. *See, e.g.*, *Milligan*, 599 U.S. at 19-21; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 435 (2006). There is no value in a showing that an isolated majority-minority district is reasonably configured if it will turn the plan into "a monstrosity." *Milligan*, 599 U.S. at 28 (citation omitted).

Second, there is particular risk of collateral damage here, given that enacted SD1 and SD2 border SD5 (40.35% BVAP) and SD11 (36.65% BVAP). JA45. The district court found that SD5 enables Black voters to elect their candidates of choice and that SD11 may provide equal minority electoral opportunity as well. JA924-925. Although § 2 does not mandate crossover districts, states may create them "as a matter of legislative choice or discretion," *id.* at 23, and § 2 can "be *satisfied by* crossover districts," *Cooper*, 581 U.S. at 305.

Demonstration District A dismantles SD11 and may dismantle SD5, given the cascade effect. That race-based approach would *eliminate* minority opportunity that the Senate Plan currently provides *without* racial predominance. *See* JA896.

VRA § 2 does not countenance this one-step-forward-two-steps-backward approach. Supreme Court precedent rejects proposals that would do nothing but "trade[] off" the "rights of some minority voters…against the rights of other members of the same minority class." *Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994). Because "a § 2 violation is proved for a particular area," *Shaw II,* 517 U.S. at 917, eliminating minority opportunity in some districts (here, SD5 and SD11) to create minority opportunity in another (here, Demonstrative A) is improper, *see id.* at 917 (rejecting as "a misconception of the vote-dilution claim" the view that a majority-Black district may be drawn "anywhere").

Third, in dismantling the State's county groupings, Demonstration District A cannot be deemed reasonably configured under any calculus. VRA § 2 "never requires adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30. But Demonstration District A does such violence to the WCP as to require a new plan. Plaintiffs have argued that county boundaries are optional because *Stephenson I* and its progeny authorize departures from county lines for "legislative districts required by the VRA." *Stephenson I*, 562 S.E.2d at 396-97. But that is circular logic. *Stephenson I* assumed districts required by the VRA; it did not address circumstances where they would

(and would not) be required.[3] VRA § 2 does not require districts that violate a state's neutral criteria, *Milligan*, 599 U.S. at 20, and the WCP is North Carolina's preeminent neutral criterion, *see* JA913-914.

On these alternative grounds (which were all advanced below), this Court can and should affirm. *R.R. ex rel. R.*, 338 F.3d at 332. If the Court considers itself unable to do so—and Plaintiffs somehow overcome all other deficiencies in this appeal—it must remand so that the district court may determine whether Demonstration District A satisfies the first *Gingles* requirement. *See, e.g.*, *Hill v. Coggins*, 867 F.3d 499, 510 (4th Cir. 2017); *Levy*, 589 F.3d at 720.

### 3. The Totality of the Circumstances

The district court did not clearly err in finding that vote dilution is unlikely to be shown under "the totality of the circumstances." *Gingles*, 478 U.S. at 78; *see* JA940-953. This determination, too, compels affirmance.

1. Proof of the *Gingles* preconditions is necessary, but not sufficient, for a § 2 claim. A § 2 plaintiff must "prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 138 S. Ct. at 2331. The inquiry is "peculiarly dependent upon the facts of each case" and requires "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the present

---

[3] *Stephenson I* referenced federal dictates that do not have a "reasonable configuration" requirement, including the one-person, one-vote principle and the non-retrogression command of VRA § 5. *See Stephenson I*, 562 S.E.2d at 396-97.

and past reality." *Milligan*, 599 U.S. at 19 (citations omitted). The Supreme Court recently clarified that §2 claims "rarely" succeed because the statute's "exacting requirements…limit judicial intervention to those instances of intensive racial politics where the excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 29-30 (quotation and alteration marks omitted).

2.     The district court correctly found that this is not such a rare case. Looking to legislative history, case law has identified many factors that guide this holistic inquiry. *See* JA941; *Gingles*, 478 U.S. at 36-37. None favor Plaintiffs. JA941-56.

The first factor looks to the "extent…of official discrimination…that touched the right….to vote." *Gingles*, 478 U.S. at 36-37 (citation omitted). Plaintiffs pointed to "very old voting practices and cases" and "just one case from the last 30 years" involving discriminatory intent. JA942. It was not clearly erroneous for the court to "give[] little weight" to that "outdated evidence." JA942. Because "history did not end in 1965," the district court properly looked for "current data reflecting current needs." *See Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 552-53 (2013). "[T]he most relevant 'historical' evidence is relatively recent history, not long-past history." *Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016).

The second factor weighs "extent to which voting in the elections of the state…is racially polarized." *Gingles*, 478 U.S. at 37 (citation omitted). The district court rightly found this "factor weighs in favor of the legislative

defendants," given that Plaintiffs' evidence "demonstrates 'substantial crossover voting' in North Carolina." JA942. The court found that Black candidates routinely win without majority-minority districts, which indicates that white voters will vote for Black candidates of choice. JA905-06. That proves North Carolina does not experience an "excessive role of race in the electoral process," *Milligan*, 599 U.S. at 30 (quotation and alteration marks omitted), and that it would be improper to impose a majority-minority district. Majority-minority districts "rely on a quintessentially race- conscious calculus aptly described as the 'politics of second best,'" and the Supreme Court has discouraged them in "communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Johnson*, 512 U.S. at 1020 (citation omitted).

Plaintiffs fared no better on the third Senate factor, as there are no "other voting practices or procedures that may enhance the opportunity for discrimination against the minority group…." *Gingles*, 478 U.S. at 37 (citation omitted). Plaintiffs "fail[ed] to cite evidence" of such practices. JA943. Instead, they described *past* practices that no longer exist, but that approach "would render the third Senate factor superfluous in light of the first." JA943. It is not the rule courts have applied and misconstrues the inquiry into the present combined effect of the challenged system. JA943 (citing cases); *see also, e.g.*, *Wright*, 979 F.3d at 1296 (finding existing majority-vote requirement enhanced dilutive impact of challenged at-large system).

40

Plaintiffs conceded that the fourth factor, which examines candidate slating processes, "does not apply." JA943.

The fifth factor examines "the extent to which" minorities "bear the effects of discrimination in such areas as education, employment and health" in a manner that "hinder[s]" their electoral participation. *Gingles*, 478 U.S. at 37 (citation omitted). The court found that Plaintiffs' evidence of "socioeconomic disparities" failed to link disparities to racial discrimination. JA943. That finding of fact fits well within the court's space to "find[] that different pieces of evidence carry different probative values in the overall section 2 investigation." *Solomon*, 221 F.3d at 1227.

As to the sixth factor, the district court properly found no proof that North Carolina "campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37 (citation omitted). The court properly gave minimal weight to incidents occurring "decades ago," JA944 (citing *Luna v. County of Kern,* 291 F. Supp. 3d 1088, 1139 (E.D. Cal. 2018)), and to a 2022 advertisement that did not "mention race." JA944. That left only one arguable racial appeal, which could not "'characterize' North Carolina campaigns," when the State "has hosted hundreds of thousands of political campaigns since 1965." JA944. That is sound fact-finding. *See, e.g.*, *Rose v. Raffensperger,* No. 1:20-cv-2921, 2022 WL 670080, *3 (N.D. Ga. Mar. 7, 2022); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 610 (N.D. Ohio 2008).

The seventh factor considers "the extent to which members of the minority group have been elected to public office." *Gingles*, 478 U.S. at 37

(citation omitted). As the district court held, this inquiry "favors the legislative defendants." JA945. The question is whether "no members" or just "a few" of a minority group "have been elected to office over an extended period of time," S. Rep. No. 97-417, at 28 n.115, and Plaintiffs' own evidence showed that 21.6% of North Carolina representatives and 18% of senators are Black, JA429-430. North Carolina's lieutenant governor is Black, as are the legislative minority leaders, and "numerous black candidates have won election to statewide appellate judgeships." JA945. To find this factor in Plaintiffs' favor would have been clear error. And, for the same reasons, another factor, whether opportunity districts "are in substantial proportion to the minority's share of voting-age population," *Johnson*, 512 U.S. at 1017, also favors Legislative Defendants. Success of Black candidates of choice in 18% of senate races is substantially proportional to the State's roughly 20% BVAP. JA944-45.

Turning to the eighth factor, the district court properly found no evidence of "elected officials' responsiveness or unresponsiveness to black voters." JA945; *see Gingles*, 478 U.S. at 37. Plaintiffs sponsored "no evidence of elected officials' responsiveness or unresponsiveness to black voters," so this factor could "not support plaintiffs' argument." JA945-46. Plaintiffs asked the district court to look to *outcomes*, including "persistent and dramatic socioeconomic disparities," JA945 (quoting D.Ct.Doc.17 at 26), but the district court correctly rejected the "unjustified inference" from outcomes that may have no relationship to responsiveness at all, JA945-946 (citing *Rose*, 2022 WL 670080, at *3). Representative government does not guarantee outcomes—let alone

justify judicially compelled outcomes—and it is not magic empowering an elected body to cure all manner of social ills by mere force of will. *See N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1023 & n.24 (2d Cir. 1995).

On the ninth factor, the district court was bound to reject Plaintiffs' argument that the state's policy in favor of its redistricting plan was "tenuous." JA946. It found that the General Assembly enacted the redistricting legislation to "comply with federal law and the WCP and in light of traditional redistricting principles…." JA946 (citation omitted). Moreover, the court appropriately found it significant that the General Assembly had no "strong basis in evidence" to believe "that Section 2 required a majority-black Senate district in northeast North Carolina." JA955. Avoiding racial gerrymandering is not a tenuous policy.

3.    The district court also properly considered other factors, including the cause of divergent voting preferences. *See, e.g., Charleston Cty. S.C.*, 365 F.3d at 347-48 (recognizing that an "inclusive examination of the totality of the circumstances" is "tailor made" for considering why "voting patterns differ along racial lines"); *Uno v. City of Holyoke*, 72 F.3d 973, 985 (1st Cir. 1995) (holding that § 2 "does not require courts to ignore evidence that factors other than race are the real obstacles to the political success of a minority group"). The district court credited the conclusion of Legislative Defendants' expert, Dr. Alford, that voting in North Carolina is "politically polarized" but not "racially polarized." JA946-950. It was right to do so.

Dr. Alford showed that, while North Carolina experiences partisan divisions, "the race of the candidates does not appear to have a polarizing impact on vote choice." JA679. Partisan affiliation better predicts voter choice than race in all elections he studied. JA681-684. For example, Dr. Alford compared the 2020 U.S. Senate election (which had two white candidates) with the 2022 U.S. Senate election (which had one white and one Black candidate), and found higher white support for the Black Democratic candidate in 2022 than for the white Democratic candidate in 2020. JA947. *See* JA678-679. This pattern is evident, with one exception, across all five court of appeals races in 2020. JA679-681. Dr. Alford's estimates showed that Black Democrats prefer a white Democratic candidate over a Black Republican candidate. JA680-681. In fact, Black support for all Democratic candidates was nearly identical regardless of candidates' race. JA680-681. The district court properly credited these findings. And it did not clearly err in discounting Plaintiffs' response "that minority-preferred candidates need not themselves be members of the minority group." JA949. That is "[t]rue" but misses the point that, in distinguishing political and racial motive, the model must "account[] for a candidate's race." JA949. A reliable study requires test and control groups.

In sum, because the muted polarization is likely political, not racial, this factor—like all the others—cuts against a finding of vote dilution. The court's determination is eminently supportable and commands affirmance.

II.    **The District Court Correctly Held That Equitable Factors Foreclose an Exceptional Mandatory Injunction**

The order below stands independently on equitable grounds. A plaintiff seeking a preliminary injunction must prove "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The district court did not abuse its discretion in finding these standards unmet, on multiple bases.

A.    **The *Purcell* Principle Bars an Injunction**

The district court had no choice but to conclude that the *Purcell* principle forbids an injunction. JA956-961.

The *Purcell* principle "establish[es] (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when…lower federal courts contravene that principle." *Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurring) (citing *Purcell*, 549 U.S. at 1 (per curiam)). The district court accurately observed that *Purcell* "is not new" and was applied in the Supreme Court's landmark one-person, one-vote ruling, which began the modern era of decennial redistricting. JA956 (discussing *Reynolds v. Sims*, 377 U.S. 533 (1964)). Of more immediate import, *Purcell* governs district and appellate courts equally. In *Purcell*, a federal district court denied an injunction that the Ninth Circuit subsequently issued. 549 U.S. at 3-4. The Supreme Court summarily and unanimously vacated "[i]n view of the pending election." *Id.* at 5-6. As the district court put it, *Purcell* "is not just a yellow caution light"; it "is a heavy gate

with flashing red lights amplified by loud sirens." JA956-957. Other courts have ignored these warnings. Their injunctions were short lived. *See, e.g.*, *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020); *Merrill v. People First of Alabama*, 141 S. Ct. 190 (2020); *Clarno v. People Not Politicians Oregon*, 141 S. Ct. 206 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207-08 (2020); *Miller v. Johnson*, 512 U.S. 1283 (1994). This Court has heeded this warning before and should again here. *See Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020) (en banc).

*Purcell* applies because the "State's election machinery is already in progress." *Reynolds*, 377 U.S. at 585. The district court found as fact that, "on December 15, 2023, candidate filing ended"; that, "[o]n February 15, 2024, in-person early voting begins"; and that "absentee voting throughout North Carolina already has begun." JA958. It found as fact that, under a mandatory injunction, "county boards of elections would have to discard completed absentee ballot, including the ballots of the numerous North Carolina citizens in the United States military who are deployed overseas"; that the State Board "would have to conduct its geocoding process again to reassign voters to the proper districts"; that "[c]andidates would have to refile"; that the State Board "would have to regenerate and proof new ballots"; and that the State Board "would also have to redistribute those new ballots." JA958-959.

An injunction therefore cannot issue. In *Milligan*, the Supreme Court intervened to stay a three-judge panel's redistricting injunction, which was issued "seven weeks" before delivery of ballots for absentee voting in "the

primary elections." 142 S. Ct. at 879 (Kavanaugh, J., concurring). According to the two Justices whose votes were decisive, the *Purcell* principle alone compelled that result. *Id.* at 879-82. But that *Purcell* violation pales in comparison to the violation Plaintiffs demand here, where voting is "ongoing." JA959. If any case has ever presented "a prescription for chaos," *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring), this is it.

Plaintiffs have resisted these inescapable points with the erroneous assertion that an injunction would only impact SD1 and SD2. *See* JA960. As explained, the district court found that Demonstration A would require reconfiguring the senate plan's county groupings "and necessitate a new statewide Senate districting plan." JA923; *see also* JA960. The statewide impact of an injunction would risk the election-administration Chernobyl event that *Purcell* demands courts avoid. As the State Board has explained, it is impossible to conduct the scheduled March primary elections consistent with a federal injunction issued at this time. JA825-827. Only by stopping statewide voting as it happens, cancelling and reissuing ballots, and rescheduling all primaries in North Carolina at a later date could an injunction be implemented. JA958-959. *Purcell* forbids that in the starkest possible terms. This Court should, like the district court, "heed[] *Purcell*'s heavy gate, blaring sirens, and flashing red lights." JA962.

Plaintiffs point to Demonstration District B-1 as the solution to this problem. *See* JA958 n.13. But the district court held it is not a majority-minority district; it is a crossover district. *See* §I.B.2.a, *supra*. Accordingly, under *Bartlett*,

47

it is illegal because the WCP—which Demonstration District B-1 violates—trumps any supposed need or desire for a crossover district. *See* 556 U.S. at 7 ("Here the question is whether § 2 of the Voting Rights Act requires district lines to be drawn that otherwise would violate the Whole County Provision."). The district court cannot enforce Demonstration District B-1, the General Assembly cannot adopt it, and the State Board cannot implement it.

Besides, an injunction's disruption in SD1 and SD2 violates *Purcell* in all events. Candidates have qualified for contested general elections in both districts. *See* N.C. State Board of Elections, Candidate Detail List 5 (Jan. 29, 2024).[4] New district lines may render them ineligible and would require a new candidate qualification period and, potentially, primary elections.

In sum, there is nothing difficult about this case. Voting is happening; an injunction would so thoroughly interfere with voting as to cause "voter confusion and consequent incentive to remain away from the polls"; and an injunction cannot issue. *Purcell*, 549 U.S. at 4-5. This is the type of question the Supreme Court frequently resolves in just a few sentences. *See, e.g.*, *Andino*, 141 S. Ct. at 9–10; *Clarno*, 141 S. Ct. at 207. One word—"affirmed"—would suffice here.

---

[4]https://s3.amazonaws.com/dl.ncsbe.gov/Elections/2024/Candidate%20Filing/2024_General_Election_Candidate_PDFs/2024_general_candidate_detail_list_federal_and_state.pdf.

### B.    Other Equitable Considerations Foreclose Relief

The district court correctly found the *Purcell* principle is just *one* equitable bar to relief. *See Winter*, 555 U.S. at 20. It did not abuse its discretion.

First, applying the rule that "equity ministers to the vigilant, not to those who sleep upon their rights," *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012), the district court found it disqualifying that "Plaintiffs waited 26 days after the General Assembly enacted SB 758 to file suit and 28 days to seek a preliminary injunction." JA954; *see also* JA962. Plaintiffs have "failed to explain their slothfulness." JA842. While 28 days in some contexts may not be unreasonable, it is here in light of Plaintiffs' own "completely unreasonable" demands. JA954. Plaintiffs insisted that responses to their preliminary-injunction motion be filed in one business day, they appealed *before* the district court had time to rule on their motion, and they have obtained an expedition order in this Court making full-length merits briefs due 10 days after Plaintiffs noticed their appeal. Compared against these and other assertions about the need for speed, 28 days is a long time.[5] And, where Plaintiffs repeatedly assert that the § 2 violation is "egregious and clear-cut," *see* JA462, that delay cannot be justified (or else the alleged violation must not be clear). Plaintiffs slept on their supposed rights.

---

[5] In the most recent § 2 case resolved in the Supreme Court, suit was filed the day the challenged law was enacted. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 939 (N.D. Ala. 2022). And the predicates to a § 2 claim were presented to the legislature during the redistricting. *See* JA902. The Supreme Court *still* stayed the ensuing injunction. *Milligan*, 142 S. Ct. at 879.

49

Second, the district court correctly concluded that the balance of equities does not support an injunction. JA954-956. Plaintiffs' demand raises the "particular dangers" of racial classifications that would necessarily accompany a new majority-minority district. JA896 (citation omitted). Whereas the General Assembly "did not have race in the computer when it created" the challenged plan, JA902-903, a district dismantling the State's county groupings to hit a racial quota would require racial predominance, *see Cooper*, 581 U.S. at 292-93. That would, in turn, create an intolerable risk that voters in SD1, SD2, and even in surrounding districts, would vote in racially gerrymandered districts (e.g., if Plaintiffs' claim fails on the merits, as is likely). "[I]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). The right to be free from "a racial classification," *Rucho v. Common Cause*, 139 S. Ct. 2484, 2502 (2019), is as sacrosanct a right as there is.

Third, along similar lines, the district court rightly found it significant that the General Assembly did not have "a strong basis in evidence" at the time of redistricting "that Section 2 required a majority-Black Senate district in northeast North Carolina." JA955; *see also* JA900-906. This confirms where the public interest lies. A plan the Equal Protection Clause forbade the public's representatives from enacting contravenes the public interest. Moreover, the district court rightly saw an equitable problem with demanding that the General Assembly, immediately after redistricting, return to the drawing board to enact the race-based district it (rightly) believed it could not enact, when Plaintiffs had

every opportunity to make their case to the General Assembly and did not. *See* JA902 (noting that the Alabama plaintiffs first lobbied the legislature for a majority-minority district before suing). It is unfair to North Carolina's voting public to play games with their elected representatives as Plaintiffs have done.[6]

Finally, the district court correctly found that Plaintiffs did not satisfy the enhanced standard for a mandatory injunction. Plaintiffs did not allege or prove any "need to protect the status quo," and instead sought "to disrupt the status quo." JA909. The high standard governing that exceptional request is not satisfied.

## CONCLUSION

The Court should affirm the district court's order.

---

[6] The district court noted that one civil-rights group requested that the General Assembly select a different county-grouping configuration in northeast North Carolina, but "did not request any majority-minority districts" there. JA904 (citation omitted).

February 5, 2024                    Respectfully submitted,

                                   /s/   Richard B. Raile

Phillip J. Strach                  Richard B. Raile
Thomas A. Farr                     Katherine L. McKnight
Alyssa M. Riggins                  Trevor M. Stanley
Cassie A. Holt                     Benjamin D. Janacek
Alexandra M. Bradley               BAKER & HOSTETLER LLP
NELSON MULLINS RILEY &             1050 Connecticut Ave. N.W.,
    SCARBOROUGH LLP                Washington, DC 20036
301 Hillsborough Street            (202) 861-1711
Raleigh, North Carolina 27603      rraile@bakerlaw.com
(919) 329-3800
phil.strach@nelsonmullins.com

                                   Patrick T. Lewis
                                   BAKER & HOSTETLER LLP
                                   Key Tower
                                   127 Public Square
                                   Cleveland, Ohio 44114
                                   (216) 861-7096
                                   plewis@bakerlaw.com

                                   Rachel Palmer Hooper
                                   Tyler G. Doyle
                                   BAKER & HOSTETLER LLP
                                   811 Main Street
                                   Houston, TX 77002
                                   (713) 646-1329
                                   rhooper@bakerlaw.com

                                   *Counsel for Legislative Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(A)(7)(B) because it contains 12,830 words, excluding the parts of the brief exempted by FRAP 32(f).

2.      This brief complies with the typeface and type-style requirements of FRAP 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Calisto MT font.


February 5, 2024                      /s/    Richard B. Raile
                                      Richard B. Raile
                                      BAKER & HOSTETLER LLP
                                      1050 Connecticut Ave. N.W.
                                      Washington, DC 20036
                                      (202) 861-1711
                                      rraile@bakerlaw.com


                                      *Counsel for Legislative Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

February 5, 2024

/s/    Richard B. Raile
Richard B. Raile
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com

*Counsel for Legislative Defendants-Appellees*

## ADDENDUM: RELEVANT STATUTORY PROVISIONS

Voting Rights Act § 2, 52 U.S.C. § 10301

**Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

(a)   No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b)   A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Voting Rights Act § 3, 52 U.S.C. § 10302

**Proceeding to enforce the right to vote**

### (a)     Authorization by court for appointment of Federal observers

Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court shall authorize the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with section 1973d [1] of title 42 to serve for such period of time and for such political subdivisions as the court shall shall determine is appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of such observers is necessary to enforce such voting guarantees or (2) as part of any final judgment if the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in such State or subdivision: Provided, That the court need not authorize the appointment of observers if any incidents of denial or abridgement of the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

**(b)    Suspension of use of tests and devices which deny or abridge the right to vote**

If in a proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title, it shall suspend the use of tests and devices in such State or political subdivisions as the court shall determine is appropriate and for such period as it deems necessary.

**(c)    Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote**

If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such

qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

Voting Rights Act § 5, 52 U.S.C. § 10304

**Alteration of voting qualifications; procedure and appeal; purpose or effect of diminishing the ability of citizens to elect their preferred candidates**

(a)    Whenever a State or political subdivision with respect to which the prohibitions set forth in section 10303(a) of this title based upon determinations made under the first sentence of section 10303(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 10303(a) of this title based upon determinations made under the second sentence of section 10303(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 10303(a) of this title based upon determinations made under the third sentence of section 10303(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right

to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the

provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court.

(b)    Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.

(c)    The term "purpose" in subsections (a) and (b) of this section shall include any discriminatory purpose.

(d)    The purpose of subsection (b) of this section is to protect the ability of such citizens to elect their preferred candidates of choice.

Voting Rights Act § 12, 52 U.S.C. § 1308

**Civil and criminal sanctions**

### (a)    Depriving or attempting to deprive persons of secured rights

Whoever shall deprive or attempt to deprive any person of any right secured by section 10301, 10302, 10303, 10304, or 10306 of this title or shall violate section 10307(a) of this title, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

### (b)    Destroying, defacing, mutilating, or altering ballots or official voting records

Whoever, within a year following an election in a political subdivision in which an observer has been assigned (1) destroys, defaces, mutilates, or otherwise alters the marking of a paper ballot which has been cast in such election, or (2) alters any official record of voting in such election tabulated from a voting machine or otherwise, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

### (c)    Conspiring to violate or interfere with secured rights

Whoever conspires to violate the provisions of subsection (a) or (b) of this section, or interferes with any right secured by section 10301, 10302, 10303, 10304, 10306, or 10307(a) of this title shall be fined not more than $5,000, or imprisoned not more than five years, or both.

Add-8

**(d)    Civil action by Attorney General for preventive relief; injunctive and other relief**

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 10301, 10302, 10303, 10304, 10306, or 10307 of this title, section 1973e of title 42,[1] or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes.

**(e)    Proceeding by Attorney General to enforce the counting of ballots of registered and eligible persons who are prevented from voting**

Whenever in any political subdivision in which there are observers appointed pursuant to chapters 103 to 107 of this title any persons allege to such an observer within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under chapters 103 to 107 of this title or registration by an appropriate election official and (2) their eligibility to vote, they have not been permitted to vote in such election, the observer shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded. Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the

inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto. The district court shall hear and determine such matters immediately after the filing of such application. The remedy provided in this subsection shall not preclude any remedy available under State or Federal law.

**(f)    Jurisdiction of district courts; exhaustion of administrative or other remedies unnecessary**

The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of chapters 103 to 107 of this title shall have exhausted any administrative or other remedies that may be provided by law.

Voting Rights Act § 14, 52 U.S.C. § 10310

**Enforcement proceedings**

### (a)    Criminal contempt

All cases of criminal contempt arising under the provisions of chapters 103 to 107 of this title shall be governed by section 1995 of title 42.

### (b)    Jurisdiction of courts for declaratory judgment, restraining orders, or temporary or permanent injunction

No court other than the District Court for the District of Columbia shall have jurisdiction to issue any declaratory judgment pursuant to section 10303 or 10304 of this title or any restraining order or temporary or permanent injunction against the execution or enforcement of any provision of chapters 103 to 107 of this title or any action of any Federal officer or employee pursuant hereto.

### (c)    Definitions

(1)    The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

(2)    The term "political subdivision" shall mean any county or parish, except that where registration for voting is not conducted under the supervision

of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.

(3)    The term "language minorities" or "language minority group" means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage.

**(d)    Subpenas**

In any action for a declaratory judgment brought pursuant to section 10303 or 10304 of this title, subpenas for witnesses who are required to attend the District Court for the District of Columbia may be served in any judicial district of the United States: Provided, That no writ of subpena shall issue for witnesses without the District of Columbia at a greater distance than one hundred miles from the place of holding court without the permission of the District Court for the District of Columbia being first had upon proper application and cause shown.

**(e)    Attorney's fees**

In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.