No. 24-01095

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

RODNEY D. PIERCE and MOSES MATTHEWS,

*Plaintiffs-Appellants*,

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ALAN
HIRSCH, in his official capacity as Chair of the North Carolina State Board
of Elections, JEFF CARMON III in his official capacity as Secretary of the
North Carolina State Board of Elections, STACY "FOUR" EGGERS IV in
his official capacity as a member of the North Carolina State Board of
Elections, KEVIN N. LEWIS in his official capacity as a member of the
North Carolina State Board of Elections, SIOBHAN O'DUFFY MILLEN in
her official capacity as a member of the North Carolina State Board of
Elections, PHILIP E. BERGER in his official capacity as President Pro
Tem of the North Carolina Senate, and TIMOTHY K. MOORE in his official
capacity as Speaker of the North Carolina House of Representatives,

*Defendants-Appellees*.

---

From the United States District Court for
the Eastern District of North Carolina
The Honorable James E. Dever III (No. 4:23-cv-193-D-RN)

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

---

| | |
|---|---|
| Edwin M. Speas, Jr. | R. Stanton Jones |
| POYNER SPRUILL LLP | Elisabeth S. Theodore |
| P.O. Box 1801 | Samuel I. Ferenc |
| Raleigh, NC 27602-1801 | ARNOLD & PORTER |
| (919) 783-6400 |   KAYE SCHOLER LLP |
| espeas@poynerspruill.com | 601 Massachusetts Avenue, NW |
| | Washington, DC 20001-3743 |
| *Counsel for Plaintiffs-* | (202) 942-6000 |
| *Appellants* | stanton.jones@arnoldporter.com |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT .............................................. 3

ISSUES PRESENTED FOR REVIEW ......................................... 3

STATEMENT OF THE CASE ..................................................... 3

    A.   Northeastern North Carolina's Black Belt Counties ................... 3

    B.   The General Assembly's 2023 Enacted Senate Map ..................... 4

    C.   Procedural History ...................................................... 8

SUMMARY OF ARGUMENT ....................................................... 10

STANDARD OF REVIEW ........................................................... 12

ARGUMENT .............................................................................. 12

I.   Plaintiffs Are Likely to Succeed on the Merits ......................... 12

    A.   The First *Gingles* Precondition Is Satisfied ....................... 13

        1.   Demonstration District A Alone Satisfies *Gingles* One ..... 14

        2.   Demonstration District B-1 Also Satisfies *Gingles* One .... 18

    B.   The Second *Gingles* Precondition Is Satisfied ..................... 26

    C.   The Third *Gingles* Precondition Is Satisfied ....................... 26

        1.   Dr. Barreto's Racially Polarized Voting Analysis Satisfies *Gingles* Three ....................................................... 28

        2.   Dr. Barreto's Performance Analysis and the Legislature's Own Analysis Also Satisfy *Gingles* Three ..................... 31

        3.   The District Court's Remaining Conclusions Are Legally Erroneous .............................................................. 37

    D.   The Totality of the Circumstances Supports a VRA Violation .................................................................. 42

E.     The Legislature Cannot Avoid Section 2 Liability By
        Failing to Analyze *Gingles* ...............................................52

II.     The Remaining Factors Strongly Favor an Injunction ...........................54

A.     Plaintiffs Will Suffer Irreparable Harm Without Injunctive
        Relief .................................................................................54

B.     The Balance of Equities and Public Interest Favor
        Injunctive Relief ..............................................................55

C.     Plaintiffs Do Not Seek a Mandatory Injunction, But Satisfy
        the Requirements For One Anyway ...............................56

III.    *Purcell* Does Not Counsel Against a Preliminary Injunction ...............57

IV.     Remedial Procedures .......................................................................63

CONCLUSION ................................................................................64

CERTIFICATE OF COMPLIANCE .........................................................65

CERTIFICATE OF SERVICE .................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Milligan,*
599 U.S. 1 (2023)..............................................1, 13, 17, 26, 29, 42, 44, 48, 57, 60

*Barnett v. City of Chicago,*
141 F.3d 699 (7th Cir. 1998).................................................................21

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954)...............................................................................46

*Caster v. Merrill,*
2022 WL 264819 (N.D. Ala. Jan. 24, 2022)......................................39

*Cooper v. Harris,*
581 U.S. 285 (2017)..............................................................20, 39, 40, 52

*Covington v. North Carolina,*
316 F.R.D. 117 (M.D.N.C. 2016) ...............26, 27, 37, 38, 39, 40, 45, 46, 52, 61

*Disability Rights N.C. v. N.C. State Bd. of Elections,*
2022 WL 2678884 (E.D.N.C. July 11, 2022)......................................55

*District of Columbia v. Trump,*
959 F.3d 126 (4th Cir. 2020)...................................................................9

*Fabela v. City of Farmers Branch,*
2012 WL 3135545 (N.D. Tex. Aug. 2, 2012) ......................................25

*Hall v. Virginia,*
276 F. Supp. 2d 528 (E.D. Va. 2003) ...................................................22

*Harper v. Hall,*
867 S.E.2d 554 (N.C. 2022) .....................................................................5

*Harper v. Hall,*
868 S.E.2d 499 (N.C. 2022) ...................................................4, 5, 32, 54

iii

*Harper v. Hall,*
881 S.E.2d 156 (N.C. 2022) ...............................................................5

*Harris v. McCrory,*
159 F. Supp. 3d 600 (M.D.N.C. 2016) .........................33, 43, 44, 45, 46, 52, 59

*Hengle v. Treppa,*
19 F.4th 324 (4th Cir. 2021) ...........................................................20

*Holloway v. City of Virginia Beach,*
531 F. Supp. 3d 1015 (E.D. Va. 2021) ...............................................22

*Johnson v. De Grandy,*
512 U.S. 997 (1994)......................................................................13

*League of Women Voters of N.C. v. North Carolina,*
769 F.3d 224 (4th Cir. 2014).............................................12, 46, 54, 55, 56, 57

*Lewis v. Alamance County,*
99 F.3d 600 (4th Cir.1996)...........................................................50, 51

*LULAC v. Perry,*
548 U.S. 399 (2006)......................................................20, 22, 42

*Lussier v. Runyon,*
50 F.3d 1103 (1st Cir. 1995) ...........................................................25

*Manning v. Caldwell,*
930 F.3d 264 (4th Cir. 2019)...........................................................20

*Merrill v. Milligan,*
142 S. Ct. 879 (2022) ...................................................................59

*In re Microsoft Corp. Antitrust Litig.,*
333 F.3d 517 (4th Cir. 2003)...........................................................57

*Miranda v. Garland,*
34 F.4th 338 (4th Cir. 2022) ......................................................12, 55

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,*
201 F. Supp. 3d 1006 (E.D. Mo. 2016) ...............................................36

iv

*N.C. State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016)..............................................43, 44, 48

*N.C. State Conf. of the NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020)..............................................43

*Negron v. City of Miami Beach,*
    113 F.3d 1563 (11th Cir. 1997)..........................................21

*North Carolina v. Covington,*
    138 S. Ct. 2548 (2018)...................................................45, 46

*Pope v. Cnty. of Albany,*
    2014 WL 316703 (N.D.N.Y. Jan. 28, 2014)..............................21, 22

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006)....................................2, 57, 58, 59, 61, 62, 64

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    140 S. Ct. 1205 (2020) ...................................................58, 61

*Singleton v. Merrill,*
    582 F. Supp. 3d 924 (N.D. Ala. 2022)...................................47, 48

*Stephenson v. Bartlett,*
    562 S.E.2d 377 (2002) ..............................................15, 16, 60, 61

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)................... 1, 13, 26, 29, 30, 39, 42, 43, 44, 47, 50

*United States v. Charleston Cnty.,*
    316 F. Supp. 2d 268 (D.S.C. 2003)......................................45

*United States v. Charleston Cnty.,*
    365 F.3d 341 (4th Cir. 2004)..........................................29, 49, 50, 51

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008).......................................................12

**Statutes**

28 U.S.C. § 1292(a)(1) ......................................................3

28 U.S.C. § 1331................................................................................3

52 U.S.C. § 20302(a)(8) ...................................................................8

52 U.S.C. § 10301(b)......................................................................13

2023 N.C. Sess. Laws 146 ...............................................................6

Section 2 of the Voting Rights Act..... 1, 3, 8, 10, 12, 16, 20, 38, 39, 52, 53, 54, 60

**Other Authorities**

*11/03/2020 Official Local Election Results - Statewide*,
    https://er.ncsbe.gov/?election_dt=11/03/2020&county_id=0&o
    ffice= NCS&contest= ................................................................48, 57

*11/08/2022 Official General Election Results - Statewide: NC
    State Senate District 03*, https://bit.ly/47zPxBC .........................31

*11/08/2022 Official General Election Results - Statewide*,
    https://bit.ly/3OzzUmx ..............................................................5, 48

*2023-146 Senate*, https://bit.ly/47zTlCU...................................7, 8

ABA Comm. on Ethics & Pro. Resp., Formal Op. 478....................25

Booker T. Washington, *Up From Slavery: An Autobiography*
    (1st elec. ed. 1997),
    https://docsouth.unc.edu/fpn/washington/washing.html...........3, 4

Christopher Cooper et al., *NC General Assembly County
    Clusterings from the 2020 Census*, https://bit.ly/3vYynju ...........17

Letter from S. Coal. for Soc. Just. to Sen. Phil Berger et al. (Oct.
    22, 2023), https://southerncoalition.org/wp-
    content/uploads/2023/10/NCGA-VRA-Senate-Ltr-10.22.23-
    FINAL.pdf ....................................................................................6

*StatPack, SL 2023-146*,
    https://www.ncleg.gov/Files/GIS/Plans_Main/
    Senate_2023/SL%202023-146%20Senate%20-
    %20StatPack2023_S.pd..............................................................32

## INTRODUCTION

This case involves an egregious and clear-cut violation of Section 2 of the Voting Rights Act (VRA), and seeks a limited and straightforward remedy that would affect only two of North Carolina's 50 Senate districts. The new state Senate map enacted by the General Assembly on October 25, 2023, cracks Black voters in northeastern North Carolina's Black Belt counties between Districts 1 and 2, diluting their voting power. Under the enacted map, over 100,000 Black voters in the Black Belt counties will not be able to elect candidates of their choice because their votes will be drowned out by white majorities in both districts who vote against Black-preferred candidates.

Although the district court's opinion is long, its reasons for denying a preliminary injunction fall away on examination. The court assumed that the first *Gingles* precondition was satisfied and held that the second was. As for the third, it is undisputed that voting in this area is racially polarized in the extreme, and the court's conclusion that white bloc voting here is not "legally significant" rests on clear errors of law (and fact). The General Assembly's own statistics show that Black-preferred candidates will "usually" (in fact always) lose Districts 1 and 2—the test for "legal significance." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986); *Allen v. Milligan*, 599 U.S. 1, 18 (2023). The

court below denied relief only by inventing non-existent requirements for VRA liability that flout Supreme Court caselaw, including last year's decision in *Milligan*.

The 2022 Senate map likewise split Black voters in the Black Belt counties at issue between three districts, none of which elected a Black-preferred candidate. Yet in 2023, the General Assembly *reduced* the Black population in what is now District 2, eliminating any chance that Black-preferred candidates could win. It did so despite being presented with clear evidence that new Districts 1 and 2 violated the VRA.

There is still time to decide this appeal and afford relief for the 2024 elections. *Purcell* does not apply because there is *no election* currently ongoing in either of the challenged districts. If two new districts are ordered and multiple candidates per party file to run, the State Board has confirmed that it is "administratively feasible" to hold primaries on May 14, when North Carolina will hold runoff primaries anyway. That is over three months away. The General Assembly waited until the last moment to enact this textbook VRA violation in an effort to thwart judicial review. The Court should not reward them. It should grant a preliminary injunction for 2024.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The court denied a preliminary injunction on January 26, 2024, and plaintiffs timely appealed that day. JA896, JA965. This Court has jurisdiction to review the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

Whether Plaintiffs are entitled to a preliminary injunction barring use of Districts 1 and 2 in North Carolina's 2023 state Senate map because they dilute Black voting power in violation of § 2 of the Voting Rights Act.

## STATEMENT OF THE CASE

Appellants (Plaintiffs) are Black registered voters who reside in Halifax and Martin Counties in northeastern North Carolina. JA442-445. Appellees are the North Carolina State Board of Elections and its members (State Board Defendants) and North Carolina's legislative leaders (Legislative Defendants).

### A.    Northeastern North Carolina's Black Belt Counties

Northeastern North Carolina includes a number of counties that are part of the historic Black Belt—a region stretching across the South characterized by its "thick, dark, and naturally rich soil." Booker T. Washington, *Up From Slavery: An Autobiography* 108 (1st elec. ed. 1997),

https://docsouth.unc.edu/fpn/washington/washing.html.   Because the Black Belt's soil made it "the part of the South where the slaves were most profitable … they were taken there in the largest numbers," outnumbering white populations. *Id.*

Today, eight counties in northeastern North Carolina have a total population that is majority-Black. JA39. These eight counties are: Bertie, Hertford, Edgecombe, Northampton, Halifax, Vance, Warren, and Washington. JA39-40. Other nearby counties have substantial Black populations, including Martin, Gates, and Chowan Counties. JA72-73.

Statewide, North Carolina's population increased by more than 900,000 people between the 2010 and 2020 censuses, a total increase of roughly 9.5%. *See* JA39; JA274. The Black population grew at a substantially higher rate than the white population. JA39; JA274.

### B.    The General Assembly's 2023 Enacted Senate Map

In November 2021, following the 2020 census, the General Assembly enacted new congressional and state legislative maps. In 2022, the North Carolina Supreme Court enjoined those maps as unconstitutional. The state Supreme Court directed the General Assembly to submit new maps and remanded the case to the trial court to assess their constitutionality. *Harper*

4

*v. Hall* (*Harper I*), 868 S.E.2d 499, 551-52, 559-60 (N.C. 2022), *overruled on reh'g by Harper v. Hall* (*Harper III*), 886 S.E.2d 393 (N.C. 2023); *see Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022).

On February 23, 2022, the trial court approved the General Assembly's new Senate map. *See Harper v. Hall* (*Harper II*), 881 S.E.2d 156, 162 (N.C. 2022), *withdrawn and superseded on reh'g by Harper III*, 886 S.E.2d 393. The approved Senate map was used in the 2022 elections, *Harper III*, 886 S.E.2d at 407; Black-preferred candidates lost in Senate Districts 3 and 11, and a white-preferred candidate won unopposed in Senate District 1.[1]

On December 16, 2022, in *Harper II*, the North Carolina Supreme Court reversed the trial court's decision approving the remedial Senate map. 881 S.E.2d at 181. The state Supreme Court then granted rehearing of *Harper II*, and, on April 28, 2023, overruled *Harper I*, withdrew *Harper II*, and vacated the trial court's February 23, 2022 order approving the remedial maps. *Harper III*, 886 S.E.2d at 448-449. The court authorized the General Assembly to enact new state House and Senate maps. *Id.*

---

[1] *See 11/08/2022 Official General Election Results - Statewide*, https://bit.ly/3OzzUmx.

In October 2023—six months after *Harper III*—the General Assembly enacted new maps. SB 758, the Senate redistricting bill, was introduced on October 18, 2023 and passed on October 25, 2023. 2023 N.C. Sess. Laws 146. Because the Governor cannot veto redistricting legislation, the bill took effect upon passage.

During that one-week process, the General Assembly received an analysis and expert report from the Southern Coalition for Social Justice finding racially polarized voting in the Black Belt counties, stating that "all three *Gingles* preconditions are established in the area covered by Proposed Senate Districts 1 & 2," and explaining that those districts "unlawfully dilute the voting strength of Black voters in northeast North Carolina … in violation of the VRA."[2] The General Assembly had data on the racial composition of each proposed district. JA155-166. And the General Assembly knew that in 2022, two Black-preferred candidates in Senate districts containing Black Belt counties had been defeated by white candidates: Mark Speed in Senate District 11 (36.65% BVAP) and Valerie Jordan in Senate District 3 (42.33% BVAP). *See supra* n.1; JA44 tbl.2.

---

[2] *See* JA19; JA280 & n.17; Letter from S. Coal. for Soc. Just. to Sen. Phil Berger et al. 2-3 (Oct. 22, 2023), https://southerncoalition.org/wp-content/uploads/2023/10/NCGA-VRA-Senate-Ltr-10.22.23-FINAL.pdf

Nonetheless, the General Assembly enacted a Senate map that cracks Black voters in the Black Belt counties across multiple districts. JA276, JA283. Specifically, in the 2023 enacted map, Senate District 1 includes Northampton, Bertie, Hertford, and Gates Counties, while Senate District 2 includes Warren, Halifax, Martin, Washington, and Chowan Counties. *See S.L. 2023-146 Senate*, https://bit.ly/47zTlCU. Both districts have a BVAP of 30% or less, JA45, and Black voters cannot elect preferred candidates in either district, JA283. This cracking is vividly illustrated by the figure below, which superimposes the district boundaries on a heat map showing voting districts shaded by the percentage of the voting age population that is Black:



JA45; *see S.L. 2023-146 Senate*, https://bit.ly/47zTlCU.

### C.    Procedural History

Plaintiffs filed this action on November 20, 2023, just 26 days after the state Senate map was enacted, and filed a preliminary injunction motion with three expert reports and an amended complaint two days later. JA7. Plaintiffs assert that the enacted Senate map violates § 2 of the VRA by cracking Black voters in the Black Belt counties between Districts 1 and 2. Plaintiffs seek a remedy replacing Districts 1 and 2 with two new districts, one of which gives Black voters the opportunity to elect their preferred candidates. Plaintiffs' proposed remedy, Demonstration Districts B-1 and B-2, does not alter the boundaries of any other district.

Legislative Defendants opposed the motion. The State Board took no position on the merits but indicated that, to hold any needed primaries in new districts on March 5 as initially scheduled, candidate filing for those districts had to begin by January 5 to allow UOCAVA ballots to go out on time. JA825.[3] (There are no primaries under current Districts 1 and 2 because only one

_____

[3] *See* 52 U.S.C. § 20302(a)(8) (Uniformed and Overseas Citizens Absentee Voting Act).

candidate per party filed, but it is possible that primaries will be needed if the districts are replaced.)

The State Board further stated that, if relief were ordered after January 5, 2024, it "recommends moving the affected election contests to May 14, 2024, the date currently set for a second primary" in North Carolina.  JA826.  The Board stated that it is "administratively feasible" to hold any necessary primaries for two new districts on May 14, and that such changes have occurred "with some frequency in North Carolina in recent years."  JA827.  The Board advised that, to hold primaries May 14, new districts must be set in time for candidate filing to conclude before March 15.  JA826.

On December 29, 2023, Plaintiffs appealed, contending that the district court had delayed deciding the preliminary injunction motion, amounting to a constructive denial under *District of Columbia v. Trump*, 959 F.3d 126, 131-32 (4th Cir. 2020).  This Court dismissed the appeal for lack of jurisdiction on January 9, 2024, noting the "time-sensitive nature" of the case.  JA850-851.

On January 26, 2024, the district court denied a preliminary injunction.  JA841.  The court assumed that Plaintiffs met the first *Gingles* precondition and held that they satisfied the second, but held that they did not satisfy the

third.    The court also concluded, *inter alia*, that the totality of the circumstances did not support relief, and that *Purcell* barred relief.

Plaintiffs appealed.

## SUMMARY OF ARGUMENT

The district court abused its discretion in denying Plaintiffs' preliminary injunction motion.  *First*, Plaintiffs are overwhelmingly likely to succeed in demonstrating that Districts 1 and 2 in the 2023 Senate map violate Section 2 of the VRA by unlawfully diluting Black voting power.  Plaintiffs drew two compliant majority-Black illustrative districts, the existence of extreme racially polarized voting is undisputed, and overwhelming evidence establishes that Black-preferred candidates cannot win in the existing districts in light of white bloc voting.  The district court's analysis was replete was with obvious legal and plain factual errors and relied on flawed extra-record evidence that the court improperly gathered *sua sponte*.  And the court's principal reason for concluding that *Gingles* Three was not satisfied was the absence of a form of analysis that was not present in either *Gingles* itself or in the Supreme Court's recent *Milligan* decision finding a VRA violation.

*Second*, Plaintiffs and over 100,000 other Black voters in North Carolina's Black Belt will suffer irreparable harm if forced to vote in unlawful

10

districts this year. Courts routinely grant immediate relief to prevent violations of fundamental voting rights like this one. *Third*, the balance of equities and the public interest favor an injunction. The public interest is served by protecting federally guaranteed voting rights. Nor do Plaintiffs seek a higher-threshold "mandatory injunction," although they satisfy that standard too.

*Finally*, *Purcell* is no obstacle to relief because there are no primaries in the challenged districts and thus no election until November. If primaries are needed for remedial districts, the State Board has confirmed they could be held on May 14, the date already set for runoff primaries, as long as candidates file before March 15. North Carolina has held May primaries 12 times in the last 17 election cycles. And even if an election were impending, *Purcell* would not bar relief here because the underlying merits are so clear-cut, irreparable harm is certain, plaintiffs have acted expeditiously, and the requested remedy—altering the boundary between two districts in a single map—is eminently feasible. This Court should reverse and enjoin use of the challenged districts in the 2024 elections.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). Legal conclusions are reviewed de novo and factual findings for clear error. *Id.* A "district court abuses its discretion when it misapprehends or misapplies the applicable law." *Id.* "Clear error occurs when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). When the government is the opposing party, the third and fourth factors merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022). Plaintiffs have established each element.

## I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are overwhelmingly likely to prevail in establishing that the 2023 Senate map violates § 2 of the VRA because it "dilute[s] the voting

12

strength of politically cohesive minority group members … by fragmenting [them] among several districts where a bloc-voting majority can routinely outvote them." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

Plaintiffs satisfy all three of the "preconditions" the Supreme Court identified in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and recently reaffirmed in *Allen v. Milligan*, 599 U.S. 1, 18 (2023). Specifically: (1) Black voters in the Black Belt counties are "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) they are "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it … usually to defeat [Black voters'] preferred candidate." *Gingles*, 478 U.S. at 50-51; *see Milligan*, 599 U.S. at 18. And the "totality of the circumstances," 52 U.S.C. § 10301(b), establishes that cracking Black voters between Districts 1 and 2 dilutes their votes and prevents them from electing preferred candidates. The district court's contrary conclusions rest on multiple legal errors.

## A.    The First *Gingles* Precondition Is Satisfied

It is easy to draw a reasonably configured majority-Black district in the Black Belt counties. *Milligan*, 599 U.S. at 18. The Black population thus "'has the potential to elect a representative of its own choice in some single-member

district'" that "comports with traditional districting criteria." *Id.* (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

### 1. Demonstration District A Alone Satisfies *Gingles* One

Plaintiffs satisfied *Gingles* One by presenting Demonstration District A, which shows that Black voters are "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Id.* (internal quotation marks omitted). Demonstration District A is majority Black, highly compact, contiguous, and made up of whole counties:



JA47. Demonstration District A's Black voting age population (BVAP) is 51.47%, and the Black citizen voting age population (Black CVAP) is 53.12%.

JA47 tbl. 3.  Demonstration District A splits no counties, is more compact than both of the challenged districts, and adheres to other traditional redistricting criteria.  JA45, JA47, JA50-54.

The district court "assume[d] without deciding" that Demonstration District A satisfies *Gingles* One.  JA925.  As the court explained, Legislative Defendants have argued that Demonstration District A is not "reasonably configured" in light of the North Carolina Constitution's Whole County Provisions, which require that counties be grouped together to form legislative districts in ways that minimize the need to split counties throughout the State.  *Stephenson v. Bartlett*, 562 S.E.2d 377 (2002).  Although Demonstration District A itself splits zero counties, Legislative Defendants argue that this district, if adopted, would "break" other county groupings required by the Whole County Provisions.  JA465-466.

This argument is insubstantial.  The North Carolina Supreme Court has repeatedly reiterated that the Whole County Provisions' county grouping formula applies only *after* any VRA districts are drawn.  *Stephenson* directed that "legislative districts required by the VRA" must be "formed prior to creation of non-VRA districts" using the Whole County Provisions formula.  562 S.E.2d at 396-97.  In explaining how the Whole County Provisions worked

15

(first, assign any counties that can constitute "one non-VRA legislative district," then assign districts "[w]hen two or more non-VRA legislative districts may be created within a single county," etc.), *Stephenson* repeatedly stressed that VRA districts trump the county grouping formula. *Id.* at 397.

The state Supreme Court reiterated the point in *Pender County v. Bartlett*, explaining that if a district is "required by Section 2," that "obviat[es] the need to comply with the WCP." 649 S.E.2d 364, 367-68 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009). Indeed, the question in *Pender* was whether the challenged district, which concededly violated the Whole County Provisions, was nonetheless required under the VRA. If the fact that the district violated the Whole County Provisions itself precluded satisfaction of *Gingles* One's "reasonably configured" requirement, the litigation would have been over before it started.

Any other result would contravene the Supremacy Clause. Section 2 would be a dead letter if the "reasonably configured" requirement at *Gingles* One meant state law could bar demonstration districts from including particular counties with large Black populations. But this Court need not reach that federal law question, because North Carolina law is clear that the

Whole County Provisions' county grouping requirements simply do not apply until *after* any VRA districts are drawn.[4]

Legislative Defendants also noted that Plaintiffs did not draw the rest of the map around Demonstration District A. That is not required. *Gingles* One focuses on whether the illustrative "district" is "reasonably configured." *Milligan*, 599 U.S. at 18 (internal quotation marks omitted). "A district will be reasonably configured … if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* Plaintiffs had to show only that Demonstration District A satisfies those requirements—especially where, as here, Plaintiffs do not propose Demonstration District A as a

---

[4] Plaintiffs' map-drawing expert, Blakeman Esselstyn, co-authored a paper describing an algorithm for determining optimal county groupings. The district court stated that Esselstyn "does not explain his decision to create Demonstration District A by ignoring the county grouping algorithm that he helped to prepare." JA923 n.5. There is nothing to explain. Esselstyn's paper stated that "[t]he one part of Stephenson v. Bartlett which this analysis does not reflect is compliance with the Voting Rights Act." Christopher Cooper et al., *NC General Assembly County Clusterings from the 2020 Census* 1, https://bit.ly/3vYynju. In other words, the paper described the county groupings that would apply if the VRA did *not* require any majority-minority districts. (The algorithm's creators have published an alternative algorithm that allows optimal county groupings to be drawn after any VRA districts are drawn, *see Repository*, https://bit.ly/49l4MiI.) Since map-drawers must draw VRA districts *before* applying the Whole County Provisions, there is nothing inconsistent about Esselstyn's decision to draw a VRA demonstrative district without reference to county groupings described in an academic paper that explicitly did not address compliance with the VRA.

17

remedy. The question is whether the "minority has the potential to elect a representative of its own choice in some single-member district." *Id.* (quoting *Growe*, 507 U.S. at 40). Here, Black North Carolinians have that potential.

Legislative Defendants' discussion of minority opportunity districts is a red herring. Plaintiffs agree that current Senate District 5, containing Pitt and Edgecombe Counties, is a minority opportunity district and that a remedy in this case cannot disturb it. JA924-925. But Demonstration District A does not include Pitt or Edgecombe Counties or impact District 5. And Legislative Defendants presented no evidence that Senate District 11, a district with a 36.65% BVAP that the Black-preferred candidate lost in 2022,[5] is a minority opportunity district or potential crossover district.

## 2. Demonstration District B-1 Also Satisfies *Gingles* One

Although not necessary to satisfy *Gingles* One, Plaintiffs also showed that it is feasible to create a majority-Black district without altering the boundaries of any enacted district besides Districts 1 and 2. Demonstration District B-1, shown below, preserves existing county groupings to the greatest possible extent, preserves the Pitt/Edgecombe minority opportunity district, and splits only one county:

_____

[5] District 11 is the same in the 2022 and 2023 enacted maps.

JA50; *see* JA47-53. Demonstration District B-1's Black CVAP is 50.19% and its BVAP is 48.41%. JA48 tbl. 4. It is more compact than Districts 1 and 2 in the enacted map, JA45 tbl. 2, JA48 tbl. 4, JA52, and adheres to other traditional redistricting criteria, JA50-53.

The district court held that Demonstration District B-1 does not satisfy *Gingles* One on the theory that using Black CVAP, rather than BVAP, is impermissible. This Court need not resolve the issue because Demonstration District A alone satisfies *Gingles* One, and Demonstration Districts B-1 and B-2 (along with existing Districts 3 through 50) form a permissible *remedial* map regardless of whether Demonstration District B-1 is majority-Black. It

19

is undisputed that Demonstration District B-1 would be an effective crossover district. JA283-284. A crossover district that is less than majority-minority can properly remedy a § 2 violation so long as the relevant minority "in fact meet[s] *Gingles'* size condition," as Demonstration District A establishes here. *Cooper v. Harris*, 581 U.S. 285, 305 (2017).

In any event, the district court's rejection of CVAP turns the law on its head. The Supreme Court and lower courts around the country routinely use CVAP to evaluate the first *Gingles* precondition. In *LULAC v. Perry*, 548 U.S. 399 (2006), the parties "agree[d] that the relevant numbers must include citizenship," and the Supreme Court explained that "[t]his approach *fits the language of § 2* because only eligible voters affect a group's opportunity to elect candidates." *Id.* at 429 (emphasis added). The court below did not have "discretion" (JA928) to reject a metric that "fits the language of § 2." Even if *LULAC*'s statement is dicta, this Court "routinely afford[s] substantial, if not controlling deference to dicta from the Supreme Court." *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc); *see Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021).

Lower courts, too, have overwhelmingly held that using CVAP is *always* permissible, and sometimes even required. Although plaintiffs are not

"require[d]" to present a district with majority-minority CVAP (as opposed to VAP) absent "evidence of a significant noncitizen population," *Pope v. Cnty. of Albany*, 2014 WL 316703, at *13 (N.D.N.Y. Jan. 28, 2014), we are aware of no case holding that, if plaintiffs *have* presented such a district, a court has "discretion" to reject it under *Gingles* One.

The district court badly misconstrued the cases it cited for this proposition. JA926, JA928. It described *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998), as "holding courts should use voting-age population where 'noncitizens [are] not a significant part of the relevant population.'" JA926. But *Barnett* actually held: "We think that *citizen* voting-age population [*i.e.*, CVAP] is the basis for determining equality of voting power that best comports with the policy of the statute." *Barnett*, 141 F.3d at 704 (emphasis added). *Barnett* explained that some past cases *have* used voting-age population where "noncitizens were not a significant part of the relevant population," not that courts "should" do so. *Id.* at 705. Similarly, *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997), held that CVAP was always "the *proper* statistic," but that VAP can also be *permissible* absent "reliable information indicating a significant difference in citizenship rates." *Id.* at 1569 (emphases added). Nor did *Pope* "decline to use" CVAP, JA926;

the *Pope* plaintiffs presented only BVAP evidence, and *Pope* simply rejected defendants' argument that CVAP was required. 2014 WL 316703, at \*12-13.

The district court's reliance on *Pender County* (JA929) is puzzling at best. *Pender County* held that, under *LULAC* and the "plain language of Section 2," the "proper statistic" is "voting age population *as refined by citizenship*." 649 S.E.2d at 370-71 (emphasis added). It then found that *Gingles* One was *not* satisfied because the illustrative district's BVAP was 39.36% and the record lacked CVAP evidence. *Id.* at 374.

The district court also ignored or misconstrued decisions within this Circuit explaining that a majority Black CVAP district satisfies *Gingles* One. *See Hall v. Virginia*, 276 F. Supp. 2d 528, 536 (E.D. Va. 2003), *aff'd*, 385 F.3d 421 (4th Cir. 2004) (a "§ 2 vote dilution claim cannot succeed when a protected group fails to comprise a majority of the citizen voting-age population" (quoting *Negron*, 113 F.3d at 1569)); *Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015 (E.D. Va. 2021), *vacated as moot*, 42 F.4th 266 (4th Cir. 2022) (requiring CVAP); *see also Holloway*, 42 F.4th at 285 (Gregory, J., dissenting).

The court's decision to reject CVAP also fails on its own terms, because noncitizens *are* a significant part of the relevant population—the fact that Black CVAP is about two percentage points higher than BVAP in the

22

demonstration districts establishes as much. The district court stated that Plaintiffs cite "no significant *black* noncitizen population." JA926 (emphasis added). That is irrelevant. Black CVAP and BVAP are calculated as *percentages* of total CVAP and VAP. Thus, mathematically, a significant Black noncitizen population likely means that Black CVAP is lower than BVAP; a significant *non-Black* noncitizen population means (as here) that Black CVAP is higher.

The district court next concluded that there must be something wrong with Plaintiffs' CVAP statistics—though they were uncontested, *infra*—because "the *number* of voting-age African-Americans who are citizens … cannot exceed the total minority voting age population in this case." JA920 (emphasis added) (citation omitted). This statement—which did not rely on any expert analysis or record evidence—reflects a basic math error. Again, Black CVAP and BVAP are expressed as percentages. If there are many non-Black noncitizens, the denominator for Black CVAP will be smaller than for BVAP, while the numerator will not change, meaning Black CVAP will exceed BVAP. Plaintiffs thus were not required to "explain *why*" Black CVAP exceeds BVAP, JA927, especially when defendants never argued that there was anything unusual about Black CVAP being higher (because there isn't).

Anyway, the reason is self-evident: the voting-age population in these districts contains many thousands of Latinos and Asian and Pacific Islanders, s*ee* JA161-164, who are more likely to be non-citizens than Black residents.

The court also stated that it was declining to consider CVAP "in light of CVAP's questionable reliability and plaintiffs' failure to explain how they arrived at their Black CVAP figures." JA929. As an initial matter, Demonstration District B-1's Black CVAP was *uncontested*. Legislative Defendants accepted that "the Black citizen voting-age population ("CVAP") of Demonstration District B-1 is 50.19%." JA464. Plaintiffs' expert explained that he calculated it based on CVAP data from the Census Bureau's American Community Survey. *See* JA46 n.6, JA69, JA928 (district court noting as much). That is the standard source for calculating CVAP.

Because the 50.19% figure was unchallenged, Plaintiffs did not file a reply report elucidating it further. Nonetheless, the district court faulted Plaintiffs for failing to preemptively address CVAP "margins of error" that the district court purported to calculate on its own, after briefing closed, based on extra-record material. JA928-929. The court downloaded some unspecified portion (not the "entire nationwide dataset") of a Census Bureau file containing raw margins of error for CVAP in various block groups, and then

24

calculated purported median, average, and maximum percentage margins of error for that unspecified portion of block groups. JA928 & n.8. To be clear, these purported figures are not Census Bureau data contained in the file the district court downloaded, but rather the court's own calculations.[6]

This was wholly improper and troubling. "It is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts." *Lussier v. Runyon*, 50 F.3d 1103, 1113 (1st Cir. 1995). The American Bar Association has observed that such independent research undermines the "hallmark principle of judicial impartiality" and risks "substitut[ing] … someone who combines the roles of advocate, witness, and judge" for the "time-honored role of the neutral and detached magistrate." ABA Comm. on Ethics & Pro. Resp., Formal Op. 478 at 2, Independent Factual Research by Judges Via the Internet (2017).

In short, Plaintiffs presented unchallenged evidence that Demonstration District B-1 has a Black CVAP over 50%. It was patent legal

---

[6] These margins of error would not be relevant even if they were correct—which is why no expert here cited them. Block groups contain tiny numbers of people, sometimes no people. Mr. Esselstyn calculated CVAP at the level of *districts* containing around 208,000 people. *Cf. Fabela v. City of Farmers Branch*, 2012 WL 3135545, at *7 & n.15 (N.D. Tex. Aug. 2, 2012) (CVAP margins of error for "block groups" are not "pertinent" at the level of an "illustrative district").

error—and clear factual error—for the district court to conclude that it could simply disregard that uncontested evidence.

## B.  The Second *Gingles* Precondition Is Satisfied

Legislative Defendants did not dispute that the *Gingles* Two is satisfied here, and the district court found that it is.  JA930-931.  For good reason. Black voters in the Black Belt are highly "politically cohesive."  *Gingles*, 478 U.S. at 51; *Milligan*, 599 U.S. at 18.  Plaintiffs' expert Dr. Matt Barreto found that Black voters support the same candidates by a ratio of 9-to-1 or greater. JA273-274, JA280-281.  Legislative Defendants' own expert noted the "high cohesion demonstrated by Black voters" in the relevant area.  JA674.

## C.  The Third *Gingles* Precondition Is Satisfied

Plaintiffs are likely to succeed in showing that "the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 51; *see Milligan*, 599 U.S. at 18.  The district court's contrary conclusion was obvious legal error and clear factual error.

The key inquiry under *Gingles* Three is whether "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn."  *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C.

2016), *aff'd*, 581 U.S. 1015 (2017) (cleaned up). Courts evaluate whether there is "racial bloc voting that, absent some remedy, would enable the majority usually to defeat the minority group's candidate of choice" in the challenged districts. *Id.* at 167 (citing *Gingles*, 478 U.S. at 51). If there is, the racial polarization is "legally significant." *Id.* at 170.

For starters, anyone with passing familiarity with North Carolina's political geography can see that Black voters have no chance of electing their preferred Senate candidates in Districts 1 and 2. These two districts crack Black voters in the Black Belt counties right down the middle, ensuring that their votes, in each district, will be drowned out by white majorities.

The expert evidence confirms this obvious reality. Dr. Barreto conducted two analyses: a racially polarized voting analysis using the ecological inference regression technique, JA278-283, and a performance analysis of election outcomes in current Senate Districts 1 and 2 based on the results of past elections in other contests (since Districts 1 and 2 are new), JA283-284, JA291-293. He concluded that white voters in the relevant area overwhelmingly vote against Black-preferred candidates, and that this white bloc voting will prevent Black-preferred candidates from winning in the challenged districts. JA283. Defendants' expert John Alford replicated Dr.

27

Barreto's analysis, using the same publicly available software and data Dr. Barreto used, and obtained "substantively similar" results. JA678. Each of Dr. Barreto's analyses is independently sufficient to establish legally significant white bloc voting satisfying *Gingles* Three.

### 1. Dr. Barreto's Racially Polarized Voting Analysis Satisfies *Gingles* Three

Dr. Barreto's racially polarized voting analysis showed that, across 31 elections in 2020 and 2022, white voters in the region opposed Black voters' candidates of choice at rates around *85 percent or higher*. JA280-281. In the Northeast-1 region, which includes the Black Belt counties in the challenged districts, there is not a single election where white bloc voting was lower than 82%, and in most elections it was far higher—as high as 92%. JA285-286 (tbl. A1, "White" column under "Northeast-1"). In the 2020 and 2022 state Senate elections, 87.8% and 88.4% of white voters opposed Black preferred-candidates. JA285, 287. White voters regularly voted in the exact opposite pattern of Black voters. JA280-281. Notably, white bloc voting against Black-preferred candidates is consistently more extreme in northeastern North Carolina than in other parts of the State. JA281.

All this evidence is undisputed. *See* JA673-688 (Legislative Defendants' expert report accepting Dr. Barreto's statistical conclusions). And it is

sufficient as a matter of law to satisfy *Gingles* Three. Indeed, it is strikingly similar to the evidence that sufficed in *Milligan*, where, "on average, Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote." 599 U.S. at 22 (internal quotation marks omitted). The Supreme Court cited with approval testimony that those figures provided "intense," "very strong," and "very clear" "evidence of racially polarized voting" satisfying *Gingles* Three. *Id.* The defendants in *Milligan* did not even dispute that such an extreme level of racially polarized voting satisfied *Gingles* Three, and the courts found that it did. *Id.* The uncontested finding here that around 85% or more of white voters oppose Black-preferred candidates means white voters only support Black-preferred candidates with 15% of the vote—just like in *Milligan*. And Black voting cohesion is just as great here—consistently at 9-to-1 margins and sometimes as high as 98 or 99%. JA280-281 (Barreto Rep. ¶¶ 22, 26).

"Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice." *Gingles*, 478 U.S. at 68. This Court has described far lower levels of white bloc voting—at the 75% level—as "extremely polarized." *United States v. Charleston Cnty.*, 365 F.3d 341, 344 (4th Cir. 2004).

The uncontested proof of extreme white bloc voting here is easily sufficient to establish that the white majority will "usually … defeat the minority's preferred candidate" in the challenged districts. *Gingles*, 478 U.S. at 51. The General Assembly's decision to crack Black voters in the Black Belt left District 1 with a voting-age population that is 29.49% Black and 63.29% non-Hispanic White, and District 2 with a voting-age population that is 30.01% Black and 63.13% non-Hispanic White. *See* JA45 tbl.2; JA163, JA165 (General Assembly statpack). Even assuming (counterfactually) that white turnout is no higher than Black turnout, if even only 80% of white voters vote against the Black-preferred candidate, that candidate will lose every time. That's because 80% of 63.29% is 50.6%, and 80% of 63.13% is 50.5%. Accordingly, the uncontested proof that well over 80% of white voters vote against Black-preferred candidates establishes that white bloc voting in Districts 1 and 2 will usually defeat Black-preferred candidates—meaning the racial polarization is "legally significant." *Gingles*, 478 U.S. at 56.[7]

Recent election results in the region confirm that white bloc voting usually prevents Black-preferred candidates from succeeding. In 2022, the

---

[7] Legislative Defendants' own evidence states that Black turnout is lower than white turnout. JA712. That only confirms that the white bloc voting here will usually defeat Black candidates.

area now comprising Senate Districts 1 and 2 was divided between then-Districts 1 and 3. Then-District 3 had a 42.33% BVAP and a 44.47% Black CVAP. JA44 tbl.2. But the white candidate of choice, Bobby Hanig, defeated the Black-preferred candidate, Valerie Jordan, by *5 points*.[8] Obviously white bloc voting will result in the defeat of Black-preferred candidates in current Districts 1 and 2, where BVAP and Black CVAP is over 10 points *lower*.

### 2.    Dr. Barreto's Performance Analysis and the Legislature's Own Analysis Also Satisfy *Gingles* Three

Although it was unnecessary in light of his racial polarization analysis, Dr. Barreto's analysis of how Senate Districts 1 and 2 would perform using results of past elections independently satisfies *Gingles* Three. Dr. Barreto took the precinct-level results of 31 contests in North Carolina in 2020 and 2022—27 statewide and 4 state legislative races—and tallied up how current Districts 1 and 2 would have voted in those elections. For instance, he found that, using the results of the 2020 presidential elections, Black-preferred candidates lose Districts 1 and 2 by margins of 9 and 14 points, respectively. JA292. In total, he showed that the Black-preferred candidate loses in

---

[8] *See 11/08/2022 Official General Election Results - Statewide: NC State Senate District 03*, https://bit.ly/47zPxBC. In District 1 the White-preferred candidate ran unopposed.

31

Districts 1 and 2 under 27 out of 27 statewide elections in 2020 and 2022, and in 3 out of 4 state legislative elections.

Defendants offered no responsive expert analysis or evidence. To the contrary, Legislative Defendants' expert replicated Dr. Barreto's analysis with "substantively similar" results, JA678, and the General Assembly has *produced the exact same results on its website*, *see* NC Gen. Assembly, SL 2023-146 ("StatPack").[9] This Court can take "judicial notice" of "statistics" that are "publicly available on the official [state legislature] redistricting website." *Hall*, 385 F.3d at 424 n.3. The General Assembly's "StatPack" for the 2023 Senate Plan reports how Districts 1 and 2 perform using results from 18 of the 27 statewide races that Dr. Barreto considered from 2020 and 2022 (the General Assembly excludes court of appeals races). According to the StatPack, Black-preferred candidates lose in Districts 1 and 2 *every single time*. StatPack at 3-37. The StatPack shows the same outcome using the results of the 2016 President, Senate, Governor, Attorney General, and

_____

[9] *StatPack, SL 2023-146*, https://www.ncleg.gov/Files/GIS/Plans_Main/Senate_2023/SL%202023-146%20Senate%20-%20StatPack2023_S.pdf.

Lieutenant Governor races—Black-preferred candidates in Districts 1 and 2 lose *every time*. StatPack at 39-48.[10]

At the preliminary injunction argument, the district court asked about Dr. Barreto's results for current District 2 using results from the 2022 Senate elections, which showed Democrats winning 54.1% of the vote. Dr. Barreto filed a supplemental report explaining why that number did not suggest that Black-preferred candidates could win in current District 2. JA853-854. Current District 2 is comprised of counties that, in 2022, were split between then-Districts 1 and 3. JA853. The 2022 District 1 Senate election was uncontested, and Dr. Barreto excluded uncontested elections from his dataset. JA853. The 54.1% figure thus in reality reflected results from the 2022 Senate elections in only three counties in current District 2—the counties that were part of District 3 in 2022, where the election was contested. JA853. Those were Halifax, Warren, and Martin Counties, which are much more heavily Black (48.4% BVAP) than current District 2 as a whole (30% BVAP). JA853.

---

[10] As is common, Dr. Barreto reports the percentage of the "two-party vote" won by the Black-preferred and white-preferred candidates, while the StatPack reports third-party candidates too. *See generally Harris v. McCrory*, 159 F. Supp. 3d 600, 619 (M.D.N.C. 2016). In elections involving third-party candidates, Dr. Barreto's percentages thus equal the raw votes for Democrats or Republicans in the StatPack divided by total votes for Democrats and Republicans.

The fact that the Black-preferred candidate won in those counties using 2022 Senate election results is not very probative of whether the Black-preferred candidate could win in the entire district.  JA853-854.

Dr. Barreto further noted that, if the votes in the uncontested election in the remaining counties in current District 2 were added back in, the Black-preferred candidate would lose by roughly 50 points—but that ultimately, the absence of a contest in most of the district meant that the 2022 Senate election results are "less probative" than other elections, especially statewide elections. JA854.

Further, although the district court ignored it, it is undisputed that the Black-preferred Senate candidate *lost* in then-District 3 in 2022 even though it had a *40%* BVAP.  *Supra* p.31.  It blinks reality to suggest, as the district court did, that the results of the 2022 Senate elections somehow support the notion that Black-preferred candidates can win in current Districts 1 or 2, which only have around 30% BVAP.

Even assuming arguendo that current District 2 performs for Black-preferred candidates based on the 2022 Senate election results (which it obviously does not), the fact that white bloc voting defeats Black-preferred candidates in 30 out of 31 elections Dr. Barreto studied, 27 out of 27 statewide

34

elections he studied, and 18 out of 18 elections the General Assembly itself reported establish that white bloc voting "usually" defeats Black-preferred candidates. That is all *Gingles* requires.

The district court stated that Dr. Barreto's "belated [post-argument] explanation undercuts all of [his] conclusions by demonstrating that fuller data sets could change his estimated outcomes," and that Dr. Barreto "fails to explain why the court should credit any of his estimated outcomes for elections in SD2 in light of his supplemental declaration." JA934. This makes no sense. Dr. Barreto's outcomes for elections in District 2 are not "estimates"; he simply tallied the votes in the counties forming District 2 in each election he considered. None of the 27 statewide elections he examined could be affected by this issue because all of the statewide elections *were* contested; there is no "fuller" dataset. JA291-293 (identifying candidates). And because they were statewide, they were contested in *all* parts of current Districts 1 and 2. As Dr. Barreto explained, "it is far more probative to analyze the performance of current Senate District 2 using 2022 statewide elections which were contested in all counties now within Senate District 2." JA854.

Nor is it clear what the district court meant when it cited "profound discrepancies" between Dr. Barreto's report and supplemental declaration.

JA934. Dr. Barreto's declaration did not suggest that he was *wrong* to have excluded votes in uncontested contests. As part of his response to the district court's question, Dr. Barreto calculated that Black-preferred candidates would resoundingly lose in current District 2 if votes in the uncontested counties *were* included; he did not suggest that was an especially probative type of analysis or that uncontested elections *should* be included. He simply explained that the 2022 Senate election results are less probative of how current District 2 will perform in light of the uncontested counties in 2022—a conclusion that is not subject to reasonable dispute.[11]

In any event, whether the district court abused its discretion in its treatment of Dr. Barreto's performance analysis (though it did) is ultimately irrelevant. As explained, Dr. Barreto's uncontested racial polarization analysis—which the district court credited—in conjunction with basic district characteristics satisfy the third *Gingles* precondition. *Supra* § I.C.1. And the General Assembly's own judicially noticeable StatPack confirms exactly what

---

[11] The district court cited no record evidence for its assertion that excluding uncontested elections constitutes an "unusual form of reconstituted election analysis." JA933. Legislative Defendants did not take that position, and courts have frequently noted that "uncontested elections" have "little to no probative value in the *Gingles* preconditions analysis." *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018).

Dr. Barreto found: Black-preferred candidates always lose in current Districts 1 and 2.

### 3. The District Court's Remaining Conclusions Are Legally Erroneous

The district court's conclusion that Plaintiffs failed to satisfy *Gingles* Three, in the face of this overwhelming and conceded evidence, rested on invented requirements and profound legal errors.

a. *There is no "district effectiveness analysis" requirement*. Although the court agreed that Dr. Barreto's analysis established statistically significant racially polarized voting, the court stated that to establish "legally significant" racially polarized voting, an expert "must" conduct a so-called "'district effectiveness analysis,' which is 'a district-specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for ... voters of that minority group to elect candidates of their choice.'"  JA935 (quoting *Covington*, 316 F.R.D. at 168 n.46); *see also* JA936-938.

There is no such requirement.  As *Covington* held, *Gingles* means what it says: "legally significant racially polarized voting … occurs when the majority group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate."  *Covington*, 316 F.R.D. at 170 (quoting

37

*Gingles*, 478 U.S. at 51, 55-56) (cleaned up).  If a plaintiff proves that white bloc voting will usually defeat the minority-preferred candidate, there is no further requirement to prove the precise BVAP or Black CVAP percentage at which the *non*-performing district would *start* to perform for minority voters. *Covington* mentions the phrase "district effectiveness analysis" one time, simply to observe that the legislature's map-drawer "did not conduct any district effectiveness analysis prior to drawing the districts, … nor did he perform a racial polarization analysis." *Id.* at 168 (cleaned up). *Covington* also noted that mere "<u>statistically</u> significant" racially polarized voting is insufficient because that phrase could include evidence that 51% of Black voters and 49% of white voters prefer the same candidate. *Id.* at 170.  That is not the situation here, where only about 15% of white voters prefer the candidate supported by over 90% of Black voters.

Indeed, given that the phrase "district effectiveness analysis" does not appear in a single federal court opinion other than *Covington* and now the decision below, it is hard to imagine how it could be the sine qua non of VRA liability.  *Gingles* itself found a § 2 violation even though there was no "district effectiveness analysis" as the district court here used that term.  Rather, the evidence in *Gingles* showed that, as here, there was significant white bloc

38

voting, and that "black voters have enjoyed only minimal and sporadic success in electing representatives of their choice" in the relevant districts. 478 U.S. at 60. There was likewise no such analysis in the record before the Supreme Court in *Milligan*. *See Caster v. Merrill*, 2022 WL 264819, at *68-70 (N.D. Ala. Jan. 24, 2022).

Nor does the fact that an expert in the *remedial* phase of a different case, *see* JA485 & n.1, completed what the district court regarded as a "district effectiveness analysis" have anything to do with whether such an analysis is required to show a § 2 violation. *Contra* JA936. In the remedial phase, *before* new districts have been drawn, such an analysis helps guide mapmakers in ensuring that potential districts will in fact remedy the VRA violation.

The district court also legally erred in concluding that a "district effectiveness analysis … must show that black voters' candidate of choice cannot win elections unless BVAP in the contested districts exceeds 50% plus one vote." JA935-936. That conclusion is flatly contrary to the Supreme Court's decision in *Cooper*, which held that a crossover district with BVAP under 50% can be a lawful and effective VRA remedy. 581 U.S. at 306. For that same reason, the district court's characterization of *Covington* as requiring "evidence that majority-black districts were necessary for black-

preferred candidates usually to win" is wrong. JA937. Instead, consistent with *Cooper*, *Covington* held that legally significant racially polarized voting is shown so long as the level of white "racial bloc voting" operates to "actually minimize or cancel minority voters' ability to elect representatives" in the challenged districts. 316 F.R.D. at 168 (cleaned up). No more, no less.

For similar reasons, the fact that Plaintiffs' Demonstration District B-1 is an effective *remedial* crossover district even though its BVAP is 48.4% does not remotely "undermine[] plaintiffs' challenge" to current Districts 1 and 2. JA938. The fact that Black voters can elect their preferred candidates in a 48.4% BVAP district says absolutely nothing about whether they can do so in the 30% BVAP districts challenged here.

The district court also pointed (JA938) to Dr. Barreto's scatterplots, which reveal extreme racially polarized voting. JA282-83. While the scatterplots show a handful of precincts with around 37.5% BVAP in which the Black-preferred candidate wins, they also show precincts with that level or greater BVAP in which the Black-preferred candidate *loses*. JA282-283. It is not possible to eyeball these scatterplots and draw any conclusions about the minimum BVAP level required to elect Black-preferred candidates. That was not their purpose, and again, such evidence is not required.

40

b.     *Nearby districts do not bear on whether Plaintiffs have established legally significant racially polarized voting.*  The district court also noted that current Senate District 5, which combines Edgecombe and Pitt Counties and has a 40.35% BVAP, is a minority opportunity district.  JA938. But the fact that white bloc voting does not prevent Black-preferred candidates from winning in District 5 says nothing about whether it prevents Black-preferred candidates from winning in Districts 1 and 2.  Not only is BVAP much higher, white bloc voting is much lower in Pitt and Edgecombe Counties than in the Black Belt counties in Districts 1 and 2.  *See* JA285 (Barreto Rep. tbl. A1) (white bloc voting in the 2022 U.S. Senate election was 87% in the Northeast-1 region excluding Pitt/Edgecombe versus 76.9% in Pitt/Edgecombe).  And non-Hispanic whites make up only 50.59% of the voting age population in District 5.  JA163.

Nor does the district court's investigation into the 2022 election results in Congressional District 1 bear on the existence of racially polarized voting here (again, no *party* in this case has ever argued otherwise).  JA938-939. CD1, as the district court acknowledged, has a BVAP that is *10 points higher* than the Senate districts challenged here.  And while CD1 contains "the counties at issue in this case," JA939, it also contains *six others*, including Pitt

and Edgecombe Counties, which have substantially lower rates of white bloc voting, JA285-287, as well as Franklin County. Legislative Defendants proffered evidence that around 45% of white voters in Franklin County vote for Black-preferred candidates. JA740-741.

There is no record support for the district court's statement that the success of Black-preferred candidates in areas with significantly higher BVAPs and significantly lower white bloc voting establishes that white bloc voting is not legally significant in Districts 1 and 2. Based on the record here, it is beyond reasonable dispute that white bloc voting will usually defeat Black-preferred candidates in the challenged districts.

### D.  The Totality of the Circumstances Supports a VRA Violation

Considering the "totality of the circumstances," the challenged districts deprive Black voters in the Black Belt counties of an equal opportunity to elect candidates of their choice, and obviously so. *Gingles*, 478 U.S. at 46; *Milligan*, 599 U.S. at 18. The "Senate factors" informing this analysis overwhelmingly support that conclusion. *See LULAC*, 548 U.S. at 426. The district court's contrary determination (JA940-946) is legally and factually erroneous.

To begin with, "[i]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have

42

failed to establish a violation of § 2 under the totality of circumstances." *Harris v. McCrory*, 159 F. Supp. 3d 600, 623 (M.D.N.C. 2016) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)), *aff'd*, 581 U.S. 285. This is not an "unusual case." It is a typical case in which the totality of the circumstances confirms that the cracking of Black voters between two districts denies them equal participation in the political process. The district court ignored this baseline principle.

Beyond that, the district court erred in its analysis of every relevant Senate factor, concluding, remarkably, that not a single factor supports a VRA violation. *First*, the first factor considers "the extent of the state's historical discrimination concerning the right to vote against plaintiffs' minority group"—here, African Americans. JA941. "[T]here is a long and shameful history of race-based voter suppression in North Carolina." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) ("Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular."). North Carolina employed numerous discriminatory practices from 1900 to 1970. *Gingles*, 478 U.S. at 38-39. From 1980 to 2013, "the Department of Justice issued over fifty

43

objection letters to proposed election law changes in North Carolina—including several since 2000—because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *McCrory*, 831 F.3d at 224. Some of those letters found that the General Assembly acted with discriminatory intent. *Id.* at 223. "During the same period, private plaintiffs brought fifty-five successful cases under § 2" challenging North Carolina voting practices. *Id.* at 224. And in 2016, this Court found that provisions of a North Carolina omnibus election law "target[ed] African Americans with almost surgical precision." *Id.* at 214.

The district court gave all this evidence "little weight" on the theory that it is "overwhelmingly outdated." JA942. That is a strange criticism given that this factor focuses on "the state's *historical* discrimination." JA941 (emphasis added). In *Gingles* itself, the district court found that the first factor supported plaintiffs based on North Carolina's "historical pattern of statewide official discrimination" from "1900 to 1970," 478 U.S. at 39, and the Supreme Court affirmed this finding, *id.* at 80; *see also Milligan*, 599 U.S. at 22.

Anyway, the evidence here is not outdated. This Court's 2016 decision in *McCrory* is strikingly recent. And the district court's critique that Plaintiffs "cite just one case from the last 30 years" finding discriminatory intent ignores

44

DOJ preclearance rejections finding discriminatory intent.  It also ignores other recent decisions finding that the General Assembly acted with racially discriminatory intent.  *See, e.g.*, *Harris*, 159 F. Supp. 3d at 604 (2011 congressional districts); *Covington*, 316 F.R.D. 117 (2011 state Senate and state House districts); *North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (affirming the district court's rejection of multiple remedial districts as racially gerrymandered).

*Second*, the second factor—"the extent of racially polarized voting," JA941—supports Plaintiffs.  The district court's contrary finding simply repeats the conclusion that "plaintiffs fail to demonstrate <u>legally</u> significant racially polarized voting."  JA942.  As explained, that is legally incorrect. *Supra* § III.C.

*Third*, the third factor is the "extent to which the state or political subdivision has used … voting practices or procedures that may enhance the opportunity for discrimination," *United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 292 (D.S.C. 2003), *aff'd*, 365 F.3d 341—not "whether the jurisdiction presently employs voting practices designed to discriminate," JA943.  In any event, three times in the last decade, the General Assembly abused the most important practice, line-drawing, to discriminate against

45

Black voters across the State. *Harris*, 159 F. Supp. 3d at 604; *Covington*, 316 F.R.D. 117; *Covington*, 138 S. Ct. at 2553. The district court offered no explanation for ignoring this evidence.

*Fourth*, the fourth Senate factor does not apply. JA943.

*Fifth*, the fifth factor asks whether Black citizens in North Carolina "bear the effects of discrimination in education, employment, or health." JA941. Plaintiffs' expert Dr. Traci Burch provided unrebutted analysis regarding the extreme disparities between Black and white North Carolinians in education, employment, and health, which hinder Black participation in the political process. JA411-423. In concluding that this factor "does not help plaintiffs," the district court found it unclear whether "race discrimination by North Carolina caused the socioeconomic disparities that Dr. Burch discusses." JA943. But of course it did. It is beyond dispute that segregated schools and decades of resistance to school integration are at least partly responsible for today's disparities in education. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); JA412. This Court has described racial disparities in education, employment, and health as "*effects of past discrimination* that hinder minorities' ability to participate effectively in the political process." *League of Women Voters of N.C.*, 769 F.3d at 246 (emphasis added).

46

*Sixth*, the district court found that the Helms campaign's extreme racial appeals in 1984 and 1990 are too old to merit consideration, that Ted Budd's 2022 advertisements reminiscent of the infamous 1988 "Willie Horton" ad "was not a racial appeal" because it "never explicitly mentioned race," and that Madison Cawthorn's 2020 ad about his opponent wanting to "ruin white males," which the court "assum[ed] without deciding" was a racial appeal, is an outlier. JA944 (bracketing omitted). In *Gingles*, the Supreme Court pointed to racial appeals in North Carolina political campaigns "from the 1890's"—a century earlier. 478 U.S. at 40. As for the Ted Budd example, *Gingles* teaches that "subtle and furtive" racial appeals are racial appeals all the same. *Id.* And the court wrote off the Cawthorn example because it is just one of "hundreds of thousands of political campaigns since 1965" in North Carolina. JA944. But if we are going back to 1965, the Helms campaign's tactics and many other "specific examples of racial appeals" support the VRA violation here. *Gingles*, 478 U.S. at 40; *see* JA425-429.

*Seventh*, the court below found that election of Black candidates "favors the legislative defendants" because "plaintiffs fail to demonstrate that few black candidates have won elections in North Carolina." JA945. But that is not the test. *See Singleton v. Merrill,* 582 F. Supp. 3d 924, 1019 (N.D. Ala.

2022), *aff'd*, 599 U.S. 1.  North Carolina has never had a Black governor or U.S. senator.  And while North Carolina has some Black state Senators, Black state Senate candidates have *lost* elections in the region covered by Districts 1 and 2 when the Black Belt counties are split.  In 2020, then-Senate District 3 elected Ernestine Bazemore and District 4 elected Toby Fitch—both Black candidates.[12]  When the 2022 map split the Black Belt counties, the Black candidates in the area covered by Districts 1 and 2 lost.[13]  If the success of Black candidates in the region is attributable to crossover districts, this factor favors finding a VRA violation.  *Singleton*, 582 F. Supp. 3d at 1020.

*Eighth*, the eighth factor—"a significant lack of responsiveness by the state's elected officials," JA941—supports Plaintiffs.  The General Assembly's enactment of intentionally discriminatory voting laws is clear evidence of significant non-responsiveness.  *See McCrory*, 831 F.3d at 214.  And attributing persistent socioeconomic disparities between Black and white

---

[12] *11/03/2020 Official Local Election Results - Statewide*, https://er.ncsbe.gov/?election_dt=11/03/2020&county_id=0&office=NCS&contest=0.

[13] *11/08/2022 Official General Election Results - Statewide*, https://bit.ly/3OzzUmx.

citizens to elected officials' lack of responsiveness to the needs of the Black community is not an "unjustified inference," JA946; it is an obvious reality.

*Ninth*, no legitimate governmental interest justifies cracking over 100,000 Black voters in the Black Belt counties between two districts where white bloc voting will prevent them from electing their candidates of choice. The district court's contrary analysis just repeated legal errors, JA946; the Whole County Provisions do not and cannot require violating the VRA. *Supra* § I.A.1. As for the assertion that Districts 1 and 2 were enacted to comply with "traditional redistricting principles," JA946, these districts are highly noncompact. JA52. District 2 is the least compact district in the entire Senate plan. JA52.

*Next*, the district court stated that whether partisanship drives polarization was relevant at the totality of the circumstances inquiry. But there was "no systematic proof to support [Legislative Defendants'] claim" that "partisanship rather than race drives the … racially polarized voting patterns." *Charleston Cnty.*, 365 F.3d at 352.

The district court (JA946-949) relied exclusively on Dr. Alford, who discussed Dr. Barreto's analysis and concluded that Black voters supported Democrats and White voters supported Republicans. JA679-684. Dr. Alford

looked at the handful of elections with Black candidates and concluded that Black Democrats got "no more" support or opposition than white Democrats from Black and white voters, and the same for Black Republicans. JA683-685. Even on its own terms, this evidence cannot carry Legislative Defendants' burden to prove that partisanship rather than race *causes* voter choices. On Dr. Alford's own account, the evidence is "*consistent* with a polarized response to the party affiliation indicated on the ballot." JA684 (emphasis added). Since partisanship and race are "inextricably intertwined," *Charleston Cnty.*, 365 F.3d at 352, it is equally "consistent" with the conclusion that Black voters cohesively voted for Black and White Democrats alike because *race*-based reasons led Black voters to prefer those candidates. Dr. Alford did not conduct any regression or make any effort to "isolate[] and measure[]" "the effects of partisanship and race on voting," as *Charleston County* requires. *Id.* If Dr. Alford's anecdotal analysis were enough to disprove racially polarized voting, it would be impossible to win a VRA claim.

In any event, Dr. Alford's analysis is irrelevant because it relates exclusively to "race of the candidates," JA684, and does not address the cause of the correlation between the "race of the *voter*" and votes for particular candidates, *Gingles*, 478 U.S. at 63 (plurality). This Court concluded in *Lewis*

50

*v. Alamance County*, 99 F.3d 600, 615 n.12 (4th Cir.1996), and *Charleston County* that causation was relevant at the totality stage in light of Justice O'Connor's *Gingles* concurrence referring to "[e]vidence that a candidate *preferred by the minority group* in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group." *Charleston Cnty.*, 365 F.3d at 347 (emphasis added) (quoting *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring in the judgment)). None of Dr. Alford's analysis speaks to this question. The fact that 88% of white voters in the relevant region voted against the Black-preferred Senate candidate Cheri Beasley in 2022 and 87% voted against the Black-preferred Senate candidate Cal Cunningham in 2020, JA683-684, obviously provides no "evidence" that the "candidate preferred by the minority group" was rejected "for reasons other than those which made that candidate the [minority-]preferred choice." Both were candidates preferred by the minority group and both were rejected. The district court erred in conflating the minority-preferred candidate and the minority candidate. *Alamance*, 99 F.3d at 607.

*Finally*, the district court pointed to decisions finding that the VRA did not excuse the General Assembly's racial gerrymandering. JA950-52. Those

51

are cases where, having done no racially polarized voting analysis, the General Assembly took districts that had successfully been electing Black-preferred candidates for a decade or more and unnecessarily packed more Black voters in. *Harris*, 159 F. Supp. 3d at 624; *Covington*, 316 F.R.D. at 173. *Harris* and *Cooper* did not conclude that the "same portion of northeast North Carolina at issue in this case" had significant "white crossover voting." JA951. The congressional district there stretched west to include Pitt and Edgecombe Counties along with numerous other areas not at issue here.

### E.     The Legislature Cannot Avoid Section 2 Liability By Failing to Analyze *Gingles*

The district court also seemed to hold that a purported absence of "contemporaneous" VRA evidence during the legislative process immunized the 2023 Senate map from VRA liability. JA901-906. This is yet another invention. A legislature that "invokes the VRA to justify race-based districting" in *defending* against racial gerrymandering must show that it had a "strong basis in evidence" for believing that § 2 was satisfied. *Cooper*, 581 U.S. at 292-93. Even if § 2 ultimately didn't require race-based redistricting, it is sufficient that a legislature had good reason to think it did. *Id.* But it is obviously not true—indeed, Legislative Defendants did not even argue—that if § 2 *is violated*, the legislature can immunize itself by claiming no one told

them § 2 applied. Section 2 is a federal law and the legislature must comply. Nothing in its text and no precedent supports the exception the district court described.

In any event, Plaintiffs submitted exactly the evidence the court said was missing. On October 22, 2023, the Southern Coalition for Social Justice sent the General Assembly a letter enclosing an expert's report finding "definitive evidence of [racially polarized voting] patterns" in the relevant region. JA280 & n.17; *see* JA19. That letter stated, in bold and italics, that "***it is readily apparent that the State Senate plan … would unlawfully dilute the voting strength of Black voters in northeast North Carolina in Senate Districts 1 & 2, in violation of the VRA***," and that "all three *Gingles* preconditions are established" in that area.[14] Despite this letter, the district court accepted Legislative Defendants' representation in their brief that the legislature had "not receive[d] any evidence that the three *Gingles* preconditions could be satisfied anywhere in North Carolina." JA904. The court also noted Legislative Defendants' statement that the letter proposed use of alternative districts from the 2022 map as a potential remedy. JA904. But the fact that someone else proposed a different map that the General Assembly rejected

---

[14] Letter, *supra* n.2, at 2-3.

53

cannot preclude Plaintiffs here from seeking Demonstration Districts B-1 and B-2 as the remedy.

## II.    The Remaining Factors Strongly Favor an Injunction

### A.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief

Over 100,000 Black voters in the Black Belt counties will suffer irreparable harm if forced to vote in districts that unlawfully dilute their votes and prevent them from electing candidates of their choice in violation of § 2. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C.*, 769 F.3d at 247. Discriminatory voting policies "are 'the kind of serious violation of ... the Voting Rights Act for which courts have granted immediate relief.'" *Id.* (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)). "[O]nce the election occurs, there can be no do-over and no redress." *Id.*

Both Plaintiffs are Black registered voters who live in enacted District 2. JA442, JA445.[15] Mr. Pierce and Mr. Matthews live in Halifax County and Martin County, respectively, and they will be irreparably harmed if forced to vote in a district that dilutes their votes in violation of the VRA. The district

---

[15] For the same reasons, Plaintiffs have standing. *See Hall*, 385 F.3d at 427 n.10.

court's contrary finding rested entirely on its erroneous conclusion that Plaintiffs were unlikely to succeed on the merits.  JA953.

### B. The Balance of Equities and Public Interest Favor Injunctive Relief

The balance of equities and public interest—which merge here—support a preliminary injunction.  *Miranda*, 34 F.4th at 365.  "The public interest is served by protecting federally guaranteed voting rights in North Carolina."  *Disability Rights N.C. v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *7 (E.D.N.C. July 11, 2022).  "By definition, [t]he public interest ... favors permitting as many qualified voters to vote as possible" in districts where those votes will not be diluted.  *League of Women Voters of N.C.*, 769 F.3d at 247 (internal quotation marks omitted).

That Plaintiffs took "28 days" to file a lawsuit and a preliminary injunction motion with three expert reports does not alter the balance of equities.  *Contra* JA954.  That is especially true when Legislative Defendants successfully argued that *30 days* were "necessary" for their own expert reports.  ECF 25 at 3; JA450.

## C.    Plaintiffs Do Not Seek a Mandatory Injunction, But Satisfy the Requirements For One Anyway

The district court alternatively concluded that the four preliminary injunction factors do not apply because Plaintiffs seek a "mandatory injunction." JA909-910. This too was legal error. The requested injunction is "prohibitory" because it "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C.*, 769 F.3d at 236. The status quo is "the last *uncontested* status between the parties which preceded the controversy." *Id.* (emphasis added). Just as the status quo in *League of Women Voters* was not the challenged voting law, *id.*, the status quo here is not the 2023 enacted map. That map *is* the controversy; it did not precede it. And the 2022 map was invalidated by the North Carolina Supreme Court and thus is not uncontested. *Supra* pp.4-5.

The last valid map in North Carolina was the map used in 2020. That map had two Senate districts in the northeast that performed for Black-preferred candidates. Senate District 3 (containing Martin County, where plaintiff Matthews lives) elected Ernestine Bazemore, a Black Democrat. Senate District 4 (containing Halifax County, where plaintiff Pierce lives)

56

elected Toby Fitch, another Black Democrat.[16]  This is akin to the map that Plaintiffs are seeking to restore in this action—meaning the injunction is prohibitory, not mandatory.  That "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions" does not convert a prohibitory injunction into a mandatory one.  *League of Women Voters of N.C.*, 769 F.3d at 236.

An injunction would be warranted even if it were mandatory.  In a VRA case, if plaintiffs are likely to succeed on the merits, a preliminary injunction is always necessary to "protect against irreparable harm" and to "preserve the court's ability to enter ultimate relief."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003).  The Supreme Court's recent decision in *Milligan* confirms that a preliminary injunction should issue in a VRA case if the ordinary factors are satisfied (and *Purcell* is not a barrier).

## III.  *Purcell* Does Not Counsel Against a Preliminary Injunction

In some election cases, injunctive relief may be denied where an election is imminent and the change sought would cause voter confusion or otherwise interfere with running an orderly election.  *Purcell v. Gonzalez*, 549 U.S. 1

---

[16]  *11/03/2020 Official Local Election Results - Statewide*, https://er.ncsbe.gov/?election_dt=11/03/2020&county_id=0&office=NCS&contest=0.

(2006).  This is not one of those cases.  There is no ongoing election.  There will be no primary elections in the challenged districts in March, and there may be no need for primaries with new districts either.  It is quite possible that the first election a remedy in this case will implicate would be the November general election.  *Purcell* accordingly does not apply.

Even if primaries are needed on May 14—the already-scheduled date for North Carolina's runoff primaries—*Purcell* still would not apply.  This is not "the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm. (RNC)*, 140 S. Ct. 1205, 1207 (2020).  A May 14 election is over three months away.  The State Board has confirmed that holding primaries in new districts that day would be "administratively feasible" so long as candidate filing concludes before March 15.  JA826-827.  This is entirely common in North Carolina.  As Senator Dan Blue's affidavit explained, as a consequence of litigation, "[a]t least once over each of the [last] five decades ... , the General Assembly has redrawn one or more redistricting maps during the period between February and May of the election years for legislative and congressional elections and held primaries for those offices between May and September of those years."  JA837.  All of these cases involved far more districts than the two at issue here.  Nor can Legislative Defendants contend

that it is infeasible to hold primaries for only two Senate districts in May, when that is when the primaries have happened in 12 of the last 17 cycles.  JA838.

Notably, the Supreme Court declined to stay a three-judge panel's decision in *Harris v. McCrory*, 159 F. Supp. 3d 600, striking down North Carolina's Congressional Districts 1 and 12—even though the injunction issued February 5, 2016, *after* absentee ballots had gone out for a March 15, 2016 primary.  *See* 577 U.S. 1129 (2016) (denying stay).  The primary was moved to June, and the absentee ballots were not counted.  Here, of course, no absentee ballots have gone out, and no March election would be disrupted.

*Purcell* would not bar an injunction here even if the election were close. *Purcell* is not an absolute bar to relief in election cases.  As Justices Kavanaugh and Alito recently explained, even where *Purcell* applies, it "might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship."  *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

Here, the merits are entirely clearcut, especially in light of last year's decision in *Allen v. Milligan*. Flouting that ruling, the General Assembly adopted Senate districts that violate § 2—and waited to do so for six months in an effort to thwart review that created the urgent threat of irreparable harm Plaintiffs now face. To avoid that harm, Plaintiffs conducted the requisite expert analysis, brought this lawsuit, and sought a preliminary injunction within weeks of the map's passage. The changes in question—altering two districts in a single map—can easily be achieved without significant cost, confusion, and hardship, as the State Board has confirmed.

The district court stated that, even though the injunction here would not require changes to any district other than Districts 1 and 2, the General Assembly could choose to enact Demonstration District A as a remedial district. JA957-958. If it did, it would need to "regroup the remaining 92 counties under *Stephenson*" and draw an entirely new map, which could require discarding absentee ballots filled out in Districts 3-50 and postponing the March primaries scheduled for some of those districts. JA957-958. But that is both wrong and irrelevant. It is wrong because state law bars the General Assembly from conducting mid-decade redistricting except as *required* by federal law. The General Assembly would not be free under state

60

law to select a remedy that goes beyond what this court's injunction covers. Moreover, *Stephenson* prevents the General Assembly from selecting a remedy that alters county clusters more than necessary.

More important, however, the General Assembly cannot bootstrap its way into a *Purcell* issue. *Purcell* only applies to election alterations by "federal courts." *RNC*, 140 S. Ct. at 1207. If this Court orders a change to two districts where an election is *not* ongoing—and it is undisputed that Demonstration Districts B-1 and B-2 would be a valid remedy for a VRA violation here—and the General Assembly responds by unnecessarily changing 48 other districts where an election *is* ongoing, "any ensuing upheaval" (JA960) is attributable to the General Assembly, not the federal court. The district court offered no explanation for its contrary statement that "upheaval" that a federal court did *not* order and its injunction would *not* require is relevant to *Purcell*. This Court should make clear that, if the General Assembly chooses to disrupt districts other than Districts 1 and 2, it will have forfeited and waived any *Purcell* argument.

The district court's invocation of *Covington*'s discussion of "special elections" is puzzling. JA961-962. No one is asking anyone to "truncate existing legislators' terms and order a special election." *Covington*, 581 U.S.

at 488-49.  A preliminary injunction that affects the *date* of primary elections, such as the one the Supreme Court declined to stay in *Harris*, does not create a "special election."

Plaintiffs did not "unduly delay" by filing a preliminary injunction motion with three expert reports *within 28 days* of the map's passage; the district court's contrary conclusion is legal error.  JA962.  Moreover, Legislative Defendants are estopped from advancing that argument because they successfully convinced the district court that 30 days was "necessary" for their own reports.  *Supra* p.55.  Finally, the fact that plaintiffs in a different lawsuit—filed a month after this one and involving challenges to multiple districts in the House, Senate, and Congressional plans as well as an intentional race discrimination claim—did not "seek" a preliminary injunction is not "evidence" that *Purcell* bars one here.  *Contra* JA959.

If the Court believes that *Purcell* counsels against an injunction, however, the better course would be to conclude that the relief for 2024 has become moot in light of timing issues, and to vacate the district court's preliminary injunction opinion.  The merits of that opinion are badly wrong; the opinion involves multiple profound legal errors and clear factual errors, including those stemming from the court's improper extra-record research.

## IV.    Remedial Procedures

In light of the State Board's guidance that candidate filing must conclude before March 15 for primaries to be held May 14, Plaintiffs respectfully suggest that the Court give the legislature no more than 7 days to fashion remedial districts.  If the remedial district is not majority-BVAP or Black CVAP, the Court should order the legislature to produce evidence that it will perform as a crossover district.

If the legislature is unable to pass new districts, the Court should instruct the district court to adopt Demonstration Districts B-1 and B-2 as remedial districts.  If the legislature passes two new districts, Plaintiffs request that the Court order the district court to grant Plaintiffs two business days to object and to select a remedial option within two business days after that.  Plaintiffs further request that this Court automatically expedite any appeal to enable review in advance of the deadline to start candidate filing. This Court should order a new map by March 6 or March 7 to enable candidate filing to begin March 7 or 8 and conclude by March 14.

If the legislature adopts an entirely new remedial map (and not simply a remedy for Districts 1 and 2), Plaintiffs may need more than two business days to brief the map's compliance with federal law.  Plaintiffs accordingly

request that the Court make clear that, if the legislature chooses to alter districts other than Districts 1 and 2, the legislature will have forfeited and waived any argument that *Purcell* bars a remedy in advance of the 2024 elections.

## CONCLUSION

For the foregoing reasons, the Court should reverse and enjoin the use of Senate Districts 1 and 2 in the 2024 elections.

Dated:  February 5, 2024

Edwin M. Speas, Jr.
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com

Respectfully submitted,

*/s/ R. Stanton Jones*
R. Stanton Jones
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-6000
stanton.jones@arnoldporter.com

*Counsel for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is set in 14-point Century Expanded BT font.

Dated:  February 5, 2024            */s/ R. Stanton Jones*
                                    R. Stanton Jones
                                    ARNOLD & PORTER
                                      KAYE SCHOLER LLP
                                    601 Massachusetts Avenue NW
                                    Washington, DC 20001-3743
                                    (202) 942-6000
                                    stanton.jones@arnoldporter.com

                                    *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2024, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ R. Stanton Jones*
R. Stanton Jones