IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RODNEY D. PIERCE and MOSES MATTHEWS,

*Plaintiffs-Appellants*,

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,

*Defendants-Appellees*.

From the United States District Court for
the Eastern District of North Carolina
The Honorable James E. Dever III (No. 4:23-cv-193-D-RN)

## PLAINTIFFS-APPELLANTS'
## PETITION FOR REHEARING EN BANC

Edwin M. Speas, Jr.
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com

*Counsel for Plaintiffs-
Appellants*

R. Stanton Jones
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-6000
stanton.jones@arnoldporter.com

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION AND RULE 35(b)(1) STATEMENT .................................1

STATEMENT ................................................................3

    A.    North Carolina's 2023 Senate Map ................................................................3

    B.    Proceedings Below ................................................................5

    C.    The Panel's Divided Decision ................................................................5

ARGUMENT ................................................................6

I.    The 2023 Senate Map Egregiously Violates Section 2 of the VRA .........6

II.    The Panel Majority's Opinion Rests on Multiple Legal Errors .............8

CONCLUSION ................................................................19

CERTIFICATE OF COMPLIANCE ................................................................20

CERTIFICATE OF SERVICE ................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
    599 U.S. 1 (2023) ..................................................................*passim*

*Bartlett v. Strickland.*
    556 U.S. 1 (2009) .................................................................14

*Caster v. Merrill,*
    2022 WL 264819 (N.D. Ala. Jan. 24, 2022) ....................................13

*Cooper v. Harris,*
    581 U.S. 285 (2017)......................................................3, 14, 15

*Covington v. North Carolina,*
    316 F.R.D. 117 (M.D.N.C. 2016) ............................................*passim*

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ......................................................10, 11

*Harper v. Hall (Harper III),*
    886 S.E.2d 393 (N.C. 2023) ....................................................3

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
    4 F.3d 1103 (3d Cir. 1993) ...................................................17

*Johnson v. Hamrick,*
    196 F.3d 1216 (11th Cir. 1999).................................................10

*Rodriguez v. Bexar Cnty.,*
    385 F.3d 853 (5th Cir. 2004)...................................................10

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)..........................................................*passim*

*United States v. Gregory*,
  871 F.2d 1239 (4th Cir. 1989)..............................................................9

**Statutes**

2023 N.C. Sess. Laws 146 .......................................................................3

Voting Rights Act Section 2........................................................*passim*

**Other Authorities**

Fed. R. App. P. 35(b)(1)...........................................................................3

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

This case involves an egregious violation of Section 2 of the Voting Rights Act (VRA). North Carolina's 2023 state Senate map "crack[s] the state's Black Belt right down the middle" between Districts 1 and 2. Op. 56 (Gregory, J., dissenting). As a result, over 100,000 Black voters in northeastern North Carolina will not be able to elect candidates of their choice because their votes will be drowned out by white majorities in both districts.

Despite the clear violation and simple proposed remedy (which would change only a single district boundary), the district court denied a preliminary injunction for the 2024 elections, and a divided panel of this Court affirmed. The district court assumed that Plaintiffs met the first *Gingles* precondition and found they met the second, and the panel did not disagree. Instead, the majority affirmed the district court's conclusion that Plaintiffs failed to show "legally significant" racially polarized voting, even though it is undisputed that (1) Black voters in the relevant area support the same candidates at a ratio of 9-to-1 or greater; (2) white voters oppose Black-preferred candidates to virtually the same degree; and (3) Black-preferred candidates lose in Districts 1 and 2 based on the results of *every* statewide election in 2020 and 2022.

Although relief is no longer available for 2024, en banc rehearing should

be granted now to ensure relief for the *2026* elections. This is so for two reasons. First, the panel majority's opinion invites the district court to reject Plaintiffs' Section 2 claim on the merits, after a trial, based on the same flawed rationales that the majority approved. Second, if Plaintiffs are forced to do another panel appeal after trial and final judgment in the district court, Legislative Defendants will argue that *Purcell* bars relief for 2026, just as they argued it barred relief for 2024. Indeed, Legislative Defendants are insisting below on a trial in February 2025, which could push a district court decision to spring or summer 2025, and a panel appeal through mid-2025 or later, at which point Legislative Defendants will likely say there is no time for en banc review or remedial proceedings.

Notably, granting en banc review here is consistent with the Supreme Court's approach in *Allen v. Milligan*, 599 U.S. 1 (2023). There, after staying the lower court's preliminary injunction and allowing use of the challenged map in 2022, the Supreme Court heard the appeal of the preliminary injunction decision and ultimately issued an opinion affirming that decision with effect *only* for the 2024 elections. This Court should take the same approach—that is, review the preliminary injunction decision here with effect only for 2026.

The panel decision here conflicts with decisions of the Supreme Court,

including *Cooper v. Harris*, 581 U.S. 285 (2017), *Milligan*, and *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  En banc rehearing is also warranted given the extraordinary importance of this case for the political power of Black voters in the Black Belt.  *See* Fed. R. App. P. 35(b)(1).  Given the clarity of the Section 2 violation here, the full Court should not risk allowing this illegal map to govern the 2026 elections as well as the 2024 elections.

## STATEMENT

### A.    North Carolina's 2023 Senate Map

On April 28, 2023, the North Carolina Supreme Court authorized the General Assembly to enact new state legislative maps to replace the ones used in 2022.  *Harper v. Hall* (*Harper III*), 886 S.E.2d 393, 448-449 (N.C. 2023).

Six months later, in October 2023, the General Assembly enacted new maps.  SB 758, the Senate redistricting bill, was introduced on October 18 and passed on October 25, 2023.  2023 N.C. Sess. Laws 146.  It cracks Black voters in northeastern North Carolina's Black Belt counties down the middle.  JA276, JA283.  District 1 includes Northampton, Bertie, Hertford, and Gates Counties, while District 2 includes Warren, Halifax, Martin, Washington, and Chowan Counties.  *See S.L. 2023-146 Senate*, https://bit.ly/47zTlCU.  Most of these counties are majority-Black, and the others have substantial Black

populations.  JA39-40; JA72-73.  Yet both districts have a BVAP of 30% or less. JA45.  This cracking is vividly illustrated by the figure below, which superimposes the district boundaries on a heat map showing voting districts shaded by the percentage of the voting age population that is Black:



JA45; *see S.L. 2023-146 Senate*, https://bit.ly/47zTlCU.

Notably, the comparable district in the 2022 map (SD3) had a 42.33% BVAP, JA44 tbl.2, yet the white-preferred candidate still defeated the Black-preferred candidate by 5 points.  Nonetheless, the legislature chose to crack Black voters and reduce the district's BVAP to 30%.  JA45.

### B. Proceedings Below

Appellants (Plaintiffs), two Black registered voters in Halifax and Martin Counties, JA442-445, filed this action on November 20, 2023, just 26 days after the Senate map was enacted. They assert that the map violates § 2 by cracking Black voters in the Black Belt counties between Districts 1 and 2. Plaintiffs seek a remedy replacing Districts 1 and 2 with two new districts, one of which gives Black voters the opportunity to elect their preferred candidates. Plaintiffs' proposed remedy, Demonstration Districts B-1 and B-2, does not alter the boundaries of any other district. Two days after commencing this action, Plaintiffs filed an amended complaint and a motion for preliminary injunction seeking relief for the 2024 elections. JA7.

Over two months later, on January 26, 2024, the district court denied a preliminary injunction. JA841. The court assumed that Plaintiffs met the first *Gingles* precondition and held that they satisfied the second, but held that they did not satisfy the third. The court also concluded, *inter alia*, that the totality of the circumstances did not support relief, and that *Purcell* barred relief.

### C. The Panel's Divided Decision

A divided panel of this Court affirmed. The majority found no reversible error with respect to the district court's analysis of the third *Gingles* precondition, the totality of the circumstances, or *Purcell*.

Judge Gregory dissented, finding that the district court "misunderstood what the third *Gingles* precondition requires" and thus erroneously imposed "an insurmountable roadblock for [Plaintiffs]." Op. 68, 73. The dissent also found that the district court "erred throughout its analysis" of the totality of the circumstances, and erred in finding that *Purcell* barred relief for 2024. *Id.* at 81, 92.

## ARGUMENT

## I. The 2023 Senate Map Egregiously Violates Section 2 of the VRA

The challenged districts violate § 2. On their face, Districts 1 and 2 crack Black voters in the Black Belt counties down the middle. Neither the district court nor the panel majority suggested that a Black-preferred candidate could actually win in District 1 or 2, where the BVAP is 30% or less and White voters oppose Black-preferred candidates at rates approaching 90%. Make no mistake: If these districts stand, Black-preferred candidates will lose in both districts not only in 2024, but in 2026, 2028, and 2030 as well.

The legal analysis is just as straightforward. The district court assumed that Plaintiffs met the first *Gingles* precondition—that Black voters in the Black Belt counties are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50-51; *see Milligan*, 599 U.S. at 18. For good reason: With a Black voting-age

population (BVAP) of 51.47%, Plaintiffs' Demonstration District A proves that it is feasible to draw a reasonably configured district with a Black majority. JA47. The district court also found that Plaintiffs met the second precondition—that those Black voters are "politically cohesive." *Id.* Indeed, Black voters in the relevant area support the same candidates by a ratio of *9-to-1 or greater.* JA273-274, JA280-281. Legislative Defendants' own expert noted the "high cohesion demonstrated by Black voters." JA674.

On *Gingles* Three, the evidence confirms the reality that "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017) (cleaned up). It is undisputed that, across 31 elections in 2020 and 2022, white voters in the relevant area opposed Black voters' candidates of choice at rates around *85 percent or higher.* JA280-281. In the key region at issue, there is not a single election where white bloc voting was lower than 82%, and in most elections it was far higher—as high as 92%. JA285-286 (tbl. A1, Northeast-1 region). In the 2020 and 2022 state Senate elections, 87.8% and 88.4% of white voters opposed Black preferred-candidates. JA285, 287. White voters regularly voted in the exact opposite

pattern of Black voters. JA280-281. Using results of the 27 statewide elections in 2020 and 2022 to predict the performance of Senate Districts 1 and 2, the Black-preferred candidate loses all 27 times. Op. 65 (dissent).

The key inquiry under *Gingles* Three is whether there is "racial bloc voting that, absent some remedy, would enable the majority usually to defeat the minority group's candidate of choice" in the challenged districts. *Covington*, 316 F.R.D. at 167 (citing *Gingles*, 478 U.S. at 51). If there is, the racial polarization is "legally significant." *Id.* at 170. It is hard to imagine racially polarized voting more significant than exists in this part of North Carolina.

## II. The Panel Majority's Opinion Rests on Multiple Legal Errors

Four errors by the panel majority warrant en banc rehearing now.

First, the majority's analysis of *Gingles* Three disregards the governing legal standard. To satisfy *Gingles* Three, Plaintiffs must show that white voters vote as a block "*usually* to defeat" Black voters' candidates of choice. *Gingles*, 478 U.S. at 50-51 (emphasis added); *Milligan*, 599 U.S. at 18. Here, it is undisputed that the Black-preferred candidate loses in Districts 1 and 2 based on the results of at least *30 of 31* elections from 2020 and 2022, including

*27 of 27* statewide elections.[1]  The General Assembly's own website similarly reports that Black-preferred candidates lose in Districts 1 and 2 based on the results of *23 of 23* statewide elections from 2016 to 2022, *see* NC Gen. Assembly, SL 2023-146 ("StatPack").[2]  It is hard to imagine clearer evidence that white bloc voting "usually" defeats Black voters' preferred candidates.

Despite paying lip service to the *Gingles* Three "usually defeats" standard, the majority erroneously affirmed the district court's conclusion that 30 of 31 elections is not "usually."  *See* Op. 27.  The majority's only rationale for this bizarre holding was that "endogenous" elections are "more probable" than "exogenous" elections in evaluating the performance of these

---

[1] To be clear, Plaintiffs' expert did not "assess" that the "black-preferred candidate would have won SD2 in 2022," and so Plaintiffs do not "stand by" such an assessment in this appeal.  Op. 27.  Plaintiffs' expert explained, in response to a question from the district court, that the Black-preferred candidate would have won SD2 using the results of the 2022 state Senate elections *only if* the counties in SD2 that have white majorities are omitted. *See generally* Plaintiffs' Opening Br. 33-34, Reply Br. 17-18.  Neither the Legislative Defendants, the district court, nor the panel majority have ever explained what they believe to be *wrong* about that analysis.

[2] The panel majority disregarded this judicially-noticeable evidence, *see* Op. 29 & n.9, on the ground that it wasn't clear error because the website wasn't cited below. *But see United States v. Gregory,* 871 F.2d 1239, 1245 (4th Cir. 1989) (relying on judicially-noticeable data "not suppl[ied] below" to find clear error).  But this is just the *same* data reported by Dr. Barreto; the General Assembly's own endorsement of it confirms it was error to ignore it.

districts. *Id.* But that is patently incorrect. The cases cited by the majority speak to the relative probative value of endogenous and exogenous elections in situations where there were relevant historical endogenous elections in the *actual districts at issue. E.g., Johnson v. Hamrick*, 196 F.3d 1216 (11th Cir. 1999) (holding that past at-large elections in the city of Gainesville were most probative in evaluating the same at-large districts). None of those cases suggests, and no expert in this case even argued, that endogenous elections are better for purposes of conducting a reconstituted election analysis that predicts how *new* districts would perform. To the contrary, Legislative Defendants' expert Dr. Alford has opined before that "exogenous races" are "the most relevant" in performing "reconstituted election analysis" in a new district with no or few prior elections. *Rodriguez v. Bexar Cnty.*, 385 F.3d 853, 860-61 & n.7 (5th Cir. 2004) (citing Dr. Alford's testimony).

In any event, Plaintiffs agree that historical endogenous elections are probative—and the only examples within the relevant boundaries were the Senate races in Districts 1 and 3 in 2022, which contain *every* county in what are now Districts 1 and 2. There, the Black-preferred candidate lost in District 3 even though its BVAP was 42.33% BVAP (compared to 30% in both new districts); and no Black-preferred candidate even ran in District 1. It is clear

error for the district court to have simply *ignored* that evidence of what actually happened in 2022—it is acknowledged nowhere in the opinion even though Plaintiffs repeatedly raised it below—while declaring that the 2022 Senate races suggest that Black-preferred candidates will win.

Even when engaged in "deferential" review, this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). If 85% or more of white voters vote as a bloc against the Black-preferred candidate, those candidates cannot win elections in a district with only 30% BVAP. Likewise, if the Black-preferred candidate lost by 5 points in a 42.44% BVAP district, that candidate is not likely to win in a 30% BVAP district. This is not a case where *Gingles* Three is a close call. The undisputed evidence proves beyond any doubt that Black-preferred candidates cannot win in these districts.

Second, the majority's endorsement of a so-called "district effectiveness analysis" warrants en banc review. The district court held that to establish "legally significant" racially polarized voting, plaintiffs "must" conduct a "'district effectiveness analysis,' which is 'a district-specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for ... voters of that minority

group to elect candidates of their choice.'" JA935 (quoting *Covington*, 316 F.R.D. at 168 n.46); *see also* JA936-938.

There is no such requirement. As *Covington* held, *Gingles* means what it says: "legally significant racially polarized voting … occurs when the majority group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Covington*, 316 F.R.D. at 170 (quoting *Gingles*, 478 U.S. at 51, 55-56) (cleaned up). If a plaintiff proves that white bloc voting will usually defeat the minority-preferred candidate, there is no further requirement to prove the precise BVAP percentage at which the *non-performing* district would *start* to perform for minority voters. *Covington* mentions the phrase "district effectiveness analysis" one time, simply to observe that the legislature's map-drawer "did not conduct any district effectiveness analysis prior to drawing the districts, … nor did he perform a racial polarization analysis." *Id.* at 168 (cleaned up). *Covington* also noted that mere "<u>statistically</u> significant" racially polarized voting is insufficient because that phrase could include evidence that 51% of Black voters and 49% of white voters prefer the same candidate. *Id.* at 170. That is not the situation here, where only about 15% of white voters prefer the candidate supported by over 90% of Black voters. No court has ever held that plaintiffs must conduct a

"district effectiveness analysis" to prove a § 2 violation; *Gingles* itself found a § 2 violation even though there was no "district effectiveness analysis" as the district court here used that term; and there was no such analysis in the record before the Supreme Court in *Milligan*. *See Caster v. Merrill*, 2022 WL 264819, at *68-70 (N.D. Ala. Jan. 24, 2022).

The panel majority called the district court's requirement of a district effectiveness analysis an "inaccurate implication," but held that it "is not a basis for reversing its denial of a preliminary injunction." Op. 33. According to the majority, "Plaintiffs have not shown that the court's case-specific assessment—that the absence of a district effectiveness analysis affected the persuasiveness of Barreto's opinions—was erroneous." *Id.* As the dissent explained, "[i]t is hard to reconcile these two statements" by the majority. *Id.* at 69. "The very reason the district court erroneously thought a district effectiveness analysis was necessary is because it did not understand what the third *Gingles* precondition required." *Id.* While disclaiming the "necessity" of a district effectiveness analysis, the majority held that a district court properly relied on its absence to discount evidence that actually satisfied the "usually defeats" test.

Worse, the majority's holding that the district court could properly consider the absence of a district effectiveness analysis reflects a fundamental misunderstanding of the third *Gingles* precondition that doomed Plaintiffs' claim. As the dissent explained, "the district court believed that showing racial bloc voting requires showing that Black voters can elect their candidates of choice *only when* BVAP exceeds 50%," and "[t]he way to show this is through a 'district effectiveness analysis.'" *Id.* at 68. This "misunderstanding of the legal standard led to an insurmountable roadblock for Appellants," *id.*, because Plaintiffs' expert opined that a 48% BVAP district would elect Black-preferred candidates, *id.* at 33.

"The district court's belief that the third *Gingles* precondition requires showing 'black voters' candidates of choice cannot win elections unless BVAP in the contested districts exceeds 50% plus one vote' rested on a misunderstanding of *Bartlett v. Strickland*. 556 U.S. 1 (2009)." Op. 67 (dissent). As the dissent explained, *Strickland* dealt with the first *Gingles* precondition, not the third, and it does not remotely support a view that, to establish a § 2 violation, plaintiffs must prove that Black voters could only elect their candidates of choice when BVAP exceeds 50%. To the contrary, *Cooper v. Harris*, 581 U.S. 285 (2017), describes this same proposition—that "§ 2 …

cannot be satisfied by crossover districts"—as "at war with our § 2 jurisprudence." *Id.* at 305-06. If § 2 can be satisfied by crossover districts (in an area where it is possible to draw a majority-minority district), it cannot be the case that § 2 liability requires proof that only a 50%+ BVAP-district will perform.

As the dissent explained, this error by the district court—which the majority invites the district court to repeat—was dispositive. "Because of the district court's legal error—a per se rule that plaintiffs cannot show legally significant racial bloc voting, and thus cannot meet the third *Gingles* precondition, without a district effectiveness analysis—Appellants' case was doomed from the start, regardless of the quantity, strength, and probativeness of their other evidence." Op. 69.

In sum, the district court imposed an unprecedented requirement that does not exist and that flouts controlling Supreme Court caselaw. Saying that a district effectiveness analysis is not necessarily a per se requirement in every case does not solve the problem when the majority held that such an analysis *may be required in this case* and that the absence of such an analysis is a proper basis for denying relief.

Third, the majority erred in holding that racially polarized voting alone—no matter how extreme—can never establish legal significance. Op. 29. *Gingles* itself acknowledged that "[b]loc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice." 478 U.S. at 68. And *Covington v. North Carolina* supports the view that "especially severe" racially polarized voting—such as the 88.4% of White voters in the 2022 Senate elections who vote against Black-preferred candidates in the relevant Northeast-1 region, JA285—can itself satisfy *Gingles* Three. 316 F.R.D. 117, 167 (M.D.N.C. 2016).

The majority flatly misread *Covington* to stand for the opposite proposition. When *Covington* explained that "a general finding regarding the existence of racially polarized voting, *no matter the level*, is not enough" to establish a § 2 violation, it was referring to racially polarized voting at very *low* levels, such as 51% of Black voters supporting the same candidates and 51% of white voters opposing those candidates. Op. 29 (quoting *Covington*, 316 F.R.D. at 167 (emphasis by panel majority)). In other words, plaintiffs can't just show *some* level of racially polarized voting and establish § 2 liability. The preceding sentence in *Covington* expressly states, "[t]o be sure," that "evidence of 'especially severe' racially polarized voters, in which there are few

majority-group crossover voters for the minority group's preferred candidate, can help support finding the existence of *Gingles*' third factor." 316 F.R.D. at 167. As support, *Covington* explained that in the *LULAC* case, *Gingles* Three was found to be satisfied, "in part, because the evidence indicated that racially polarized voting was 'especially severe,' with 92% of Latinos voting against a candidate and 88% of non-Latinos voting for him." *Id.* Those numbers are strikingly similar to the extreme racial polarization here.

Indeed, it is undisputed that racially polarized voting is extreme here. Legislative Defendants' expert replicated Plaintiffs' RPV analysis and got "substantively similar" results, JA678—and Plaintiffs specifically argued to the district court that that extreme racially polarized voting alone sufficed to establish liability. The majority's inversion of *Covington* to justify the district court's erroneous failure to consider this evidence warrants en banc review.

Fourth, the majority "erred throughout its analysis" of the totality of the circumstances. Op. 81 (dissent). For starters, the majority ignored that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of the circumstances." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993), *aff'd*, 581 U.S.

285. The majority made no attempt to explain why this would be such an unusual case.

As the dissent explained, "the district court strayed from the four corners of [Supreme Court] jurisprudence throughout its totality analysis, planting additional obstacles for Appellants to surmount along the way." Op. 81. It "failed to meaningfully contend with the role of history in contravention of *Gingles* and subsequent case law." *Id.* Its reasoning with respect to Senate factor two—accepted by the panel majority—"threatens the viability of any Section 2 claim because it permits courts to dismiss every Section 2 case in which voting patterns could be explained on partisan grounds." *Id.* at 82-83. "It concluded that Senate factor three mandates a present-tense inquiry when no precedent supports that requirement." *Id.* at 82. "It mandated never-before-required statistical proof of causation between discrimination and socioeconomic disparities on Senate factor five and overlooked areas in Appellants' expert report where a connection is drawn between discrimination and disparate outcomes." *Id.* at 81-82. "And in its evaluation of the seventh factor, it erroneously assumed that the presence of minority office holders in other parts of the state is nearly dispositive of the ability of minority candidates in the challenged area to succeed." *Id.* at 82.

These legal errors, if allowed to stand, will infect the district court's analysis of the totality of the circumstances on remand.

## CONCLUSION

For the foregoing reasons, rehearing en banc should be granted to ensure that relief is available for the 2026 elections.

Dated: April 11, 2024

Respectfully submitted,

*/s/ R. Stanton Jones*

Edwin M. Speas, Jr.
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
(919) 783-6400
espeas@poynerspruill.com

R. Stanton Jones
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-6000
stanton.jones@arnoldporter.com

*Counsel for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is set in 14-point Century Expanded BT font.

Dated: April 11, 2024

*/s/ R. Stanton Jones*
R. Stanton Jones
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
(202) 942-6000
stanton.jones@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2024, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ R. Stanton Jones*
R. Stanton Jones